No. 21-35220

# In the United States Court of Appeals for The Ninth Circuit

HEREDITARY CHIEF WILBUR SLOCKISH; CAROL LOGAN;
CASCADE GEOGRAPHIC SOCIETY; MOUNT HOOD
SACRED LANDS PRESERVATION ALLIANCE,
*Plaintiffs-Appellants*,

v.

UNITED STATES FEDERAL HIGHWAY ADMINISTRATION, ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Oregon
No. 3:08-cv-1169
Hon. Marco A. Hernández

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

KEITH A. TALBOT
PATTERSON BUCHANAN FOBES
  & LEITCH, INC., P.S.
1050 SW 6th Ave. # 1100
Portland, OR 97204
(503) 200-5400

JAMES J. NICITA
302 Bluff St.
Oregon City, OR 97045
(503) 799-0725

LUKE W. GOODRICH
DIANA M. VERM
JOSEPH C. DAVIS
DANIEL L. CHEN
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs state that no nongovernmental corporation is a party to this appeal.

Dated: May 3, 2021

/s/ *Luke W. Goodrich*

LUKE W. GOODRICH
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES......................................................iv

GLOSSARY...............................................................xii

INTRODUCTION ...........................................................1

JURISDICTIONAL STATEMENT .............................................5

STATEMENT OF ISSUES.................................................6

STATEMENT OF THE CASE ...............................................7

    A. Plaintiffs' Tribes ............................................7

    B. Plaintiffs' Religious Beliefs and the Sacred Site..............................8

    C. Plaintiffs' Use of the Sacred Site .................................12

    D. Protection of the Sacred Site.......................................13

    E. Destruction of the Sacred Site ...................................17

    F. Proceedings Below ...........................................27

STANDARD OF REVIEW....................................................29

SUMMARY OF ARGUMENT .............................................29

ARGUMENT...........................................................32

    I. The Government violated RFRA. ...................................32

        A. The destruction of Plaintiffs' sacred site imposes a substantial burden on Plaintiffs' religious exercise.................33

        B. The Government cannot satisfy strict scrutiny.........................42

    II. The Government violated the Free Exercise Clause. ...................44

III. The Government violated NEPA. ................................................. 46

    A. Failure to perform NEPA analysis ........................................... 46

    B. Failure to prepare EIS............................................................. 47

    C. Failure to consider reasonable alternatives ............................. 49

IV. The Government violated NHPA. ................................................ 50

    A. Failure to perform any Section 106 process ............................ 50

    B. Failure to perform tribal consultation .................................... 51

    C. Untimely consultation ............................................................. 53

    D. Plaintiffs have standing for their NHPA claims. ..................... 54

V. The Government violated FLPMA. ............................................... 55

    A. Destruction of sacred site. ....................................................... 56

    B. Grant of tree-cutting permit. ................................................... 57

VI. The Government violated DTA. .................................................. 59

VII. Plaintiffs' NEPA, NHPA, FLPMA, and DTA claims
were not waived. ........................................................................ 61

    A. The Government waived waiver. ............................................... 61

    B. The waiver defense fails. .......................................................... 62

CONCLUSION ................................................................................ 69

STATEMENT OF RELATED CASES ..................................................... 71

CERTIFICATE OF COMPLIANCE ....................................................... 72

CERTIFICATE OF SERVICE ................................................................ 73

ADDENDUM ................................................................................... 74

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Survival v. Surface Transp. Bd.*,
  705 F.3d 1073 (9th Cir. 2013) ............................................................... 63

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) .............................................................. 49

*Anglers of the Au Sable v. USFS*,
  565 F. Supp. 2d 812 (E.D. Mich. 2008) ............................................... 47

*Apache Stronghold v. United States*,
  No. 21-15295 (9th Cir. Mar. 5, 2021) ................................................... 35

*Arizona v. California*,
  530 U.S. 392 (2000) ............................................................................... 62

*Bair v. Cal. State Dep't of Transp.*,
  No. 17-6419, 2019 WL 2644074 (N.D. Cal. June 27, 2019) ................ 48

*Bair v. Cal. State Dep't of Transp.*,
  982 F.3d 569 (9th Cir. 2020) ................................................................ 48

*Barnes v. DOT*,
  655 F.3d 1124 (9th Cir. 2011) ......................................................... 64, 68

*Bob Marshall All. v. Hodel*,
  852 F.2d 1223 (9th Cir. 1988) .............................................................. 46

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ......................................................................... 32, 43

*Cal. Parents for the Equalization of Educ.
  Materials v. Torlakson*,
  973 F.3d 1010 (9th Cir. 2020) .............................................................. 45

iv

*Carr v. Saul,*
141 S. Ct. 1352 (2021) ................................................................ 62, 68

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ........................................................ 30, 43, 44

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ................................................................ 35, 42

*Comanche Nation v. United States,*
No.CIV-08-849-D, 2008 WL 4426621
(W.D. Okla. Sept. 23, 2008) .............................................................. 36

*Comcast of Sacramento I, LLC v. Sacramento Metro. Cable
Television Comm'n,*
923 F.3d 1163 (9th Cir. 2019) ......................................................... 29

*Delaware Riverkeeper Network v. U.S. Army Corps of Eng'rs,*
869 F.3d 148 (3d Cir. 2017) ............................................................. 68

*Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020) ......................................................................... 45

*Dugong v. Rumsfeld,*
No. C 03-4350 MHP, 2005 WL 522106
(N.D. Cal. Mar. 2, 2005) ................................................................ 51

*Fazaga v. FBI,*
965 F.3d 1015 (9th Cir. 2020) ......................................................... 45

*Fraternal Ord. of Police v. City of Newark,*
170 F.3d 359 (3d Cir. 1999) ............................................................. 45

*Friends of the Clearwater v. Dombeck,*
222 F.3d 552 (9th Cir. 2000) ...................................................... 65, 68

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418, (2006) ................................................................ 33, 42

v

*Greene v. Solano Cnty. Jail,*
　　513 F.3d 982 (9th Cir. 2008)..................................................33, 35, 40

*Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter,*
　　456 F.3d 978 (9th Cir. 2006)..................................................33

*Haight v. Thompson,*
　　763 F.3d 554 (6th Cir. 2014)..................................................34

*Herrera v. Wyoming,*
　　139 S. Ct. 1686 (2019).........................................................54

*Holt v. Hobbs,*
　　574 U.S. 352 (2015)...........................................34, 36, 42, 44

*Idaho Conservation League v. Bonneville Power Admin.,*
　　826 F.3d 1173 (9th Cir. 2016)................................................46

*Tlio'ulaokalani Coal. v. Rumsfeld,*
　　464 F.3d 1083 (9th Cir. 2006)..........................................62, 64, 67, 68

*Int'l Church of Foursquare Gospel v. City of San Leandro,*
　　673 F.3d 1059 (9th Cir. 2011)................................................35

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory*
　　*Comm. v. DOI,*
　　642 F. App'x 690 (9th Cir. 2016) ...........................................55

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory*
　　*Comm. v. DOI,*
　　No. 11-cv-00395, 2012 WL 2884992
　　(C.D. Cal. July 13, 2012).......................................................39

*Lands Council v. McNair,*
　　629 F.3d 1070 (9th Cir. 2010)................................................64

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
　　485 U.S. 439, 454 (1988)................................................36, 37, 38, 41

*McGirt v. Oklahoma,*
140 S. Ct. 2452 (2020) ........................................................................ 54

*Mockaitis v. Harcleroad,*
104 F.3d 1522 (9th Cir. 1997) ............................................................ 35

*Mont. Wilderness Ass'n v. Fry,*
310 F. Supp. 2d 1127 (D. Mont. 2004) ............................................... 51

*Muckleshoot Indian Tribe v. USFS,*
177 F.3d 800 (9th Cir. 1999) .............................................................. 50

*N. Idaho Cmty. Action Network v. DOT,*
545 F.3d 1147 (9th Cir. 2008) ............................................................ 60

*Nance v. Miser,*
700 F. App'x 629 (9th Cir. 2017) ................................................. 35, 36

*Nat'l Parks Conservation Ass'n v. Semonite,*
916 F.3d 1075 (D.C. Cir. 2019) .......................................................... 47

*Navajo Nation v. USFS,*
535 F.3d 1058 (2008) ............................................... 36-37, 39, 41

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) .............................................................................. 55

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
402 F.3d 846 (9th Cir. 2005) .............................................................. 47

*Oklevueha Native Am. Church of Haw., Inc. v. Lynch,*
828 F.3d 1012 (9th Cir. 2016) ............................................................ 42

*ONRCF v. Brong,*
492 F.3d 1120 (9th Cir. 2007) ...................................................... 58, 59

*Organized Vill. of Kake v. USDA,*
795 F.3d 956 (9th Cir. 2015) .............................................................. 49

vii

*Pit River Tribe v. USFS*,
469 F.3d 768 (9th Cir. 2006)........................................................50, 53

*Ramsey v. Kantor*,
96 F.3d 434 (9th Cir. 1996)..........................................................46, 47

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .....................................................................30, 46

*S. Fork Band Council of W. Shoshone of Nev. v. DOI*,
588 F.3d 718 (9th Cir. 2009).............................................................56

*S. Fork Band v. DOI*,
643 F. Supp. 2d 1192 (D. Nev. 2009)................................................39

*Sac and Fox Nation of Mo. v. Norton*,
240 F.3d 1250 (10th Cir. 2001).........................................................51

*Salmon Spawning & Recovery All. v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008)...........................................................54

*Sherbert v. Verner*,
374 U.S. 398 (1963) ................................................................33-34, 43

*Sims v. Apfel*,
530 U.S. 103 (2000) ...........................................................................63

*Snoqualmie Indian Tribe v. FERC*,
545 F.3d 1207 (9th Cir. 2008)...........................................................38

*SPARC v. Slater*,
352 F.3d 545 (2d Cir. 2003) ..............................................................60

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
No. 16-1534, 2017 WL 908538 (D.D.C. March 15, 2017) ..................39

*Stop H-3 Ass'n v. Coleman*,
533 F.2d 434 (9th Cir. 1976)........................................................60, 61

*Stop H-3 Ass'n v. Dole,*
    740 F.2d 1442 (9th Cir. 1984) ............................................................ 61

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ........................................................ 30, 44, 45

*Tanzin v. Tanvir,*
    141 S. Ct. 486 (2020) ......................................................................... 34

*Te-Moak Tribe of W. Shoshone Indians of Nev. v. DOI,*
    565 F. App'x 665 (9th Cir. 2014) ............................................ 31, 55, 56

*Te-Moak Tribe of W. Shoshone of Nev. v. DOI,*
    608 F.3d 592 (9th Cir. 2010) ........................................................ 50, 55

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
    309 F.3d 144 (3d Cir. 2002) ................................................................ 45

*Thai Meditation Ass'n of Ala. v. City of Mobile,*
    980 F.3d 821 (11th Cir. 2020) ............................................................ 33

*Thompson v. DOL,*
    885 F.2d 551 (9th Cir. 1989) ........................................................ 62, 66

*U.S. Telecom Ass'n v. FCC,*
    359 F.3d 554 (D.C. Cir. 2004) ....................................................... 51, 52

*United States v. Antoine,*
    318 F.3d 919 (9th Cir. 2003) .............................................................. 34

*United States v. Hardman,*
    297 F.3d 1116 (10th Cir. 2002) .......................................................... 43

*W. Watersheds Project v. Abbey,*
    719 F.3d 1035 (9th Cir. 2013) ....................................................... 46, 50

*Warsoldier v. Woodford,*
    418 F.3d 989 (9th Cir. 2005) ........................................................ 33, 35

ix

*Wishtoyo Found. v. USFWS,*
   No. CV 19-03322-CJC(ASx), 2019 WL 8226080
   (C.D. Cal. Dec. 18, 2019) .................................................................. 54, 55

*Yellowbear v. Lampert,*
   741 F.3d 48 (10th Cir. 2014) .............................................................. 34

**Statutes**

5 U.S.C. §551 .......................................................................................... 53

23 U.S.C. §139 ........................................................................................ 63

23 U.S.C. §325 ........................................................................................ 52

42 U.S.C. §2000 ...................................................................................... 32

42 U.S.C. §4322 ...................................................................................... 46

43 U.S.C. §1712 ...................................................................................... 55

43 U.S.C. §1732 ...................................................................................... 55

49 U.S.C. §303 ........................................................................... 32, 60, 61

54 U.S.C. §300320 .................................................................................. 51

54 U.S.C. §302304 .................................................................................. 52

54 U.S.C. §302706 ............................................................................ 50, 52

54 U.S.C. §306108 ............................................................................. 50-51

Oregon Resource Conservation Act of 1996,
   Pub. L. No. 104-208, 110 Stat. 3009-536, §401(g) (1996) ............. 14, 58

**Regulations**

23 C.F.R. §774 ........................................................................................ 60

36 C.F.R. §800...................................................................50, 52-53

43 C.F.R. §3809.5..........................................................................56

43 C.F.R. §5511.3..........................................................................46

61 Fed. Reg. 26,771 (May 24, 1996)...................................56, 57

73 Fed. Reg. 19,134 (Apr. 8, 2008)....................................21, 63

**Other Authorities**

BLM Manual Handbook H-8120-1, Guidelines for
    Conducting Tribal Consultation (Dec. 3, 2004) .................53

Fed. R. Civ. P. 8 ..........................................................................61

Fed. R. Civ. P. 56 ........................................................................29

Stephanie Barclay & Michalyn Steele,
    *Rethinking Protections for Indigenous Sacred Sites*,
    134 Harv. L. Rev. 1294 (2021) ...........................................40

Rex Buck, Jr. & Wilson Wewa, *"We Are Created from this
    Land" Washat Leaders Reflect on Place-Based Spiritual
    Beliefs*, 115 Or. Hist. Q. 298 (2014) .....................................8

Michael McKenzie, *Washat Religion (Drummer-Dreamer
    Faith), in* Encyclopedia of Religion and Nature 1712
    (Bron Taylor, ed., 2006) ........................................................8

Robert Charles Ward, *The Spirits Will Leave: Preventing the
    Desecration and Destruction of Native American Sites on
    Federal Land*, 19 Ecology L.Q. 795 (1992)...........................8

# GLOSSARY

| | |
|---|---|
| **BLM** | Bureau of Land Management |
| **C-FASH** | Citizens for a Suitable Highway |
| **CGS** | Cascade Geographic Society |
| **DTA** | Department of Transportation Act |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **FEIS** | Final Environmental Impact Statement |
| **FHWA** | Federal Highway Administration |
| **FLPMA** | Federal Land Policy and Management Act |
| **FONSI** | Finding of No Significant Impact |
| **MHSLPA** | Mount Hood Sacred Lands Preservation Alliance |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **ODOT** | Oregon Department of Transportation |
| **ONRCF** | Oregon Natural Resources Council Fund |
| **ORCA** | Oregon Resource Conservation Act |
| **REA** | Revised Environmental Assessment |
| **RFRA** | Religious Freedom Restoration Act |
| **SDMP** | Salem District Resource Management Plan |

# INTRODUCTION

Our nation has a tragic history of callously destroying Native American sacred sites. The question in this case is whether federal law allows that history to repeat itself today.

Plaintiffs are members of federally-recognized tribes who long practiced their faith at a small sacred site called *Ana Kwna Nchi Nchi Patat,* or the "Place of Big Big Trees." The site measured approximately 100 by 30 meters—less than one acre—and consisted of a dense stand of old-growth trees encircling a historic campground, burial ground, and centuries-old stone altar. The site has been used by indigenous peoples since time immemorial, and by Plaintiffs personally since the 1940s for core religious ceremonies that cannot take place anywhere else.

In the 1980s, when the Government proposed widening a nearby highway, one of Plaintiffs' leaders informed the Government of the site's historic and religious significance, including the graves and stone altar. In response, the Government modified its project to protect the site. But in 2008, the Government widened the highway again to add a center turn lane. This time, it protected a nearby wetlands, but completely destroyed the sacred site—cutting down the old-growth trees, bulldozing the burial ground and stone altar, and covering the area under a massive earthen berm. It did this even though there were several feasible ways to add the turn lane without harming the sacred site.

1

This needless destruction of an ancient sacred site violated six federal laws. First, it violated the Religious Freedom Restoration Act ("RFRA"), which prohibits the Government from imposing a "substantial burden" on religious exercise unless it satisfies strict scrutiny. Here, the sacred site's destruction obviously imposes a "substantial burden" on Plaintiffs' religious practices because it makes those practices impossible. And given the many ways the Government could have added a turn lane without harming the sacred site, the Government hasn't even attempted to satisfy strict scrutiny.

Second, the Government violated the Free Exercise Clause of the First Amendment by carving out secular—but not religious—exemptions from the negative consequences of its actions. Specifically, while the Government altered the project to accommodate nearby wetlands, it refused to make the same accommodation for Plaintiffs' sacred site.

Third, the Government violated the National Environmental Policy Act ("NEPA") by failing to take a "hard look" at the environmental consequences of its actions. The project could not have taken place unless Defendant Bureau of Land Management ("BLM"), which managed the A.J. Dwyer Scenic Area ("Dwyer") of which the sacred site was part, granted a tree-removal permit and right-of-way authorizing construction. Yet the Government performed no NEPA analysis for these actions at all. Defendant Federal Highway Administration ("FHWA") performed only a

truncated NEPA analysis for the project as a whole, improperly concluding it would have no significant impact on Dwyer even though it would destroy almost all of Dwyer's large, old-growth trees—the very characteristics that had prompted the site's federal protection in the 1960s. FHWA also ignored several alternatives that would have minimized the project's impact on Dwyer—even though it used the same alternatives to minimize impacts on nearby wetlands.

Fourth, the Government violated the National Historic Preservation Act ("NHPA") by failing to consider the project's impact on Plaintiffs' sacred site. BLM performed no NHPA analysis for its actions. And FHWA, for its part, tried to delegate to a state agency its NHPA duty to consult with tribes—which is expressly forbidden by statute. And even assuming FHWA's delegation were allowed, consultation with the Yakama took place only after tree-removal had already occurred—long after the time required by statute.

Fifth, the Government violated the Federal Land Policy and Management Act ("FLPMA") by destroying the sacred site and performing extensive tree-cutting within Dwyer—both of which are prohibited by other provisions of federal law incorporated into FLPMA.

Sixth, the Government violated §4(f) of the Department of Transportation Act ("DTA"), which forbids FHWA from approving highway pro-

jects unless the project avoids or minimizes any impact on parks and recreation sites. Dwyer was officially designated as part of the Wildwood Recreation Site—an area all parties agree is protected by §4(f). Yet FHWA performed no §4(f) evaluation at all and made no effort to minimize the impact on Dwyer.

In short, despite a host of federal laws designed to protect Plaintiffs' sacred site, Defendants ignored them, knowingly destroying centuries of Native American history, religion, and culture. More promises made and broken.

The saddest thing about this case is that the destruction of Plaintiffs' sacred site never had to happen. Defendants had numerous alternatives for adding a turn lane without harming Plaintiffs' sacred site. But they ignored Plaintiffs' pleas for protection and chose the *most* destructive alternative—with officials admitting in internal correspondence that they didn't think they needed to "blindly follow[] the rule book" given the low "likelihood of someone figuring out." 7-ER-1379. The result was the destruction of a scenic area protected by Congress and the Government for over forty years, and the destruction of a sacred site used by Native American for centuries—a site that "never had walls, never had a roof, and never had a floor," but for Plaintiffs was "just as sacred as a white person's church." Justice demands more.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter under 28 U.S.C. §§1331 and 1343. This Court has jurisdiction under 28 U.S.C. §1291 because this is an appeal from a final judgment issued March 19, 2021. The notice of appeal was timely filed on March 22, 2021.

## STATEMENT OF ISSUES

1. Whether the government imposes a "substantial burden" on Native American religious exercise when it authorizes the destruction of their sacred site, rendering core Native American religious practices physically impossible.

2. Whether the government faces heightened scrutiny under the Free Exercise Clause when it adopts measures to protect secular interests during a highway project but refuses to adopt the same measures to protect religious interests.

3. Whether the government violates NEPA when it performs no NEPA analysis at all for the issuance of federal permits, issues only an EA instead of an EIS for actions significantly degrading the environment, and fails in its EA to consider reasonable alternatives.

4. Whether the government violates NHPA when it fails to perform any Section 106 process, fails to perform tribal consultation, and tries to delegate a belated consultation process to a state agency.

5. Whether the government violates FLPMA when it needlessly destroys a Native American sacred site and authorizes tree cutting where cutting is prohibited by statute and regulation.

6. Whether the government violates the DTA when it fails to prepare a §4(f) evaluation for a project that destroys a public recreation area.

## STATEMENT OF THE CASE

### A. Plaintiffs' Tribes

Plaintiffs are Wilbur Slockish, Johnny Jackson, Carol Logan, the Cascade Geographic Society ("CGS"), and the Mount Hood Sacred Lands Preservation Alliance ("MHSLPA").[1]

Slockish and Jackson are enrolled members of the Confederated Tribes and Bands of the Yakama Nation. 5-ER-912, 5-ER-939. The Yakama lived along the Columbia River since before recorded history but were forced to sign a treaty in 1855 ceding 12 million acres to the Government and move to a reservation. 1-ER-185-91. The last Chief to sign the treaty, Chief Sla-kish, did so under protest, and is a direct ancestor of Slockish and Jackson. 5-ER-912; 5-ER-939.

Logan is an enrolled member of the Confederated Tribes of Grand Ronde. 5-ER-927. The Grand Ronde lived in western Oregon, southern Washington, and northern California, but were forced onto a reservation in 1856 so the Government could "free [their] land for…pioneer settlement." 2-ER-193. Part of the land taken from Plaintiffs' tribes is at issue in this case. 5-ER-882; 5-ER-871.

The individual Plaintiffs are also members of CGS and MHSLPA, organizations dedicated to preserving the cultural and religious resources of the Cascade Mountains. 5-ER-912; 5-ER-929; 5-ER-939; 3-ER-325,

---

[1] Jackson passed away in 2020 at age 89, twelve years after filing this suit. Slockish is 76. Logan is 77.

329-30.

## B. Plaintiffs' Religious Beliefs and the Sacred Site

As Hereditary Chiefs (Slockish and Jackson) and Elder (Logan), Plaintiffs are responsible for maintaining their tribes' traditions. 5-ER-913-15; 5-ER-940-41; 5-ER-928. Slockish and Jackson practice *Washat*—the traditional religion of the Yakama, also known as the "Drummer-Dreamer faith" or the "Religion of the Seven Drums." 5-ER-915; 5-ER-940; *see also* 2-ER-207 (Michael McKenzie, *Washat Religion (Drummer-Dreamer Faith)*, *in* Encyclopedia of Religion and Nature 1712, 1712 (Bron Taylor, ed., 2006)). Logan is a "Traditional Practitioner of the Clackamas Tribe" and spiritual leader for other Native Americans. 5-ER-871; 3-ER-502.

Plaintiffs worship and seek guidance from a Creator, 5-ER-915, 917-18; 5-ER-929; 5-ER-941-44; *see also* McKenzie at 1713, who "keep[s] all Life in continuance" through a delicate balance. 5-ER-928; 3-ER-466; *see also* 2-ER-222-24 (Rex Buck, Jr. & Wilson Wewa, *"We Are Created from this Land" Washat Leaders Reflect on Place-Based Spiritual Beliefs*, 115 Or. Hist. Q. 298, 309-11 (2014)). Although *Washat* and other Native American religions "revere the natural world in its entirety," certain sacred sites are "accorded special reverence." 2-ER-254-55 (Robert Charles Ward, *The Spirits Will Leave: Preventing the Desecration and Destruction of Native American Sites on Federal Land*, 19 Ecology L.Q. 795, 800-01 (1992)); *see also* 3-ER-459; Buck at 303. The visiting of these sacred sites

"play[s] an important role in [Plaintiffs'] religious practice." 3-ER-489; *see also* 4-ER-678; 5-ER-916.

The site at issue here is traditionally known to Plaintiffs' tribes as *Ana Kwna Nchi Nchi Patat* (the "Place of Big Big Trees"). 5-ER-884; 5-ER-872; 5-ER-893. The site was located within a small portion of the A.J. Dwyer Scenic Area, which is a roughly 5-acre parcel of land north of U.S. Highway 26 within the Wildwood Recreation Site. The site measured approximately 100 by 30 meters, or 0.74 acres. 5-ER-962-63.

The site lay along a trading route used by Native Americans for centuries—which later became part of the Oregon Trail, and is now followed by U.S. 26. 5-ER-943; 4-ER-715; *see also* ECF 122 at 4 & n.3. The site was held sacred because of its traditional use as a campsite for native peoples traveling to trade at Celilo Falls or to pick camas, a traditional food, in the Willamette Valley, 5-ER-943-44; 4-ER-711; 5-ER-917, 919, 36; 5-ER-929, and as a burial ground for those who died along the way. 4-ER-584; 3-ER-460; 5-ER-919; 5-ER-943-44.

A map taken from the highway planning documents (6-ER-1215), with the key area circled in red, appears below:



The sacred site contained several features. First were the "historic campground and burial grounds." 5-ER-934; *see also* 4-ER-711; 5-ER-914. The historic campground was marked by a small clearing just north of U.S. 26, which could be accessed through a gap in the guardrail. 3-ER-345. The clearing is depicted on the map as a yellow bulge. The burial grounds were located next to the campground in the strip of trees between the campground and U.S. 26. 5-ER-876; 5-ER-887; 5-ER-896.

Second, the site contained an ancient stone altar. *See* 3-ER-484-85,

488; 5-ER-887; 5-ER-895.[2] The altar was located between the campground and the highway and was roughly 6 feet long, 3-4 feet wide, and 1.5 feet high. 11-ER-2295, 2299; 5-ER-887; 5-ER-825; 3-ER-494-95. It served both to "mark[] surrounding graves" and as a focal point for religious ceremonies. 5-ER-825; 3-ER-486; 4-ER-724-25; 5-ER-895; 5-ER-887. The altar is shown below during a 1986 BLM archaeological excavation, which concluded that the altar "may be at least several hundred years (and possibly much more) old" (11-ER-2295; 6-ER-1158; 5-ER-969; 5-ER-1022):



---

[2] The altar is sometimes called a "stone monument," "rock cluster," or "rock cairn." 5-ER-926; 5-ER-825; 4-ER-724-25.

Third, the site featured valuable, old-growth Douglas fir trees. 4-ER-663. These trees were directly incorporated into religious ceremonies and provided the separation from the outside world necessary for Plaintiffs' religious practices. 3-ER-469; 5-ER-922-23.

Finally, the site had "powerful medicine" plants used in a particular type of healing ceremony. 3-ER-459, 532; *see also* 5-ER-919-20. Due to the climate, elevation, and spiritual power of the site, there is no other site where those plants can be gathered. 3-ER-533-34.

## C. Plaintiffs' Use of the Sacred Site

Indigenous peoples have used this site for religious purposes "since time immemorial." 5-ER-929. According to their religion, Plaintiffs were obligated to protect the site and engage in religious practices there, or else risk being "banished to" the "land of darkness" "forever." 4-ER-748; 3-ER-501. They protected and used the site for many years.

Logan learned about the site as "a young girl" in the late 1940s or early 1950s. 3-ER-550-51. As an adult, she continued visiting the site for "prayer and meditation," to gather sacred medicine plants, and to pay respects to her ancestors through memorial ceremonies. 5-ER-929; 3-ER-532. These ceremonies included a time of spiritual preparation (3-ER-501); commemoration of ancestors by prayer, meditation, and song (5-ER-929); and the burning of tobacco offerings in a small fire (3-ER-501).

These ceremonies gave Logan "higher knowledge" and connection with the "spirit that is there." 3-ER-465.

Jackson was taught about the site in his youth and returned there for religious practices for over forty years. 5-ER-916, 919-21; *see also* 4-ER-633-34; 5-ER-896-98. For Jackson, the site was "like a church"—one that "never had walls, never had a roof, and never had a floor," but "is still just as sacred as a white person's church." 5-ER-916.

Slockish, consistent with his *Washat* faith, has a religious obligation to visit sacred sites like this one. 5-ER-940-41. On his visits, Slockish engaged in "prayer, veneration of [his] ancestors, and giving of tobacco offerings." 5-ER-945. He began visiting thirty years ago and continued "at least twice a month or whenever [he] was driving through the Mount Hood Area" from his home. 5-ER-894.

In all, Logan used the site for her religious practices for 50 years, Jackson for 40, and Slockish for 15—until the Government destroyed it, making their religious practices "impossible." 5-ER-919, 923; 3-ER-550-52; 5-ER-934; 5-ER-945, 947; 5-ER-948; *see also* 5-ER-923; 5-ER-935.

### D. Protection of the Sacred Site

Dwyer—where the site is located—is owned by the Government and managed by BLM. Dwyer "is a corridor of large fir trees" donated in the 1930s by a logging company to allow "future generations to see and appreciate old-growth Douglas fir trees." 7-ER-1454; 9-ER-2060. In 1968,

the Government "withdr[ew]" and "reserved" Dwyer "for protection of public recreation values" as part of the Wildwood Recreation Site. 10-ER-2223; *see also* 7-ER-1426. In 1995, as part of the Salem District Resource Management Plan ("SDMP"), BLM designated Dwyer a "Special Area," "unique" for "scenic and botanical values," including its "large older trees." 6-ER-1331; *see also* 8-ER-1549-723. And in 1996, Congress designated the parts of Dwyer visible from the highway as "Mt. Hood Corridor Lands" protected for their "scenic qualities." Oregon Resource Conservation Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-536, §401(g) (1996) ("ORCA"); *see* 7-ER-1545-47.

Dwyer borders U.S. 26, which is used for recreational travel between Portland and tourism destinations like Mount Hood. 10-ER-2099, 2105. Over the decades, there have been several efforts to expand the highway—including the stretch bordering Dwyer—to facilitate travel during "holiday weekends and on ski weekends." 10-ER-2105.

In 1985, FHWA, BLM, and the Oregon Department of Transportation ("ODOT") issued a draft environmental impact statement ("EIS"), proposing to expand U.S. 26 to include a center turn lane, including in the portion bordering Dwyer. *See* 10-ER-2097-100. This proposal would have extended the pavement 15 feet north into Dwyer, 9-ER-1830, resulting in the removal of "most of [Dwyer's] large trees." 10-ER-2099.

This proposal prompted a large-scale campaign to save Dwyer. 9-ER-1826. Or as one official put it, "The community went nuts." 7-ER-1460. The campaign was led by Citizens for a Suitable Highway ("C-FASH"), an organization led by Michael Jones, who was also the head of Plaintiffs CGS and MHSLPA in this case.[3] 8-ER-1790. C-FASH submitted letters, testified at public hearings, gathered signatures on petitions, and talked extensively with agency officials. 9-ER-1922-28, 1933-38, 1940-41, 1949-64, 2000, 2084-85; 7-ER-1460; 8-ER-1790-93. C-FASH emphasized Dwyer's "historical and cultural significance," noting that the area is "sacred" to Native Americans, that there was a "gravesite" and stone altar. 8-ER-1791; 9-ER-1935.

BLM then issued a permit allowing archaeologists to study the stone altar. 11-ER-2294. Although the archaeologists found no human remains directly beneath the altar, they concluded that the altar "may be at least several hundred years (and possibly much more) old," and it was "not possible to determine with any confidence whether the feature is aboriginal or Euro-American." 11-ER-2295.

Responding to the public concerns, FHWA and ODOT in 1986 issued a final EIS ("FEIS"), changing the proposal to "to decrease the impact in the Dwyer [Area]." 9-ER-1826, 1848. They decided not to add a center

---

[3] Jones passed away in 2020 at age 68, twelve years after filing this suit.

turn lane through Dwyer and to use "guardrails and retaining walls" to "minimize the number of trees taken." 9-ER-1848-50, 1860-61.

To memorialize discussions surrounding the project, C-FASH and ODOT signed an "Agreement" in 1987. 8-ER-1759-819. The Agreement stated there were "sacred" resources and Native American gravesites in Dwyer, and ODOT "committed" itself to managing U.S. 26 "consistent with these statements." 8-ER-1791, 1760. Jones sent copies of this Agreement to BLM officials by 1990. 5-ER-867.

Jones and others continued to raise awareness of the site's religious significance throughout the 1990s. In one public meeting, a government official acknowledged that the stone altar was "the reason why we can't widen the highway." 3-ER-375. A few days later, the altar was vandalized. *Id.* Jones then informed BLM archaeologist Philipek, who memorialized the call in notes dated March 12, 1990. 5-ER-966-67. Jones told Philipek that Native Americans had been going to the Dwyer site "for years" because of Native American "graves" there. *Id.* He also told her about ceremonies performed at the site, including to reconsecrate the altar after its vandalism. *Id.* Jones's information came from Larry Dick, a "Medicine Person" of the Confederated Tribes of Warm Springs who, like "the Wascos and other tribes both in Oregon and Washington," used the Dwyer site and its "sacred altar" for his own religious practice. 2-ER-117, 134, 139, 155-64.

16

Jones and a Yakama leader named Willferd Yallup later participated in a meeting with government officials, at which Yallup "identified the [Dwyer site as] having burials." 3-ER-424; 6-ER-1073-121; 5-ER-830-31. Jones also told FHWA and BLM officials that Dwyer "was a traditional cultural property used by Native Americans" and that "there were Native American cultural and religious sites, including burials, at…Dwyer." 3-ER-370-72 (FHWA); 3-ER-376-77 (BLM); *see also* 3-ER-372-75 (FHWA present), 3-ER-380 (Jones "told everyone who [he] came in contact with [from] BLM" at the site "that there were Native American cultural and religious sites" there). By March 2008, Jones's persistent efforts to raise awareness about Dwyer were reflected in handwritten notes of a federal official: "Michael Jones—A nightmare. Since 1979[.]" 5-ER-1023.

### E. Destruction of the Sacred Site

Despite these efforts, in the late 1990s, the Government and ODOT again discussed adding a center turn lane within Dwyer. 7-ER-1472-514. Although the Government claims it was to address safety, ECF 340 at 1, the stretch of U.S. 26 bordering Dwyer was statistically safer than "similar rural principal arterials" in Oregon, with 24% fewer accidents than comparable roads. 6-ER-1211.

In a 2000 scoping packet, officials recognized that widening U.S. 26 to the north "would require…extensive filling" and "removal of many large

diameter trees"—the same trees the agencies had "expended considerable effort to protect" in the 1980s. 7-ER-1475; *see also* 7-ER-1458. And as discussions resumed in 2004, officials reiterated this "may again spark public controversy over the preservation of large trees" and "historic resources" within Dwyer. 7-ER-1452-57.

Nevertheless, FHWA and ODOT moved forward, issuing an Environmental Assessment ("EA") and Revised Environmental Assessment ("REA") and Finding of No Significant Impact ("FONSI"), in 2006 and 2007 respectively. In the EA, the Government identified various alternatives for "improv[ing] safety" on U.S. 26 without impacting Dwyer. 6-ER-1217. For instance, a center turn lane could be added by widening the road to the south, leaving the north side of the highway—including Dwyer and the sacred site—unaffected. 6-ER-1220. Likewise, the road could be expanded "equal[ly]…to the north and south," minimizing the impact to either side alone. 6-ER-1221. Or the speed limit could be lowered, resulting in no impact on the site at all.

The option most destructive to Dwyer would be to widen the road to the north only. But within that option, the Government still recognized ways to reduce the impact. For instance, rather than using a longer 3:1 slope on the north side of the highway—one that ran three feet for every foot of rise—the Government could use a steeper 1.5:1 slope or a retaining wall. *See* 7-ER-1396-97; *see also* 7-ER-1404-06. These options would have

reduced the project's footprint in Dwyer by 39% or 61%, respectively. *See* 7-ER-1398-1403.

The following demonstratives (not to scale) illustrate these alternatives (ECF 292 at 16-17):



19



Despite these options, the Government chose the "Widen to the North" alternative, using a 3:1 slope—the option most destructive of the sacred site. 6-ER-1265-66; 6-ER-1178. This alternative would add 14 feet of paving on the north side of U.S. 26, requiring a 25–50-foot-wide strip of land in Dwyer to be "cleared of trees and vegetation," "includ[ing] most of the larger trees." 6-ER-1331.



ECF 292 at 17.

20

At the same time, the Government proposed to "steepen the slopes…and/or install guardrail" for another stretch of the widening, in order to "avoid" "impact[ing] a…wetland" also "located on the north side of the highway." 6-ER-1175-76.

Following the REA, BLM took the necessary steps to authorize construction: On February 28, 2008, it issued a tree-removal permit for cutting Dwyer's old-growth trees, 5-ER-1037; and on April 2, it granted a right of way authorizing construction within Dwyer. 5-ER-1025-34; 5-ER-1009-12. Following the permit and right of way, on April 8, FHWA published a notice in the Federal Register, stating that "[c]omments or questions concerning this proposed action and the FONSI should be directed to the FHWA." 73 Fed. Reg. 19,134, 19,134-35 (Apr. 8, 2008).

Meanwhile, Plaintiffs continued speaking out about their site—before issuance of the tree-removal permit or right of way, before the Federal Register notice, and before any tree-cutting or construction began. And they did so despite their well-founded fear that publicly disclosing their practices could lead to the same sort of vandalism that had occurred in the 1990s. 5-ER-929; 3-ER-474; 4-ER-669-70; 3-ER-330; *see also* 10-ER-2236 (FHWA guidelines recognizing that "[m]any tribes[']…beliefs require that the location and even the existence of traditional religious and cultural properties not be divulged").

21

In January 2008, Logan called FHWA and spoke about the religious use of the site. 5-ER-996. On February 14 and 15, Logan sent FHWA multiple memoranda discussing the "American Indian cultural and religious sites" in Dwyer, and expressing belief that "an additional lane c[ould] be added in the Wildwood to Wemme area without destroying heritage resources." 6-ER-1147-56; *see also* 6-ER-1067-69. In a February 15 memorandum, Logan and Jones gave the Government a copy of (*inter alia*) the 1987 Agreement, a transcript of the 1991 meeting with Wilferd Yallup, and a 1991 letter from a Yakama leader regarding use of the area—highlighting the burials, the altar, and the religious significance of the site. 6-ER-1070-1146. March 2008 notes from a federal official reflect communications from Slockish, Jackson, and Logan about the site, including that "these are [Native] sites" that have "graves," and that Plaintiffs were "not consulted about the project." 5-ER-1022-23.

After tree removal began—but before construction—Jackson, Logan, and Slockish sent additional memoranda in April and May, each of which detailed the Dwyer site's history and importance to Native American religious exercise. 5-ER-981-1007. In May, an FHWA official, alerted by Plaintiffs' attorney to "Indian remains on the site," informed Philipek. 5-ER-1022. Philipek said she had "addressed the issue with" Plaintiffs "in 1986" and decided it was not worth protecting. *Id.* Philipek returned to the site on July 24, 2008, and documented that the "rock cluster" had

been scattered. 5-ER-969-73. She drafted a report about the visit, attaching the notes from her 1990 call with Jones highlighting the sacred nature of the site and its religious usage by Native Americans. 5-ER-964-67. All of Plaintiffs' outreach—in the 1980s, 1990s, and continuing through 2008—is included in the administrative record compiled for this project and submitted by Defendants in this case.

Construction began the week of July 28, 2008. ECF 122 at 7-8. The project destroyed all elements of the site used in Plaintiffs' religious exercise. Scores of trees were cut down and used to rehabilitate a fish habitat. 6-ER-1331; 7-ER-1377. During tree removal, around twelve "stone monuments" marking the "surrounding graves" of Plaintiffs' ancestors were uncovered from where they "had become camouflaged by the trees and vegetation." 5-ER-876-877; *see also* 4-ER-587; 3-ER-469-70; 5-ER-887; 5-ER-896. These markers were "scraped up" and removed. 5-ER-887-88. The traditional campground and burial grounds were bulldozed and buried beneath a massive earthen berm. 5-ER-935. Before tree removal, the stone altar had "a red flag over it," so Plaintiffs hoped it would be protected. 3-ER-468; *see also* 5-ER-887; 5-ER-875. But the altar was "scattered and disturbed" during tree removal, 5-ER-969, and ultimately "disposed of." ECF 287 at 28. The native vegetation formerly covering the campground, including the sacred medicine plants, was replaced with

grass. 3-ER-349. And a new guardrail blocked off the former access to the site. 5-ER-923; 5-ER-947-48.

The following map, satellite images, and photographs depict the destruction of the site:[4]

### Construction Map (6-ER-1215)



---

[4] Interactive photos of the site before and after construction are available from Google (https://bit.ly/3380iM4) and 2-ER-173 (http://bit.ly/2usgvbo), respectively.

**Before Widening – 2005 (2-ER-181)**



**After Widening – 2016 (2-ER-179)**



**Before Widening – 2008 (2-ER-177)**



**After Widening – 2017 (2-ER-183)**



The destruction of the site has rendered Plaintiffs' religious practices impossible. 5-ER-948; 3-ER-496; 3-ER-531-32; 4-ER-674; 4-ER-675; 3-ER-353.

### F. Proceedings Below

Plaintiffs filed suit on October 6, 2008. ECF 1. In May 2009, the Government moved to dismiss for lack of standing, claiming that because it had already destroyed the sacred site, Plaintiffs' injury was no longer redressable. ECF 28-2 at 5-8, 10-12. The magistrate and district judges rejected that argument. ECF 52. In June 2011, Defendants moved for judgment on the pleadings, arguing that destruction of Plaintiffs' site did not impose a "substantial burden" on their religious exercise under RFRA. ECF 104 at 8-13. The magistrate and district judges rejected this argument, too, reasoning that Defendants imposed a substantial burden by destroying religious artifacts and eliminating access to the site. ECF 131 at 9-10. The case was then stayed for almost three years to facilitate settlement negotiations. ECF 208. After those negotiations failed, the case was reassigned to new magistrate and district judges. ECF 234, 301.

After discovery, the parties in May 2017 cross-moved for summary judgment on Plaintiffs' claims under RFRA. ECF 287, 292. The new magistrate judge rejected the prior judges' rulings and recommended granting Defendants' motion, reasoning that the total destruction of Plaintiffs'

sacred site did *not* constitute a "substantial burden" on Plaintiffs' religious exercise, even though it made Plaintiffs' religious practices physically impossible. 1-ER-95-108. The district court adopted the magistrate's recommendation and dismissed Plaintiffs' RFRA claims. 1-ER-89-92.

The parties then filed cross-motions for summary judgment on Plaintiffs' claims under (*inter alia*) NEPA, NHPA, FLPMA, DTA, and the Free Exercise Clause. After those motions had been pending for a year (and Michael Jones, the head of Plaintiffs CGS and MHSLPA, had died), the magistrate on April 1, 2020, issued findings and recommendations. 1-ER-6-88. The magistrate did not reach the merits of most of Plaintiffs' claims—stating that the merits were "tangled." 1-ER-49. Instead, it recommended dismissing Plaintiffs' claims on the threshold grounds of laches and waiver (1-ER-69-81)—even though the Government had never asserted these affirmative defenses in any of its four answers and did not raise them until a decade after litigation began. ECF 350 at 12.

Plaintiffs timely objected to the magistrate judge's recommendation. ECF 350. Ten months later—after Plaintiff Jackson had died (ECF 352) and Plaintiffs had filed an unopposed motion to expedite (ECF 353)—the district court issued a five-paragraph order adopting the magistrate's recommendations in part and granting summary judgment to Defendants. 1-ER-3-5. Although the district court rejected the magistrate's ruling on

laches, it found "no basis to modify the remainder of the Findings & Recommendation"—thus granting summary judgment to the Government on Plaintiffs' remaining claims, most of them on grounds of administrative waiver. 1-ER-4. The five-paragraph order included no additional substantive reasoning.

The district court entered judgment a month later, on March 19, 2021. 1-ER-2. Plaintiffs noticed this appeal the next business day. ECF 359.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's decision on cross-motions for summary judgment." *Comcast of Sacramento I, LLC v. Sacramento Metro. Cable Television Comm'n*, 923 F.3d 1163, 1168 (9th Cir. 2019). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## SUMMARY OF ARGUMENT

The needless destruction of Plaintiffs' sacred site violated multiple federal laws, and the district court's contrary ruling should be reversed.

**I.** Under RFRA, the federal government may not impose a "substantial burden" on religious exercise unless imposing that burden is the least restrictive means of advancing a compelling governmental interest. Here, the Government has substantially burdened Plaintiffs' religious exercise by making it physically impossible for Plaintiffs to engage in essential,

longstanding religious practices. It is undisputed that for decades, Plaintiffs performed key religious exercises at the site that cannot be replicated elsewhere. But the Government's actions rendered these exercises impossible—by cutting down the trees, destroying the sacred altar, and burying the site under an earthen berm.

The Government therefore bears the burden of satisfying strict scrutiny. But it hasn't tried to carry this burden. And it can't meet this burden because its actions weren't the least restrictive means of furthering a compelling governmental interest.

**II.** Under the Free Exercise Clause, the Government must satisfy strict scrutiny unless the burden on religious exercise is "neutral and of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 521 (1993). If the government "treat[s] *any* comparable secular activity more favorably than religious exercise," it fails this test. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). Here, the Government treated a nearby wetlands more favorably than Plaintiffs' sacred site. That triggers strict scrutiny, which the Government cannot satisfy.

**III.** Under NEPA, agencies must take a "hard look at environmental consequences" before acting. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (cleaned up). The Government violated NEPA in three ways. First, the project here could only take place if BLM

30

granted both a tree-removal permit and a right-of-way authorizing construction. But the Government performed no NEPA analysis for these actions at all. Second, FHWA performed only a narrow NEPA analysis for the project as a whole, and improperly focused on "lichens and vascular plants" instead of the large, old-growth trees which were the reason for federal protections of Dwyer in the first place. Third, FHWA also ignored several feasible alternatives that would have minimized the impact on Dwyer—an especially egregious error when the Government used those same alternatives to minimize impacts on nearby wetlands.

**IV.** NHPA requires federal agencies to consider the impact of any undertaking on properties of traditional religious and cultural importance to an Indian tribe. The Government violated NHPA by failing to do so here. BLM performed no NHPA analysis for its actions, and FHWA erred by attempting to delegate to a state agency its NHPA duty to consult with tribes—an action expressly forbidden by NHPA's text. And even assuming such a delegation were permissible, consultation with the Yakama occurred only after the tree-removal had already taken place—long after the time required by statute.

**V.** Under FLPMA, "BLM must take 'any action necessary to prevent unnecessary or undue degradation of'" federal lands. *Te-Moak Tribe of W. Shoshone Indians of Nev. v. DOI*, 565 F. App'x 665, 667 (9th Cir. 2014) (quoting 43 U.S.C. §1732(b)). Here, the Government violated FLPMA by

31

failing to prevent the undue degradation of both Plaintiffs' sacred site and Dwyer's old-growth trees.

**VI.** Section 4(f) of the DTA prohibits FHWA from approving highway projects unless there are "no prudent and feasible alternative[s]" and the project "includes all possible planning" to minimize any impact on parks and recreation sites. 49 U.S.C. §303(c). Dwyer was officially designated as part of the Wildwood Recreation Site—which all parties agree is protected by §4(f). FHWA nonetheless failed to perform a §4(f) evaluation and made no effort to use prudent and feasible alternatives to minimize the impact on Dwyer.

**VII.** The lower court's conclusion that Plaintiffs waived their NEPA, NHPA, FLPMA, and DTA claims was erroneous. The Government waived this affirmative defense by failing to plead it in its answer. And the defense is meritless, because the record shows that the Government had abundant, specific knowledge—both independently and directly from Plaintiffs—of the issues Plaintiffs raised in this lawsuit.

ARGUMENT

## I. The Government violated RFRA.

Congress enacted RFRA "to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). Under RFRA, "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. §2000bb-1(a)-(b).

32

RFRA claims proceed in two steps. First, the plaintiff must show his "exercise of religion" has been "substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). Second, "the burden is placed squarely on the Government" to prove that substantially burdening the plaintiff is "the least restrictive means" of furthering a "compelling governmental interest." *Id.* at 418, 429. Here, the Government has imposed a substantial burden by destroying Plaintiffs' sacred site. And it has waived any strict scrutiny defense.

### A. The destruction of Plaintiffs' sacred site imposes a substantial burden on Plaintiffs' religious exercise.

According to its ordinary meaning, a substantial burden is "a significantly great restriction or onus" on any exercise of religion. *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quotation marks omitted). It is "more than an inconvenience." *Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter,* 456 F.3d 978, 988 (9th Cir. 2006). As this definition suggests, a burden need not be "complete, total, or insuperable" to count. *Thai Meditation Ass'n of Ala. v. City of Mobile*, 980 F.3d 821, 830 (11th Cir. 2020). But "government conduct" that *does* "'completely prevent[]'" the plaintiff's religious exercise "clearly satisfies" it. *Id.*; *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 988 (9th Cir. 2008) ("We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise.").

The Supreme Court's cases illustrate the point. In *Sherbert v. Verner*,

33

374 U.S. 398 (1963), a state denied unemployment compensation to a Seventh-day Adventist who declined to work on her Sabbath. *Id.* at 399-401. This imposed a substantial burden because it forced her "to choose" between either "abandoning one of the precepts of her religion" or "forfeiting benefits." *Id.* at 404; *see also Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (putting Muslim prisoner to "choice" of shaving his beard or facing discipline "easily satisfied" substantial-burden test).

But in some cases, the Government is even more coercive. Instead of offering a "choice," it makes the religious exercise impossible. And when the Government "*prevents* the plaintiff from participating in a[][religious] activity," giving the plaintiff no "degree of choice in the matter," it "easily" imposes a substantial burden. *Yellowbear v. Lampert*, 741 F.3d 48, 55-56 (10th Cir. 2014) (Gorsuch, J.) (emphasis added); *accord Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) ("greater restriction…includes the lesser one").

Thus, as the Supreme Court recently recognized, government prevention of religious exercise through physical acts—such as "*destruction of religious property*"—can constitute a "RFRA violation[]." *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020) (emphasis added); *cf. United States v. Antoine*, 318 F.3d 919, 924 (9th Cir. 2003) (assuming "raz[ing]" a "house of worship" would be a substantial burden). And this Court's precedents

34

have repeatedly acknowledged that government action giving the plaintiff no choice in the matter—but instead simply taking action to violate religious beliefs or make religious exercise impossible—constitutes a substantial burden.[5]

That is what occurred here. The Government offered Plaintiffs no "choice"—such as allowing them to use the sacred site subject to penalties. Instead, the Government physically destroyed the site—making Plaintiffs' religious practices impossible. Thus, this is an *a fortiori* case. Or as Judge Bumatay explained: "the complete destruction" of a sacred site is "an obvious substantial burden." Order at 4, *Apache Stronghold v. United States*, No. 21-15295 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting); *see id.* 1-2 (no disagreement on merits); *see also Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1069 (9th Cir. 2011)

---

[5] *See, e.g.*:

- *Greene*, 513 F.3d at 988 ("little difficulty" finding that prison's "outright" refusal to allow inmate to attend worship services was a "substantial burden");

- *Warsoldier*, 418 F.3d at 996 (government conceded that "physically forc[ing an inmate] to cut his hair" would constitute a substantial burden);

- *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1525, 1530 (9th Cir. 1997) ("no question" of substantial burden where officials secretly recorded priest giving confession), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997);

- *Nance v. Miser*, 700 F. App'x 629, 631-32 (9th Cir. 2017) (prison's denial of religious oils constituted substantial burden).

("a place of worship…is at the very core of the free exercise of religion"); *Comanche Nation v. United States*, No.CIV-08-849-D, 2008 WL 4426621, at *17 (W.D. Okla. Sept. 23, 2008) (physical interference with worship at sacred site "amply demonstrate[d]" a "substantial burden").

The magistrate failed to grapple with this straightforward analysis. Instead, it found no substantial burden based on several arguments, each meritless.

*First*, it attempted to distinguish some of Plaintiffs' cases by saying they involved RLUIPA, not RFRA. 1-ER-106-07. But *Tanzin* and *Comanche Nation* are RFRA cases. More importantly, the Supreme Court has said that RLUIPA "mirrors RFRA" and imposes "the same standard as set forth in RFRA," *Holt*, 574 U.S. at 357-58—which makes sense, given that the operative text of both statutes is identical. *Accord Nance*, 700 F. App'x at 630.

*Second*, the magistrate said that under *Lyng* and *Navajo Nation*, Plaintiffs suffer no substantial burden even when they experience "actual destruction of their religious site." 1-ER-102-03. But neither case involved physical destruction of a sacred site; rather, both acknowledged the outcome would have been different otherwise.

In *Navajo Nation v. U.S. Forest Service*, plaintiffs challenged the use of treated wastewater to make artificial snow for a ski area on a sacred

mountain. 535 F.3d 1058, 1062-63 (2008) (en banc). In finding no sub-
stantial burden, this Court emphasized that the snow would have *no
physical impact* on the area, much less destroy it: "no plants, springs,
natural resources, shrines with religious significance, or religious cere-
monies…would be physically affected[;] [n]o plants would be destroyed or
stunted; no springs polluted; no places of worship made inaccessible, or
liturgy modified." *Id.* at 1063. No religious practices were made physi-
cally impossible; "the sole effect [was] on the Plaintiffs' *subjective spir-
itual experience.*" *Id.* (emphasis added).

Here, by contrast, "plants *w[ere]* destroyed"; "shrines with religious
significance [and] religious ceremonies…*w[ere]*" physically affected"; and
a place of worship [*was*] made" not just "inaccessible" but destroyed. The
claim isn't just about "subjective spiritual experience"; it's about the
physical destruction of Plaintiffs' sacred site. Thus, *Navajo Nation* is in-
apposite.

So, too, is *Lyng v. Northwest Indian Cemetery Protective Association*,
which involved completion of a road near sacred sites. There, the Court
emphasized that the Government "could [not] have been more solicitous"
toward religious practices. 485 U.S. 439, 454 (1988). It chose a route that
was "farthest removed from contemporary spiritual sites," and "provided
for one-half mile protective zones around all the religious sites." *Id.* at

454, 443. This ensured that "*[n]o sites where specific rituals take place [would] be disturbed.*" *Id.* at 454 (emphasis added).

The magistrate cited the *Lyng* plaintiffs' claim that the road would "*virtually destroy*" their "ability to practice their religion." 1-ER-103. But that claim was not based on physical destruction of their sacred site; it was based solely on the road's effect on their subjective "spiritual development." *Lyng*, 485 U.S. at 451. Accordingly, the Court held that the existence of a substantial burden "cannot depend on measuring the effects of a governmental action on *a religious objector's spiritual development.*" *Id.* (emphasis added). But the Court acknowledged that "prohibiting the Indian [plaintiffs] from *visiting* [their sacred sites] would raise a different set of constitutional questions." *Id.* at 453 (emphasis added).

Here, Plaintiffs' sacred site has not just been "disturbed," *id.* at 454, but destroyed. They have not just been prevented from "visiting" their site, *id.* at 453, it has been interred under a massive berm. And far from being maximally "solicitous" of Plaintiffs' religious practices, *id.* at 454, the Government was maximally destructive.[6]

---

[6] The same distinction of *Navajo Nation* and *Lyng* applies to the other cases the magistrate cited. 1-ER-99-101. These cases only involved claims regarding a subjective impact on spiritual development. None involved physical destruction of a sacred site:

- *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1215 (9th Cir. 2008) (plaintiffs could access sacred falls; claims concerned "the *quality* of [their] religious experience");

*Third*, citing *Navajo Nation*, the magistrate held that Plaintiffs can establish a "substantial burden" only if they demonstrate one of two "critical elements": (1) "that they are being coerced to act contrary to their religious beliefs under the threat of sanctions," or (2) "that a governmental benefit is being conditioned upon conduct that would violate their religious beliefs." 1-ER-102. In other words, had the Government merely fenced off Plaintiffs' site and threatened "sanctions" for trespassing, Plaintiffs would face a "substantial burden"; but now that the Government obliterated the site—rendering Plaintiffs' religious practices impossible—they do not.

That is absurd. *Navajo Nation* says "[a]ny burden imposed on the exercise of religion *short of*" losing a government benefit or suffering a criminal or civil sanction is not a "'substantial burden' within the meaning of RFRA." 535 F.3d at 1069-70 (emphasis added). In other words, loss of

- *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. DOI*, No. 11-cv-00395, 2012 WL 2884992, at *7 (C.D. Cal. July 13, 2012) (Government guaranteed "access to sites" and "use and possession of sacred objects");

- *S. Fork Band v. DOI*, 643 F. Supp. 2d 1192, 1208 (D. Nev. 2009) ("Plaintiffs will continue to have access to the areas identified as religiously significant"), *aff'd in part, rev'd in part on other grounds*, 588 F.3d 718 (9th Cir. 2009);

- *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, 2017 WL 908538, at *9 (D.D.C. March 15, 2017) (no claim that the Government destroyed a sacred site—only that it rendered lake "ritually [im]pure" by allowing a pipeline to be built underneath it).

benefits or threat of sanctions is the *minimum* needed to establish a substantial burden; it is not the *universe* of substantial-burden claims. If government action is *worse*, as here, courts have "little difficulty" finding a substantial burden. *Greene*, 513 F.3d at 988.

The magistrate's contrary reading of *Navajo Nation* produces grotesque results. In *Wisconsin v. Yoder*, for example, the Court held that imposing a $5 criminal fine on Amish families for violating compulsory schooling laws was a substantial burden. 406 U.S. 205 (1972). But under the magistrate's reasoning, forcibly rounding up Amish children and sending them to a public boarding school—as the Government did to Native American children in the 1800s—would not be. *See* Stephanie Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 Harv. L. Rev. 1294, 1332 (2021); *id.* at 1327, 1332 & nn.205-208 (collecting other examples of "brute force" substantial burdens). That cannot be what RFRA means.

*Fourth*, the magistrate held that Plaintiffs have not suffered a substantial burden because they can still "freely access" their site—by standing on the earthen berm where the historic campsite, graves, altar, and trees once stood. 1-ER-111. But this is, frankly, insulting—like claiming that because parishioners can stand on a pile of rubble where their bulldozed church once stood, they can "freely access" their church. A sacred

site, like a church, is more than a set of GPS coordinates. Plaintiffs cannot "freely access" a sacred site that has been destroyed.

Alternatively, the magistrate concluded that "denial of access to land, without a showing of coercion to act contrary to religious belief, does not give rise to a RFRA claim, regardless of how that denial…is accomplished." 1-ER-112. But that squarely contradicts *Lyng*, which noted that "prohibiting the Indian respondents from *visiting* [a sacred site] would raise a different set of constitutional questions." 485 U.S. at 453 (emphasis added). It also contradicts the Government's own concession in *Navajo Nation*—that it *would* be a substantial burden to eliminate access to a religious site on federal land. *See* Oral Arg. at 41:50-43:26, 535 F.3d 1058 (2008) (No. 06-15371) (en banc), https://perma.cc/4X8U-SZZR. And it is contrary to the record, which shows that the destruction of Plaintiffs' site has coercively stopped their religious practices by making those practices impossible.

*Fifth*, the magistrate said Plaintiffs have not shown a substantial burden because they supposedly have "substitute" sites "capable of serving the exact same religious function." 1-ER-102-03, 112-13 (quoting *Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1017 (9th Cir. 2016)). But this wrong both factually and legally. Factually, there is no site with the "exact same religious function"—there is no other altar like this one, 3-ER-484-85, 488; 5-ER-887; 5-ER-895; no other place

41

to gather the sacred medicine plants, 3-ER-459, 532; and the spirits of Plaintiffs' ancestors are not fungible, 2-ER-211-36; 5-ER-878; 5-ER-886; 5-ER-943-44. *Cf. Oklevueha*, 828 F.3d at 1017 (plaintiff *admitted* that cannabis was "simply a substitute for peyote").

And legally, the Supreme Court has rejected the notion that there is no substantial burden on one aspect of a plaintiff's religious exercise just because the plaintiff can engage in another. The "inquiry asks whether the Government has substantially burdened religious exercise…, not whether the…claimant is able to engage in other forms of religious exercise." *Holt*, 574 U.S. at 361-62.

Finally, even accepting the magistrate's misreading of *Navajo Nation*, Dwyer's destruction *does* deny Plaintiffs a "governmental benefit": the use and enjoyment of "government" land for religious exercise.

**B. The Government cannot satisfy strict scrutiny.**

Given the substantial burden, the Government must satisfy strict scrutiny. But it has not even tried. Because it "bears the burden of proof" on this issue, its failure to carry that burden below means Plaintiffs prevail. *O Centro*, 546 U.S. at 426-30.

Even if it tried, the Government could not satisfy strict scrutiny. Strict scrutiny "is the most demanding test known to constitutional law." *Boerne*, 521 U.S. at 534. The Government must prove destroying Plaintiffs' sacred site was "the least restrictive means" of furthering a "compelling governmental interest." *O Centro*, 546 U.S. at 418, 429. It cannot.

***Compelling governmental interest***: "[I]n this highly sensitive…area, only the gravest abuses, endangering paramount interest[s]," allow the government to limit free exercise. *Sherbert*, 374 U.S. at 406 (cleaned up). Here, it would not be a "grave abuse" to protect Dwyer—as the Government did for almost 40 years. Rather, the opposite is true. The Government has a "compelling interest" in "preserving Native American culture and religion." *United States v. Hardman*, 297 F.3d 1116, 1128-29 (10th Cir. 2002) (en banc) (collecting cases). Meanwhile, the stretch of U.S. 26 bordering Dwyer was statistically safer than comparable roads in Oregon. 6-ER-1211.

Furthermore, whatever interests supported the decision to destroy Plaintiffs' sacred site also extended to the nearby wetland. Yet the Government adjusted the project to "avoid" "impact[ing]" the wetland. 6-ER-1175-76. That alone undermines any compelling-interest showing. *See Lukumi*, 508 U.S. at 547 ("[A] law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." (cleaned up)).

***Least restrictive means***: Even assuming the Government's actions furthered a compelling interest, the Government still fails strict scrutiny because it had "other means of achieving its desired goal" while burdening Plaintiffs less. *Hobby Lobby*, 573 U.S. at 728. Specifically, it could have reduced the speed limit or widened to the south, with no impact on

43

Plaintiffs' site. "[M]ost straightforward[ly]," the Government could have used the same alternatives it adopted to protect the nearby wetland, such as a steeper slope or retaining wall. *Id.* In fact, Plaintiffs pleaded with the Government that "an additional lane c[ould] be added" to the highway "without destroying heritage resources." 6-ER-1147-56; 6-ER-1067-69; *see Holt*, 574 U.S. at 365 ("If a less restrictive means is available for the Government to achieve its goals, the Government must use it." (cleaned up)). Yet the Government ignored them. Thus, it fails strict scrutiny.

## II. The Government violated the Free Exercise Clause.

The Government's needless destruction of Plaintiffs' sacred site also violated the Free Exercise Clause. Under that Clause, government action burdening religion is subject to strict scrutiny if it "is not neutral or not of general application." *Lukumi*, 508 U.S. at 521.

Government actions fail neutrality and general applicability "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. For instance, in *Lukumi*, the Court considered a municipal ordinance prescribing punishments for "whoever…unnecessarily…kills any animal." 508 U.S. at 537. The ordinance, however, was not applied to secular killings, but only certain types of religious sacrifices. The Supreme Court held that the exemptions for secular killings rendered the ordinance not neutral and generally applicable, triggering strict scrutiny. *Id.* at 537-38.

44

The same analysis applies here. The Government steepened the slope to avoid impacting a wetland. 6-ER-1175-76. But the Government declined to do the same for Plaintiffs' site. 6-ER-1147-56; 6-ER-1067-68. That "value judgment" triggers strict scrutiny. *Fraternal Ord. of Police v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.).

The magistrate didn't address this point, instead rejecting Plaintiffs' free-exercise claim on the theory that a free-exercise plaintiff must (as under RFRA) show a "substantial burden." 1-ER-86. But "there is no substantial burden requirement" under the Free Exercise Clause. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002). Rather, when a law is not neutral or generally applicable, the Free Exercise Clause applies "[r]egardless of the magnitude of the burden imposed," *Fazaga v. FBI*, 965 F.3d 1015, 1058 (9th Cir. 2020), provided (as here) the plaintiff has alleged "specific religious conduct that was affected by the Defendants' actions." *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1017 (9th Cir. 2020); *see also, e.g.*, *Tandon*, 141 S. Ct. 1294 (no substantial-burden analysis); *Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (same). So even if the district court's substantial-burden analysis were correct—and it isn't—that still wouldn't shield the Government from strict scrutiny, which it can't satisfy. *See supra*, Part I.B.

## III. The Government violated NEPA.

NEPA imposes "a set of 'action-forcing' procedures that require that agencies take a "'hard look' at 'environmental consequences'" before engaging in projects. *Robertson*, 490 U.S. at 350. NEPA requires that "for all 'major Federal actions significantly affecting the quality of the human environment,' the agency must prepare an EIS." *Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1175 (9th Cir. 2016) (quoting 42 U.S.C. §4322(C)). To determine significant impact, the agency prepares an EA. *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988). Regardless, the agency must "give full and meaningful consideration to all reasonable alternatives." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013).

The Government here violated NEPA in multiple ways.

### A. Failure to perform NEPA analysis

First, BLM violated NEPA by failing to perform *any* NEPA analysis for its two major federal actions—the grant of a tree-cutting permit and right of way. "[I]f a federal permit is a prerequisite for a project with adverse impact on the environment, *issuance of that permit*...constitute[s] major federal action." *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) (emphasis added). Yet BLM failed to prepare an EA or EIS before granting the right of way or the tree-cutting permit—though both were prerequisites for the widening. *See* 43 C.F.R. §5511.3-2(b)(1) (prohibiting tree

removal from BLM land without a permit); 6-ER-1180 ("right-of-way from BLM" "needed").

This failure violated NEPA. *Ramsey*, 96 F.3d at 444 ("clear" violation to issue permit without NEPA analysis).

## B. Failure to prepare EIS

Second, FHWA violated NEPA by preparing only an EA, not an EIS. An EIS is required if the EA raises "substantial questions" whether the project "*may* cause significant degradation of some human environmental factor." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) (cleaned up).

One way a project can be "significant" is if it "severe[ly]" impacts an area's "unique characteristics." *Id.* at 865, 868; *see also Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1086 (D.C. Cir. 2019). Applying that criterion here, the EA showed the project would significantly impact Dwyer. The EA recognized the widening would "clear" a "25 to 50"-foot strip of land—"includ[ing] most of [Dwyer's] larger trees." 6-ER-1264. It thus would convert Dwyer from a "fairly dense stand" of "late-successional Douglas-fir forest" to a "more open" area "with younger and smaller trees." 6-ER-1238, 1332.

Yet it was precisely Dwyer's status as a "dense stand" of older, larger trees that made it unique and prompted its federal protection in the first place. *See Anglers of the Au Sable v. USFS*, 565 F. Supp. 2d 812, 826-27

47

(E.D. Mich. 2008) (old-growth trees are "unique characteristic of the project area"); *Bair v. Cal. State Dep't of Transp.*, No. 17-6419, 2019 WL 2644074, at *2 (N.D. Cal. June 27, 2019), *rev'd on other grounds*, 982 F.3d 569 (9th Cir. 2020) (similar). Dwyer was donated to the Government to preserve its trees. 10-ER-2138; 9-ER-2060. The Government altered the 1980s widening to "minimize the number of trees taken." 9-ER-1848. The SDMP prohibited "timber harvest" in Dwyer to protect its "large older trees." 6-ER-1331. And in ORCA, Congress required BLM to manage the relevant parts of Dwyer "for purposes other than timber harvest"—thus protecting its trees. 7-ER-1545-47.

Even *this* project initially focused on Dwyer's trees. The scoping document recommended protecting the "old-growth" trees that the Government had in the 1980s "expended considerable effort to protect." 7-ER-1475. And FHWA officials acknowledged the 1980s widening "was opposed…as a significant impact upon" Dwyer's "'old growth' trees," and this project posed "the same issues as before." 7-ER-1458.

Yet in the EA, the Government pivoted, stating "the truly unique botanical values at [Dwyer] include a diverse group of lichens and vascular plants," which would be unaffected. 6-ER-1247, 1256, 1331. But *nothing* in the record predating this project suggests Dwyer's importance derived from "lichens and vascular plants," rather than trees. And while an agency can change views, it must provide a "reasoned explanation for

48

disregarding previous" findings, *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966-67, 969 (9th Cir. 2015) (en banc). It cannot simply "avert[] its eyes," as it did here. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 930-31 (D.C. Cir. 2017). Because the destruction of Dwyer's trees was "significant," this project required an EIS.

### C. Failure to consider reasonable alternatives

Third, the Government violated NEPA because the EA failed to consider reasonable alternatives: a steeper slope or retaining wall within Dwyer.

The Government selected the alternative of widening to the north using a 3:1 slope—destroying "most of [Dwyer's] larger trees." 6-ER-1331. But the EA failed to consider whether, even assuming widening to the north, the project could use a steeper slope or retaining wall *within Dwyer*. As the EA recognized, there were at least three different "options" available for the project's "fill area"—a "retaining wall[]"; a "1.5:1 slope"; and a "3:1 slope." 6-ER-1265-66. The 3:1 slope would have the maximally destructive impact, extending the project's "footprint" and thus requiring removal of more trees. 6-ER-1266.

Nonetheless, the Government chose that option (6-ER-1178), never considering a steeper slope or retaining wall *within Dwyer*. Those options were reasonable and consistent with the project's purposes, enabling the Government to build the same road with less impact. In fact, the Government used just such a more protective slope to preserve nearby wetlands.

6-ER-1175-76. And it had already used such measures in the 1980s to protect Dwyer itself. 9-ER-1848.

"The existence of a viable but unexamined alternative renders an EA inadequate," violating NEPA. *W. Watersheds*, 719 F.3d at 1050 (internal quotation marks omitted). That's especially so where, as here, the unexamined alternatives are "*more* consistent with" the project's objectives than the one actually chosen. *Muckleshoot Indian Tribe v. USFS*, 177 F.3d 800, 813-814 (9th Cir. 1999) (emphasis added).

## IV. The Government violated NHPA.

NHPA requires federal agencies to "take into account the effect of any undertaking on" historic properties. *Pit River Tribe v. USFS*, 469 F.3d 768, 787 (9th Cir. 2006) (internal quotation marks omitted). To comply, agencies must complete a "section 106 process." *Te-Moak Tribe of W. Shoshone of Nev. v. DOI*, 608 F.3d 592, 607 (9th Cir. 2010). Under that process, the agency must, *inter alia*, "consult" with any tribe that "attaches religious and cultural significance" to properties potentially affected. 54 U.S.C. §302706(b); *see also* 36 C.F.R. 800.2(c)(2)(ii).[7]

Here, the Government violated NHPA in three ways.

### A. Failure to perform any Section 106 process

First, BLM violated NHPA by failing to perform *any* Section 106 process. Section 106 applies to all federal "undertaking[s]." 54 U.S.C.

---

[7] NHPA was recodified in 2014 from its prior position in title 16. This brief references the current codification.

§306108. "Because of the operational similarity between the two statutes, courts generally treat 'major federal actions' under the NEPA as closely analogous to 'federal undertakings' under the NHPA." *Sac and Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1263 (10th Cir. 2001). So just as they constituted "major federal actions," BLM's tree-cutting permit and right-of-way grants also were "undertakings." *See, e.g.*, *Dugong v. Rumsfeld*, No. C 03-4350 MHP, 2005 WL 522106, at *12-13 (N.D. Cal. Mar. 2, 2005) ("undertakings" include "licensing" and "land grants" (collecting cases)); *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1151-52 (D. Mont. 2004) ("right-of-way grant" was "undertaking"); *see also* 54 U.S.C. §300320 ("'undertaking' means a project, activity, or program under the direct or indirect jurisdiction of a Federal agency"). Yet BLM engaged in no Section 106 process for either action, violating NHPA.

## B. Failure to perform tribal consultation

Second, the Government violated NHPA by failing to consult with Indian tribes. Indeed, *no* federal agency consulted with *any* tribe regarding this project. Instead, the Government claims ODOT consulted "on behalf of FHWA." 5-ER-1042. But "[w]hen a statute delegates authority to a federal officer or agency," the officer or agency "may not subdelegate to outside entities—private or sovereign—absent affirmative evidence of authority to do so." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565-66 (D.C.

Cir. 2004). Here, Congress not only hasn't affirmatively authorized delegation—it expressly foreclosed it.

NHPA requires "*Federal agenc*[*ies*]" to consult with Native American tribes. 54 U.S.C. §302706(b). It grants no authority to delegate this responsibility to states. This "statutory 'silence'" leaves the presumptive rule—no delegation—"untouched." *U.S. Telecom*, 359 F.3d at 566.

Other provisions confirm this presumption. NHPA permits the Government to delegate certain *other* "responsibilities" to state officials—not including tribal consultation. 54 U.S.C. §302304(b)(1)(A); *see also id.* §302303 (direct responsibilities, no mention of tribal consultation). Likewise, the Federal-Aid Highway Act allows states to "assume" from FHWA certain consultation responsibilities—"*other than* responsibilities relating to federally recognized Indian tribes." 23 U.S.C. §325(a)(2) (emphasis added).

NHPA's implementing regulations agree. They acknowledge the "*Federal Government* has a unique legal relationship with Indian tribes"; require consultation to "recognize the government-to-government relationship between the *Federal Government* and Indian tribes"; instruct "*Federal agencies*" to consider certain factors when consulting with tribes; and allow tribes to enter agreements "with an *agency official*" specifying how "*they* will carry out" consultation—with "agency" defined to mean an "authority *of the Government of the United States.*" 36 C.F.R.

§§800.2(c)(2)(ii)(B)-(E) (emphases added); *see id.* §800.16(b) (cross-referencing APA definition, 5 U.S.C. §551(1)).

Finally, BLM's NHPA guidelines expressly forbid delegation, stating: "**BLM's responsibility to notify and consult with Native Americans cannot be assigned or delegated to any other party.**" BLM Manual Handbook H-8120-1, Guidelines for Conducting Tribal Consultation (Dec. 3, 2004), https://perma.cc/4BLE-DYWG, at V-4.

The Government's failure to perform any government-to-government consultation therefore violated NHPA.

### C. Untimely consultation

Even assuming delegation was proper, ODOT's consultation was inadequate because ODOT didn't contact the Yakama until *after* the planning process was complete.

NHPA requires tribal consultation to "be 'initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process.'" *Pit River*, 469 F.3d at 787 (quoting 36 C.F.R. §800.1(c)). Here, however, ODOT didn't contact the Yakama until April 2008, 5-ER-1008—two years after the EA, one year after the REA and FONSI, and even after tree-cutting and the destruction of Plaintiffs' altar were already complete. This violates NHPA. *Pit River*, 469 F.3d at 782 ("analysis…serve[s] no purpose" if done after project approval (internal quotation marks omitted)).

53

**D. Plaintiffs have standing for their NHPA claims.**

The district court initially concluded Plaintiffs had standing to raise these NHPA claims, because Plaintiffs "claim an interest in the preservation of the historic sites at issue," and thus "fall within the zone of interests protected by the NHPA." ECF 154 at 12; ECF 171. Later, however, the new magistrate reversed course, saying that "[i]t would debase a tribe's sovereignty for" tribe members to challenge the adequacy of consultation with tribes. 1-ER-49-55.

But this new theory contradicts precedent. The Supreme Court has repeatedly permitted individual Indian tribe members to assert claims based on tribal rights. *See, e.g., McGirt v. Oklahoma*, 140 S. Ct. 2452, 2460-63 (2020) (individual's challenge to prosecution based on "promises [made] to the Tribe"); *Herrera v. Wyoming*, 139 S. Ct. 1686, 1693 (2019) (same, treaty memorializing "the Tribe's right to hunt off-reservation"). Accordingly, "[c]ourts have consistently found that non-tribal plaintiffs asserting similar claims challenging the adequacy of an agency's section 106 efforts have standing under the NHPA." *Wishtoyo Found. v. USFWS*, No. CV 19-03322-CJC(ASx), 2019 WL 8226080, at *5 (C.D. Cal. Dec. 18, 2019) (collecting cases); *see Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229-30 (9th Cir. 2008) (standing for *environmental group* to challenge adequacy of defendant's consultation with *agency*).

The district court's cases are inapposite. The issue in *Te-Moak* wasn't whether non-tribe plaintiffs could challenge the adequacy of consultation with a tribe; it was whether they could assert tribal-consultation requirements to challenge the adequacy of consultation *with them*. 608 F.3d at 608 n.19; *cf.* 1-ER-54. *La Cuna*, meanwhile, is nonprecedential, predates *Herrera* and *McGirt*, and has been distinguished where—as here—plaintiffs don't *just* challenge tribal consultation but assert "allegations [that] are…broadly based." *Wishtoyo*, 2019 WL 8226080, at *5; *cf.* 1-ER-54 (citing *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. DOI*, 642 F. App'x 690, 693 (9th Cir. 2016)). Accordingly, Plaintiffs have standing.

## V. The Government violated FLPMA.

Under FLPMA, "BLM must take 'any action necessary to prevent unnecessary or undue degradation of [federal] lands.'" *Te-Moak,* 565 F. App'x at 667 (quoting 43 U.S.C. §1732(b)). BLM must also develop resource management plans, 43 U.S.C. §1712(a), then manage consistently with them, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004).

Here, BLM violated FLPMA in two ways. First, it degraded Dwyer by destroying a Native American sacred site. Second, in granting the tree-cutting permit, BLM both degraded Dwyer and failed to manage it consistently with the SDMP.

## A. Destruction of sacred site

FLPMA's prohibition on unnecessary or undue degradation includes any action violating "a state or federal law relating to environmental or cultural resource protection." 43 C.F.R. §3809.5; *S. Fork Band Council of W. Shoshone of Nev. v. DOI*, 588 F.3d 718, 723-24 (9th Cir. 2009). Here, in destroying Plaintiffs' sacred site, BLM's actions violated one such "law"—Executive Order 13007, 61 Fed. Reg. 26,771 (May 24, 1996).

E.O. 13007 provides that "[i]n managing Federal lands," agencies "shall, to the extent practicable," "avoid adversely affecting the physical integrity of [Indian] sacred sites." *Id*. It defines "sacred site" as "any [1] 'specific, discrete, narrowly delineated location' of [2] 'established religious significance' or 'ceremonial use,'" *Te-Moak*, 565 F. App'x at 667-68, provided [3] an "appropriately authoritative representative of an Indian religion has informed the agency of" its existence. 61 Fed. Reg. 26,771. These "requirements are incorporated into FLPMA." *Te-Moak*, 565 F. App'x at 667; *see S. Fork*, 588 F.3d at 724.

BLM violated E.O. 13007 here. First, Plaintiffs' site is a "specific, discrete, [and] narrowly delineated location." It measured 100 by 30 meters—less than one acre within Dwyer, 5-ER-962-63; 6-ER-1331—and comprised specific, discrete features: a historic campground, altar, burial ground, old-growth trees, and medicinal plants. *Supra* pp. 10-12.

Second, the site was of "ceremonial use." Indigenous people have used it for religious purposes "since time immemorial," 5-ER-929; and Plaintiffs elaborated in detail on their own use as traditional religious leaders of their tribes. *Supra* pp. 12-13.

Third, Plaintiffs are "appropriately authoritative representative[s]" of their religion, 61 Fed. Reg. 26,771, because they are Hereditary Chiefs and an Elder who are responsible for maintaining the traditions of their tribes. *Supra* pp. 8-9. And the Government was "informed…of the" site's "existence," 61 Fed. Reg. 26,771—repeatedly, and over the course of decades. *See, e.g.*, 8-ER-1791; 9-ER-1935; 5-ER-966-67; 4-ER-637; 6-ER-1150-52.

Under E.O. 13007, then, BLM was required, if "practicable," to "accommodate access to and ceremonial use of" the site, and "avoid adversely affecting [its] physical integrity." 61 Fed. Reg. 26,771. Instead, it destroyed the site entirely, despite numerous "practicable" measures that would have avoided it.

## B. Grant of tree-cutting permit

Second, BLM violated FLPMA by issuing the tree-cutting permit. This action both (1) constituted "unnecessary and undue degradation of the lands" because it violated a "federal law…relating to environmental or cultural resource protection"—ORCA—and (2) violated BLM's FLPMA duty to maintain federal lands in accordance with the relevant resource

management plan—the SDMP. *See ONRCF v. Brong*, 492 F.3d 1120, 1125-28, 1135 (9th Cir. 2007).

Tree-cutting within Dwyer was prohibited both by ORCA and by the SDMP. Congress passed ORCA to protect "the scenic qualities of" the "Mt. Hood Corridor Lands"—a term defined to include the portion of Dwyer at issue here. §401(g), 110 Stat. at 3009-537. It therefore prohibits "[t]imber cutting" on such lands, except "following a resource-damaging catastrophic event," like a "forest fire." *Id.* §401(h).

Tree-cutting within Dwyer was also prohibited by the SDMP. The SDMP categorizes Dwyer as a "Special Area." 8-ER-1609. And it imposes restrictions on "timber harvest" in all "Special Areas"—in some, it is permitted only in certain "zone[s]"; in some, only non-"commercial" timber harvest is permitted; and in some, "timber harvest" is categorically prohibited. 8-ER-1609-10. In Dwyer, "timber harvest" is categorically prohibited:

| Table 2 Management of Special Areas | | | | | |
|---|---|---|---|---|---|
| Name | Acres | Off-Highway Vehicle Designation | Leasable Mineral Entry | Locatable/Salable Mineral Entry | Timber Harvest |
| A.J. Dwyer Scenic Area | 5 | Limited | Open - NSO | Closed | No |

8-ER-1609.

Nonetheless, BLM issued a permit allowing ODOT to "remov[e] timber" from Dwyer, 5-ER-1035, 1039, including in areas visible from the

58

highway. 6-ER-1264. This violated both ORCA and the SDMP—and thus FLPMA.

BLM's conclusion to the contrary was arbitrary and capricious. BLM said the project would "compl[y] with" ORCA because "a forested setting would be maintained" and "the parcel is in view while traveling" U.S. 26 for only a "short amount of time." 6-ER-1331-32. But this contradicts statutory text. ORCA protects *all* "Mt. Hood Corridor Lands"—there is no *de minimis* exception for projects affecting only a short stretch of them. And ORCA does not just tell BLM to maintain "a forested setting"; it tells it *how to do so*—by allowing "[t]imber cutting" only when made necessary by "a resource-damaging catastrophic event."

As for the SDMP, BLM purported to read it to prohibit only "*commercial* timber harvest" within Dwyer. ECF 340 at 27-29. But this is "plainly inconsistent" with the SDMP's language. *ONRCF*, 492 F.3d at 1125. Although the SDMP prohibited only "commercial" timber harvest within *other* "Special Areas," 8-ER-1609-10, Dwyer is one of several for which there is no modifier: the prohibition is on "timber harvest" *simpliciter*. BLM's grant of the tree-cutting permit thus violated FLPMA.

## VI. The Government violated DTA.

Section 4(f) of DTA prohibits FHWA from approving a project "requiring the use of publicly owned land of a public park, recreation area, or…an historic site of national, State, or local significance" unless (1)

59

"there is no prudent and feasible alternative to" doing so; and (2) the "project includes all possible planning to minimize harm." 49 U.S.C. §303(c). To approve a project using §4(f)-protected property, FHWA must "determin[e]" §4(f) is satisfied via "sufficient supporting documentation." 23 C.F.R. §774.3, 774.7(a), (f).

Here, no §4(f) evaluation was prepared, 5-ER-978-80, so the only question is whether Dwyer is a "public park" or "recreation area" protected by §4(f). The answer is yes: Dwyer has been designated a recreation site since 1968. *See SPARC v. Slater*, 352 F.3d 545, 555-56 (2d Cir. 2003) ("publicly owned land is considered to be a park [or] recreation area…when the land has been officially designated as such" (internal quotation marks omitted)). That year, BLM "withdr[ew]" and "reserved" the land including Dwyer "for protection of public recreation values," designating it the "Wildwood Recreation Site." 10-ER-2223-24; *see also* 7-ER-1426.[8] So the project here was subject to §4(f)—making the lack of §4(f) analysis unlawful. *See, e.g., N. Idaho Cmty. Action Network v. DOT*, 545 F.3d 1147, 1158-59 (9th Cir. 2008); *Stop H-3 Ass'n v. Coleman*, 533 F.2d 434, 445 (9th Cir. 1976).

---

[8] *See also, e.g.*, 7-ER-1454 (Dwyer "is managed as part of the Wildwood Recreation Area"); 10-ER-2138 (Dwyer "is a corridor of large fir trees on either side of the highway through the Wildwood Recreation Area"); 10-ER-2229 (map of Wildwood in recreational brochure, Dwyer included).

Nor *could* FHWA have approved the project under §4(f). Of the various ways FHWA could have added a turn lane, FHWA chose to widen to the north only—the alternative most destructive of Dwyer. And then, *within* that alternative, FHWA chose a 3:1 slope, rather than a 1.5:1 slope or retaining wall. That is the opposite of "minimiz[ing] harm." §303(c); *see Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1447 (9th Cir. 1984) (requirements "are stringent").

## VII. Plaintiffs' NEPA, NHPA, FLPMA, and DTA claims were not waived.

The district court never considered the merits of Plaintiffs' NEPA, NHPA, FLPMA, or DTA claims. Instead, after sitting on Plaintiffs' summary-judgment motion for 11 months, the court essentially threw up its hands—concluding that the merits were "tangled," and dismissing the claims as waived, even though the Government never pled waiver. That was error.

### A. The Government waived waiver.

First, Defendants' waiver argument was itself waived. "[W]aiver must be "affirmatively state[d]" in the defendant's answer to be preserved. Fed. R. Civ. P. 8(c)(1). Yet none of the Government's four answers, over a decade of litigation, ever raised waiver as an affirmative defense. 5-ER-900-10; 5-ER-951-53. The Supreme Court has "disapprove[d] the notion that a party may wake up because a 'light finally dawned,' years after the first opportunity to raise a defense, and effectively raise it so long as the party

was (through no fault of anyone else) in the dark until its late awakening." *Arizona v. California*, 530 U.S. 392, 410 (2000). The defense was therefore waived.

### B. The waiver defense fails.

Defendants' waiver argument is also meritless. The magistrate concluded Plaintiffs didn't give the Government "sufficient notice" of their concerns for it to have had the "opportunity to rectify" them. 1-ER-74-75. But Plaintiffs vigorously raised their concerns during the 1980s and 1990s; the Government itself re-raised many of them in the leadup to the current project; and Plaintiffs raised them again in repeated outreach to the Government in early 2008. All this is reflected in the administrative record compiled and submitted in this case by Defendants themselves— meaning it was by definition before the "agency decision-makers" at the time of decision. *Thompson v. DOL*, 885 F.2d 551, 555 (9th Cir. 1989). Thus, the magistrate's waiver ruling is mistaken, on numerous levels.

At the outset, the magistrate was wrong to impose an issue-exhaustion requirement in the first place. There is no "broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006) (internal quotation marks omitted). Rather, where, as here, administrative proceedings are non-"adversarial," courts are reluctant "to impose a judicially created issue-exhaustion requirement" at all. *Carr v. Saul*, 141 S. Ct. 1352, 1358 (2021)

(citing *Sims v. Apfel*, 530 U.S. 103 (2000)); *accord Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1080 (9th Cir. 2013). Thus, the magistrate was wrong to impose an issue-exhaustion requirement here.

In any event, any waiver or issue-exhaustion requirement is met. For one thing, the magistrate held Plaintiffs' claims were waived because they didn't raise their concerns "during the administrative process"— which the magistrate took to mean before issuance of the REA and FONSI. 1-ER-75. But this is the wrong definition of "the administrative process." For highway projects like this one, Congress itself has defined the "environmental review process": it means not only "the process for preparing an" EA, but *also* "the process for and completion of any" required "environmental permit [or] approval." 23 U.S.C. §139(a)(3); *see* 73 Fed. Reg. at 19,134 (citing 23 U.S.C. §139(*l*)(1)). And there's no question Plaintiffs *did* raise their concerns (again) in January and February 2008—*before* BLM issued the tree-cutting permit or granted the right-of-way necessary for the project to occur. That is presumably why Plaintiffs' 2008 comments appear in the Government-compiled administrative record. *E.g.*, 6-ER-1067-1156; 5-ER-981-1007; 5-ER-1022-24. And that is why the magistrate's waiver analysis strayed from the start—by picking the wrong date.

Even assuming the magistrate's (rather than Congress's) cutoff date, Plaintiffs' claims still wouldn't be waived, because the Government had

"independent knowledge of the very issue[s] that concern[] Plaintiffs in this case." *ʻIlioʻulaokalani*, 464 F.3d at 1093. During the earlier widening project, Jones repeatedly raised the same concerns he and the other Plaintiffs raise in this lawsuit. And the record shows those same concerns were specifically re-aired during the Government's preparations for *this* project—yet the Government proceeded with the project anyway. Accordingly, the notion that Plaintiffs are "barred from" challenging the Government's decision "because they [did] not submit[] comments" before the REA is error. *ʻIlioʻulaokalani*, 464 F.3d at 1091.

The magistrate rejected this argument on the ground that, while the government may have been aware of Plaintiffs' "general concern," the independent-knowledge rule requires "[m]uch more specificity." 1-ER-77-78. But this argument fails for several reasons.

First, the "much more specificity" argument misstates the controlling standard. This Court has squarely held that "alerting the agency in *general terms* will be enough" to satisfy an issue-exhaustion requirement. *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) (emphasis added). That is because even where issue exhaustion may be judicially imposed, the agency still "bears the primary responsibility to ensure that it complies with NEPA." *Barnes v. DOT*, 655 F.3d 1124, 1132 (9th Cir. 2011). Accordingly, "petitioners need not 'incant [certain] magic words…in order to leave the courtroom door open to a challenge.'" *Id.*

"Compliance with" procedural obligations remains primarily the agency's "duty," not a responsibility dependent "on the vigilance and limited resources of environmental plaintiffs." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th Cir. 2000).

Moreover, even under the magistrate's incorrect standard, the record shows the Government was well-aware of Plaintiffs' concerns specifically. Jones explicitly raised these precise concerns the first time the Government considered widening through Dwyer. During that administrative process, Jones, through C-FASH, submitted numerous comments (9-ER-1922-88), testified at public hearings (9-ER-1900), gathered signatures on petitions (9-ER-1927), and talked extensively with agency officials, raising the following concerns:

- "Old growth trees [in Dwyer]...will be destroyed if the highway is widened as currently proposed," 9-ER-1924; *see also* 9-ER-1925, 9-ER-1928-29, 9-ER-1935, 9-ER-1957, 9-ER-1979;

- The project would endanger the stone altar within Dwyer (which Jones thought at the time was a "grave"), 9-ER-1924, 9-ER-1935, 9-ER-1953, 9-ER-1963, 9-ER-1976-78; and

- A §4(f) analysis was required because Dwyer was "within the boundaries of the Wildwood Recreation Site" and was used for recreation, 9-ER-1935, 9-ER-1951, 9-ER-1963, 9-ER-1970, 9-ER-1973-75.

These comments alerted the Government to Plaintiffs' concerns; indeed, the Government *acted* on them by changing the project to minimize

the impact on Dwyer, 9-ER-1848-50, arranging an archaeological excavation to investigate the altar, 11-ER-2294-2304, and responding in the FEIS to the §4(f) issue, 9-ER-1845.

More importantly, the Government was well-aware of these same concerns in preparing for the *current* widening project through Dwyer. Again, the Government itself included all the materials cited above in the administrative record for this project—thus certifying them as "documents and materials" it "directly or indirectly considered." *Thompson*, 885 F.2d at 555 (emphasis omitted).

Beyond that, the record shows that those concerns were specifically *re-aired* during the Government's preparations for the current project, in a way that maps precisely onto Plaintiffs' claims. In particular:

- Plaintiffs claim the Government violated NEPA by failing to use an EIS despite the project's destruction of Dwyer's old-growth trees. In 2004, FHWA officials raised this precise concern, noting that the previous proposal to widen into Dwyer "was opposed by the public *as a significant impact upon the 'old growth' trees*" and the current project "ha[d] the same issues as before." 9-ER-1458 (emphasis added).

- Plaintiffs claim the Government violated NEPA by failing to consider in the EA the alternative of using a steeper slope or retaining wall where the project passed through Dwyer. These are some of the precise measures the Government *actually employed* to protect Dwyer in 1987. 9-ER-1848. And the scoping document prepared for this project indicates that the Government originally planned to protect Dwyer in similar ways again. 7-ER-1474 ("section along the Dwyer Corridor…is NOT proposed for any widening").

- Plaintiffs also claim the Government violated FLPMA by destroying a Native American sacred site. In 1990, Jones told BLM archaeologist Philipek that Dwyer included a "Nat[ive] Amer[ican] sacred site" that Native Americans have been visiting "for years," and identified particular practitioners and ceremonies. 5-ER-966-67. Philipek's notes on this are part of the administrative record for this project—meaning, again, the Government has certified that they were before it in making its decision. Philipek also attached these notes to the report she produced after visiting the "scattered," but not yet destroyed, altar in 2008. 5-ER-964.

- Plaintiffs claim the Government violated FLPMA by permitting tree-cutting within Dwyer in violation of a federal statute—ORCA—that prohibits tree-cutting within "Mt. Hood Corridor Lands," including Dwyer. In the EA, the Government explicitly discussed this concern, acknowledging that "[t]he A.J. Dwyer parcel is...within the Mt. Hood Corridor, a Congressionally designated scenic area." 6-ER-1256, 6-ER-1331-32; *see also, e.g.*, 6-ER-1433-36 ("congressionally mandated...scenic corridor").

- Plaintiffs likewise claim the Government violated FLPMA by permitting tree-cutting within Dwyer when the SDMP designated Dwyer a "Special Area" where "timber harvest" was prohibited. The EA explicitly discussed this concern, acknowledging that "[t]he A.J. Dwyer parcel was designated a Special Area in the BLM's 1995 Salem District Resource Management Plan." 6-ER-1331-32; *see also, e.g.*, 7-ER-1416.

These claims can't be waived. Each of these concerns was explicitly raised in the administrative record; several of them the Government explicitly addressed. Accordingly, the "independent knowledge" rule is satisfied, '*Ilio'ulaokalani*, 464 F.3d at 1093, even apart from Plaintiffs' early-2008 efforts—which again raised all of these concerns in detail.

Alternatively, the magistrate reasoned that Plaintiffs waived their claims because the Government "in fact addressed" them. 1-ER-79. But this reasoning is backward. The fact that an agency "considered and rejected" a concern necessarily means that the agency *was aware of it. Delaware Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 155 & n.5 (3d Cir. 2017). So if the Government "considered and rejected" Plaintiffs' concerns, the claims aren't waived; they are "fair game for litigation" under the independent-knowledge rule. *Id.* (citing *'Ilio'ulaokalani*, 464 F.3d at 1093; *Barnes*, 655 F.3d at 1132).[9]

Finally, the magistrate erred by declining to consider *why* Plaintiffs were hesitant to participate in public meetings, and instead communicated their concerns to Government officials directly—namely, their concern about vandalism. *See Carr*, 141 S. Ct. at 1360 (considering "the specific context of petitioners'" claims). When Plaintiffs spoke out about the site before, and an official stated during a public meeting in the 1990s that the sacred site "was the reason why we can't widen the highway," the sacred altar was vandalized just days later. 3-ER-375; 5-ER-966-67. The lesson Plaintiffs drew from this is unsurprising: "if you talk about

---

[9] Even if—counterfactually—the Government lacked independent knowledge of Plaintiffs' concerns before their early-2008 comments, that wouldn't mean the Government was entitled to ignore those comments and "simply rest on the original" analysis. *Friends of the Clearwater*, 222 F.3d at 557. Rather, that would mean the Government was required to perform a supplemental NEPA analysis to account for the new information, *id.*—which it did not do. ECF 331 at 28-29; ECF 345 at 25-26.

[sacred things], they're going to be destroyed," so "you do everything behind closed doors." 3-ER-330. Indeed, FHWA's own Tribal Consultation Guidelines recognize that "[m]any tribes['] beliefs require that the location and even the existence of traditional religious and cultural properties not be divulged," and it is "vital" for the agency to "respect[] tribal desires to withhold specific information about these types of sites." 10-ER-2236. Plaintiffs should not be penalized for communicating about their site circumspectly—particularly when Defendants' own guidelines say it is "vital" to respect their prerogative to do so.

## CONCLUSION

Some cases present an irreconcilable conflict between the protection of a sacred site and the accomplishment of the Government's goals. Not this one. Plaintiffs sought to protect a tiny, 0.74-acre site where they worshiped for a half-century, and where their ancestors worshiped for centuries before them.

The Government knew about the site, sending an archaeologist to examine it. The Government protected the site, changing prior projects to preserve it. But then the Government knowingly destroyed it, rendering Plaintiffs' religious practices impossible. That the Government deemed the site insignificant, or wanted to finish its project more quickly, does not justify its actions. It only shows why we have laws like these in the first place—so our nation's tragic history of destroying sacred sites does not senselessly repeat itself.

The Court should reverse and remand for entry of judgment for Plaintiffs.

Respectfully submitted,

/s/ *Luke W. Goodrich*

KEITH A. TALBOT
PATTERSON BUCHANAN FOBES
  & LEITCH, INC., P.S.
1050 SW 6th Ave. # 1100
Portland, OR 97204
(503) 200-5400

JAMES J. NICITA
302 Bluff St.
Oregon City, OR 97045
(503) 799-0725

LUKE W. GOODRICH
  *Counsel of Record*
DIANA M. VERM
JOSEPH C. DAVIS
DANIEL L. CHEN
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketlaw.org*

## STATEMENT OF RELATED CASES

This appeal is related to *Apache Stronghold v. United States*, No. 21-15295 (9th Cir.), as both cases involve similar religious-freedom claims; the parties are represented by the same counsel; and the district courts rejected the religious-freedom claims on nearly identical grounds. *See* 9th Cir. R. 28-2.6 (cases are related if they "raise the same or closely related issues"). In granting Appellants' motion to expedite briefing in part, this Court noted that this appeal and *Apache Stronghold* may be calendared together for oral argument. Dkt. 11.

/s/ *Luke W. Goodrich*

Luke W. Goodrich
*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE PURSUANT TO
9TH CIRCUIT RULE 32-1 FOR CASE NUMBER 21-35220**

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,804 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

/s/ *Luke W. Goodrich*
Luke W. Goodrich
*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 3, 2021. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Luke W. Goodrich*
Luke W. Goodrich
*Counsel for Plaintiffs-Appellants*

# ADDENDUM

Pertinent Constitutional Provisions and Statutes

# Table of Contents

**Page**

Religious Freedom Restoration Act, 42 U.S.C. §2000bb *et seq.*.............. 76

First Amendment ................................................................................ 80

43 U.S.C. §4332................................................................................... 81

40 C.F.R. §1501.5................................................................................ 85

National Historic Property Act, 54 U.S.C. §300101 *et seq.*..................... 87

36 C.F.R. §800.1.................................................................................. 93

36 C.F.R. §800.2.................................................................................. 95

23 U.S.C. §325 .................................................................................. 105

42 U.S.C. §1732.................................................................................. 109

43 U.S.C. §1610.5-3 ........................................................................... 115

43 C.F.R. §3809.5............................................................................... 117

Executive Order 13007........................................................................ 123

Oregon Resources Conservation Act of 1996,
Pub. L. No. 104-208, 110 Stat. 3009-536 (1996)................................... 126

49 U.S.C. §303 .................................................................................. 128

23 C.F.R. §774.3................................................................................. 133

23 C.F.R. §774.7................................................................................. 136

Federal Rule of Civil Procedure 8 ....................................................... 139

**Religious Freedom Restoration Act, 42 U.S.C. §2000bb *et seq.***

**§2000bb. Congressional findings and declaration of purposes**

**(a) Findings**

The Congress finds that--

**(1)** the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

**(2)** laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

**(3)** governments should not substantially burden religious exercise without compelling justification;

**(4)** in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

**(5)** the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**

The purposes of this chapter are--

**(1)** to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205

76

(1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

**(2)** to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

## §2000bb-1. Free exercise of religion protected

### (a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

### (b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

**(1)** is in furtherance of a compelling governmental interest; and

**(2)** is the least restrictive means of furthering that compelling governmental interest.

### (c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

## §2000bb-2. Definitions

As used in this chapter--

**(1)** the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

**(2)** the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

**(3)** the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

**(4)** the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.

**§2000bb-3. Applicability**

**(a) In general**

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

**(b) Rule of construction**

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

**(c) Religious belief unaffected**

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

## §2000bb-4. Establishment clause unaffected

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter. As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

**First Amendment to the United States Constitution**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**42 U.S.C. §4332**

**§4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: **(1)** the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and **(2)** all agencies of the Federal Government shall--

**(A)** utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

81

**(i)** the environmental impact of the proposed action,

**(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

**(iii)** alternatives to the proposed action,

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

**(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

**(E)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(F)** recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(G)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(H)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(I)** assist the Council on Environmental Quality established by subchapter II of this chapter.

**40 C.F.R. §1501.5.**

**§1501.5. Environmental assessments.**

**(a)** An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§1501.4) is applicable or has decided to prepare an environmental impact statement.

**(b)** An agency may prepare an environmental assessment on any action in order to assist agency planning and decision making.

**(c)** An environmental assessment shall:

**(1)** Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and

**(2)** Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted.

**(d)** For applications to the agency requiring an environmental assessment, the agency shall commence the environmental assessment as soon as practicable after receiving the application.

**(e)** Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments.

**(f)** The text of an environmental assessment shall be no more than 75 pages, not including appendices, unless a senior agency official approves in writing an assessment to exceed 75 pages and establishes a new page limit.

**(g)** Agencies may apply the following provisions to environmental assessments:

**(1)** Section 1502.21 of this chapter—Incomplete or unavailable information;

**(2)** Section 1502.23 of this chapter—Methodology and scientific accuracy; and

**(3)** Section 1502.24 of this chapter—Environmental review and consultation requirements.

**National Historic Property Act, 54 U.S.C. §300101 *et seq.***

\* \* \*

### §300320. Undertaking

In this division, the term "undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including--

**(1)** those carried out by or on behalf of the Federal agency;

**(2)** those carried out with Federal financial assistance;

**(3)** those requiring a Federal permit, license, or approval; and

**(4)** those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

\* \* \*

### §302303. Responsibilities of State Historic Preservation Officer

**(a)** In general.--It shall be the responsibility of the State Historic Preservation Officer to administer the State Historic Preservation Program.

**(b)** Particular responsibilities.--It shall be the responsibility of the State Historic Preservation Officer to--

**(1)** in cooperation with Federal and State agencies, local governments, and private organizations and individuals, direct and conduct a comprehensive statewide survey of historic property and maintain inventories of the property;

**(2)** identify and nominate eligible property to the National Register and otherwise administer applications for listing historic property on the National Register;

**(3)** prepare and implement a comprehensive statewide historic preservation plan;

**(4)** administer the State program of Federal assistance for historic preservation within the State;

**(5)** advise and assist, as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities;

**(6)** cooperate with the Secretary, the Council, other Federal and State agencies, local governments, and private organizations and individuals to ensure that historic property is taken into consideration at all levels of planning and development;

**(7)** provide public information, education, and training and technical assistance in historic preservation;

**(8)** cooperate with local governments in the development of local historic preservation programs and assist local governments in becoming certified pursuant to chapter 3025;

**(9)** consult with appropriate Federal agencies in accordance with this division on--

**(A)** Federal undertakings that may affect historic property; and

**(B)** the content and sufficiency of any plans developed to protect, manage, or reduce or mitigate harm to that property; and

**(10)** advise and assist in the evaluation of proposals for rehabilitation projects that may qualify for Federal assistance.

### §302304. Contracts and cooperative agreements

**(a) State.**--A State may carry out all or any part of its responsibilities under this chapter by contract or cooperative agreement with a qualified nonprofit organization or educational institution.

**(b) Secretary.**--

**(1) In general.**--

**(A) Authority to assist Secretary.**--Subject to paragraphs (3) and (4), the Secretary may enter into contracts or cooperative agreements with a State Historic Preservation Officer for any State authorizing the Officer to assist the Secretary in carrying out one or more of the following responsibilities within that State:

**(i)** Identification and preservation of historic property.

**(ii)** Determination of the eligibility of property for listing on the National Register.

**(iii)** Preparation of nominations for inclusion on the National Register.

**(iv)** Maintenance of historical and archeological data bases.

**(v)** Evaluation of eligibility for Federal preservation incentives.

**(B) Authority to maintain National Register.**--Nothing in subparagraph (A) shall be construed to provide that any State Historic Preservation Officer or any other person other than the Secretary shall have the authority to maintain the National Register for properties in any State.

**(2) Requirements.**--The Secretary may enter into a contract or cooperative agreement under paragraph (1) only if--

**(A)** the State Historic Preservation Officer has requested the additional responsibility;

**(B)** the Secretary has approved the State historic preservation program pursuant to sections 302301 and 302302 of this title;

**(C)** the State Historic Preservation Officer agrees to carry out the additional responsibility in a timely and efficient manner acceptable to the Secretary and the Secretary determines that the Officer is fully capable of carrying out the responsibility in that manner;

**(D)** the State Historic Preservation Officer agrees to permit the Secretary to review and revise, as appropriate in the discretion of the Secretary, decisions made by the Officer pursuant to the contract or cooperative agreement; and

**(E)** the Secretary and the State Historic Preservation Officer agree on the terms of additional financial assistance to the State, if there is to be any, for the costs of carrying out that responsibility.

**(3) Establish conditions and criteria.**--For each significant program area under the Secretary's authority, the Secretary shall establish specific conditions and criteria essential for the assumption by a State Historic Preservation Officer of the Secretary's duties in each of those programs.

**(4) Preservation programs and activities not diminished.**--Nothing in this chapter shall have the effect of diminishing the preservation programs and activities of the Service.

\*     \*     \*

### §306108. Effect of undertaking on historic property

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of

any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

**36 C.F.R. §800.1**

**§800.1 Purposes.**

**(a)** Purposes of the section 106 process. Section 106 of the National Historic Preservation Act requires Federal agencies to take into account the effects of their undertakings on historic properties and afford the Council a reasonable opportunity to comment on such undertakings. The procedures in this part define how Federal agencies meet these statutory responsibilities. The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning. The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

**(b)** Relation to other provisions of the act. Section 106 is related to other provisions of the act designed to further the national policy of historic preservation. References to those provisions are included in this part to identify circumstances where they may affect actions taken to meet section 106 requirements. Such provisions may have their own implementing regulations or guidelines and are not intended to be implemented by the procedures in this part except insofar as they relate to the

section 106 process. Guidelines, policies, and procedures issued by other agencies, including the Secretary, have been cited in this part for ease of access and are not incorporated by reference.

**(c)** Timing. The agency official must complete the section 106 process "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." This does not prohibit agency official from conducting or authorizing nondestructive project planning activities before completing compliance with section 106, provided that such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties. The agency official shall ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking.

**36 C.F.R. §8002**

## §800.2 Participants in the Section 106 process.

**(a)** Agency official. It is the statutory obligation of the Federal agency to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance in accordance with subpart B of this part. The agency official has approval authority for the undertaking and can commit the Federal agency to take appropriate action for a specific undertaking as a result of section 106 compliance. For the purposes of subpart C of this part, the agency official has the authority to commit the Federal agency to any obligation it may assume in the implementation of a program alternative. The agency official may be a State, local, or tribal government official who has been delegated legal responsibility for compliance with section 106 in accordance with Federal law.

**(1)** Professional standards. Section 112(a)(1)(A) of the act requires each Federal agency responsible for the protection of historic resources, including archeological resources, to ensure that all actions taken by employees or contractors of the agency shall meet professional standards under regulations developed by the Secretary.

**(2)** Lead Federal agency. If more than one Federal agency is involved in an undertaking, some or all the agencies may designate a lead Federal agency, which shall identify the appropriate official to serve as the agency

official who shall act on their behalf, fulfilling their collective responsibilities under section 106. Those Federal agencies that do not designate a lead Federal agency remain individually responsible for their compliance with this part.

**(3)** Use of contractors. Consistent with applicable conflict of interest laws, the agency official may use the services of applicants, consultants, or designees to prepare information, analyses and recommendations under this part. The agency official remains legally responsible for all required findings and determinations. If a document or study is prepared by a non-Federal party, the agency official is responsible for ensuring that its content meets applicable standards and guidelines.

**(4)** Consultation. The agency official shall involve the consulting parties described in paragraph (c) of this section in findings and determinations made during the section 106 process. The agency official should plan consultations appropriate to the scale of the undertaking and the scope of Federal involvement and coordinated with other requirements of other statutes, as applicable, such as the National Environmental Policy Act, the Native American Graves Protection and Repatriation Act, the American Indian Religious Freedom Act, the Archeological Resources Protection Act, and agency-specific legislation. The Council encourages

the agency official to use to the extent possible existing agency procedures and mechanisms to fulfill the consultation requirements of this part.

**(b)** Council. The Council issues regulations to implement section 106, provides guidance and advice on the application of the procedures in this part, and generally oversees the operation of the section 106 process. The Council also consults with and comments to agency officials on individual undertakings and programs that affect historic properties.

**(1)** Council entry into the section 106 process. When the Council determines that its involvement is necessary to ensure that the purposes of section 106 and the act are met, the Council may enter the section 106 process. Criteria guiding Council decisions to enter the section 106 process are found in appendix A to this part. The Council will document that the criteria have been met and notify the parties to the section 106 process as required by this part.

**(2)** Council assistance. Participants in the section 106 process may seek advice, guidance and assistance from the Council on the application of this part to specific undertakings, including the resolution of disagreements, whether or not the Council is formally involved in the review of the undertaking. If questions arise regarding the conduct of the section 106 process, participants are encouraged to obtain the Council's advice on completing the process.

**(c)** Consulting parties. The following parties have consultative roles in the section 106 process.

**(1)** State historic preservation officer.

**(i)** The State historic preservation officer (SHPO) reflects the interests of the State and its citizens in the preservation of their cultural heritage. In accordance with section 101(b)(3) of the act, the SHPO advises and assists Federal agencies in carrying out their section 106 responsibilities and cooperates with such agencies, local governments and organizations and individuals to ensure that historic properties are taking into consideration at all levels of planning and development.

**(ii)** If an Indian tribe has assumed the functions of the SHPO in the section 106 process for undertakings on tribal lands, the SHPO shall participate as a consulting party if the undertaking takes place on tribal lands but affects historic properties off tribal lands, if requested in accordance with §800.3(c)(1), or if the Indian tribe agrees to include the SHPO pursuant to §800.3(f)(3).

**(2)** Indian tribes and Native Hawaiian organizations.

**(i)** Consultation on tribal lands.

**(A)** Tribal historic preservation officer. For a tribe that has assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act, the tribal historic preservation officer (THPO)

appointed or designated in accordance with the act is the official representative for the purposes of section 106. The agency official shall consult with the THPO in lieu of the SHPO regarding undertakings occurring on or affecting historic properties on tribal lands.

**(B)** Tribes that have not assumed SHPO functions. When an Indian tribe has not assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act, the agency official shall consult with a representative designated by such Indian tribe in addition to the SHPO regarding undertakings occurring on or affecting historic properties on its tribal lands. Such Indian tribes have the same rights of consultation and concurrence that the THPOs are given throughout subpart B of this part, except that such consultations shall be in addition to and on the same basis as consultation with the SHPO.

**(ii)** Consultation on historic properties of significance to Indian tribes and Native Hawaiian organizations. Section 101(d)(6)(B) of the act requires the agency official to consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking. This requirement applies regardless of the location of the historic property. Such Indian tribe or Native Hawaiian organization shall be a consulting party.

**(A)** The agency official shall ensure that consultation in the section 106 process provides the Indian tribe or Native Hawaiian organization a

reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects. It is the responsibility of the agency official to make a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations that shall be consulted in the section 106 process. Consultation should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties.

**(B)** The Federal Government has a unique legal relationship with Indian tribes set forth in the Constitution of the United States, treaties, statutes, and court decisions. Consultation with Indian tribes should be conducted in a sensitive manner respectful of tribal sovereignty. Nothing in this part alters, amends, repeals, interprets, or modifies tribal sovereignty, any treaty rights, or other rights of an Indian tribe, or preempts, modifies, or limits the exercise of any such rights.

**(C)** Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government or the governing body of a Native

Hawaiian organization. Consultation with Indian tribes and Native Hawaiian organizations should be conducted in a manner sensitive to the concerns and needs of the Indian tribe or Native Hawaiian organization.

**(D)** When Indian tribes and Native Hawaiian organizations attach religious and cultural significance to historic properties off tribal lands, section 101(d)(6)(B) of the act requires Federal agencies to consult with such Indian tribes and Native Hawaiian organizations in the section 106 process. Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal, or ceded lands of Indian tribes and Native Hawaiian organizations and should consider that when complying with the procedures in this part.

**(E)** An Indian tribe or a Native Hawaiian organization may enter into an agreement with an agency official that specifies how they will carry out responsibilities under this part, including concerns over the confidentiality of information. An agreement may cover all aspects of tribal participation in the section 106 process, provided that no modification may be made in the roles of other parties to the section 106 process without their consent. An agreement may grant the Indian tribe or Native Hawaiian organization additional rights to participate or concur in agency decisions in the section 106 process beyond those specified in subpart B of this part. The agency official shall provide a copy of any such agreement to the Council and the appropriate SHPOs.

**(F)** An Indian tribe that has not assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act may notify the agency official in writing that it is waiving its rights under §800.6(c)(1) to execute a memorandum of agreement.

**(3)** Representatives of local governments. A representative of a local government with jurisdiction over the area in which the effects of an undertaking may occur is entitled to participate as a consulting party. Under other provisions of Federal law, the local government may be authorized to act as the agency official for purposes of section 106.

**(4)** Applicants for Federal assistance, permits, licenses, and other approvals. An applicant for Federal assistance or for a Federal permit, license, or other approval is entitled to participate as a consulting party as defined in this part. The agency official may authorize an applicant or group of applicants to initiate consultation with the SHPO/THPO and others, but remains legally responsible for all findings and determinations charged to the agency official. The agency official shall notify the SHPO/THPO when an applicant or group of applicants is so authorized. A Federal agency may authorize all applicants in a specific program pursuant to this section by providing notice to all SHPO/THPOs. Federal agencies that provide authorizations to applicants remain responsible for their government-to-government relationships with Indian tribes.

**(5)** Additional consulting parties. Certain individuals and organizations with a demonstrated interest in the undertaking may participate as consulting parties due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties.

**(d)** The public—

**(1)** Nature of involvement. The views of the public are essential to informed Federal decisionmaking in the section 106 process. The agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties, confidentiality concerns of private individuals and businesses, and the relationship of the Federal involvement to the undertaking.

**(2)** Providing notice and information. The agency official must, except where appropriate to protect confidentiality concerns of affected parties, provide the public with information about an undertaking and its effects on historic properties and seek public comment and input. Members of the public may also provide views on their own initiative for the agency official to consider in decisionmaking.

**(3)** Use of agency procedures. The agency official may use the agency's procedures for public involvement under the National Environmental

Policy Act or other program requirements in lieu of public involvement requirements in subpart B of this part, if they provide adequate opportunities for public involvement consistent with this subpart.

**23 U.S.C. §325**

**§325. State assumption of responsibilities for certain programs and projects**

**(a) Assumption of Secretary's responsibilities under applicable Federal laws.**--

**(1) Pilot program.**--

**(A) Establishment.**--The Secretary may establish a pilot program under which States may assume the responsibilities of the Secretary under any Federal laws subject to the requirements of this section.

**(B) First 3 fiscal years.**--In the first 3 fiscal years following the date of enactment of the SAFETEA-LU, the Secretary may allow up to 5 States to participate in the pilot program.

**(2) Scope of program.**--Under the pilot program, the Secretary may assign, and a State may assume, any of the Secretary's responsibilities (other than responsibilities relating to federally recognized Indian tribes) for environmental reviews, consultation, or decisionmaking or other actions required under any Federal law as such requirements apply to the following projects:

**(A)** Projects funded under section 104(h).

**(B)** Transportation enhancement activities under section 133, as such term is defined in section 101(a)(35).

**(b) Agreements.**--

**(1) In general.**--The Secretary shall enter into a memorandum of understanding with a State participating in the pilot program setting forth the responsibilities to be assigned under subsection (a)(2) and the terms and conditions under which the assignment is being made.

**(2) Certification.**--Before the Secretary enters into a memorandum of understanding with a State under paragraph (1), the State shall certify that the State has in effect laws (including regulations) applicable to projects carried out and funded under this title and chapter 53 of title 49 that authorize the State to carry out the responsibilities being assumed.

**(3) Maximum duration.**--A memorandum of understanding with a State under this section shall be established for an initial period of no more than 3 years and may be renewed by mutual agreement on a periodic basis for periods of not more than 3 years.

**(4) Compliance.**--

**(A) In general.**--After entering into a memorandum of understanding under paragraph (1), the Secretary shall review and determine compliance by the State with the memorandum of understanding.

**(B) Renewals.**--The Secretary shall take into account the performance of a State under the pilot program when considering renewal of a memorandum of understanding with the State under the program.

**(5) Sole responsibility.**--A State that assumes responsibility under subsection (a)(2) with respect to a Federal law shall be solely responsible

106

and solely liable for complying with and carrying out that law, and the Secretary shall have no such responsibility or liability.

**(6) Acceptance of jurisdiction.**--In a memorandum of understanding, the State shall consent to accept the jurisdiction of the Federal courts for the compliance, discharge, and enforcement of any responsibility of the Secretary that the State assumes.

**(c) Selection of States for pilot program.**--

**(1) Application.**--To be eligible to participate in the pilot program, a State shall submit to the Secretary an application that contains such information as the Secretary may require. At a minimum, an application shall include--

**(A)** a description of the projects or classes of projects for which the State seeks to assume responsibilities under subsection (a)(2); and

**(B)** a certification that the State has the capability to assume such responsibilities.

**(2) Public notice.**--Before entering into a memorandum of understanding allowing a State to participate in the pilot program, the Secretary shall--

**(A)** publish notice in the Federal Register of the Secretary's intent to allow the State to participate in the program, including a copy of the State's application to the Secretary and the terms of the proposed agreement with the State; and

**(B)** provide an opportunity for public comment.

**(3) Selection criteria.**--The Secretary may approve the application of a State to assume responsibilities under the program only if--

**(A)** the requirements under paragraph (2) have been met; and

**(B)** the Secretary determines that the State has the capability to assume the responsibilities.

**(4) Other Federal agency views.**--Before assigning to a State a responsibility of the Secretary that requires the Secretary to consult with another Federal agency, the Secretary shall solicit the views of the Federal agency.

**(d) State defined.**--With respect to the recreational trails program, the term "State" means the State agency designated by the Governor of the State in accordance with section 206(c)(1).

**(e) Preservation of public interest consideration.**--Nothing in this section shall be construed to limit the requirements under any applicable law providing for the consideration and preservation of the public interest, including public participation and community values in transportation decisionmaking.

43 U.S.C. §1732

§1732. Management of use, occupancy, and development of public lands

(a) Multiple use and sustained yield requirements applicable; exception

The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available, except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law.

(b) Easements, permits, etc., for utilization through habitation, cultivation, and development of small trade or manufacturing concerns; applicable statutory requirements

In managing the public lands, the Secretary shall, subject to this Act and other applicable law and under such terms and conditions as are consistent with such law, regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and development of the public lands, including, but not limited to, long-term leases to permit individuals to utilize public lands for habitation, cultivation, and the development of small

trade or manufacturing concerns: *Provided*, That unless otherwise provided for by law, the Secretary may permit Federal departments and agencies to use, occupy, and develop public lands only through rights-of-way under section 1767 of this title, withdrawals under section 1714 of this title, and, where the proposed use and development are similar or closely related to the programs of the Secretary for the public lands involved, cooperative agreements under section 1737(b) of this title: *Provided further*, That nothing in this Act shall be construed as authorizing the Secretary concerned to require Federal permits to hunt and fish on public lands or on lands in the National Forest System and adjacent waters or as enlarging or diminishing the responsibility and authority of the States for management of fish and resident wildlife. However, the Secretary concerned may designate areas of public land and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law. Except in emergencies, any regulations of the Secretary concerned relating to hunting and fishing pursuant to this section shall be put into effect only after consultation with the appropriate State fish and game department. Nothing in this Act shall modify or change any provision of Federal law relating to migratory birds or to endangered or threatened species. Except as provided in section 1744, section 1782, and subsection (f) of section 1781 of this

title and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress. In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

**(c) Revocation or suspension provision in instrument authorizing use, occupancy or development; violation of provision; procedure applicable**

The Secretary shall insert in any instrument providing for the use, occupancy, or development of the public lands a provision authorizing revocation or suspension, after notice and hearing, of such instrument upon a final administrative finding of a violation of any term or condition of the instrument, including, but not limited to, terms and conditions requiring compliance with regulations under Acts applicable to the public lands and compliance with applicable State or Federal air or water quality standard or implementation plan: *Provided*, That such violation occurred on public lands covered by such instrument and occurred in connection with the exercise of rights and privileges granted by it: *Provided further*, That the Secretary shall terminate any such suspension no later than the date upon which he determines the cause of said violation has

111

been rectified: *Provided further*, That the Secretary may order an immediate temporary suspension prior to a hearing or final administrative finding if he determines that such a suspension is necessary to protect health or safety or the environment: *Provided further*, That, where other applicable law contains specific provisions for suspension, revocation, or cancellation of a permit, license, or other authorization to use, occupy, or develop the public lands, the specific provisions of such law shall prevail.

**(d) Authorization to utilize certain public lands in Alaska for military purposes**

**(1)** The Secretary of the Interior, after consultation with the Governor of Alaska, may issue to the Secretary of Defense or to the Secretary of a military department within the Department of Defense or to the Commandant of the Coast Guard a nonrenewable general authorization to utilize public lands in Alaska (other than within a conservation system unit or the Steese National Conservation Area or the White Mountains National Recreation Area) for purposes of military maneuvering, military training, or equipment testing not involving artillery firing, aerial or other gunnery, or other use of live ammunition or ordnance.

**(2)** Use of public lands pursuant to a general authorization under this subsection shall be limited to areas where such use would not be inconsistent with the plans prepared pursuant to section 1712 of this title.

Each such use shall be subject to a requirement that the using department shall be responsible for any necessary cleanup and decontamination of the lands used, and to such other terms and conditions (including but not limited to restrictions on use of off-road or all-terrain vehicles) as the Secretary of the Interior may require to--

**(A)** minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved; and

**(B)** minimize the period and method of such use and the interference with or restrictions on other uses of the public lands involved.

**(3)(A)** A general authorization issued pursuant to this subsection shall not be for a term of more than three years and shall be revoked in whole or in part, as the Secretary of the Interior finds necessary, prior to the end of such term upon a determination by the Secretary of the Interior that there has been a failure to comply with its terms and conditions or that activities pursuant to such an authorization have had or might have a significant adverse impact on the resources or values of the affected lands.

**(B)** Each specific use of a particular area of public lands pursuant to a general authorization under this subsection shall be subject to specific authorization by the Secretary and to appropriate terms and conditions, including such as are described in paragraph (2) of this subsection.

**(4)** Issuance of a general authorization pursuant to this subsection shall be subject to the provisions of section 1712(f) of this title, section 3120 of Title 16, and all other applicable provisions of law. The Secretary of a military department (or the commandant of the Coast Guard) requesting such authorization shall reimburse the Secretary of the Interior for the costs of implementing this paragraph. An authorization pursuant to this subsection shall not authorize the construction of permanent structures or facilities on the public lands.

**(5)** To the extent that public safety may require closure to public use of any portion of the public lands covered by an authorization issued pursuant to this subsection, the Secretary of the military department concerned or the Commandant of the Coast Guard shall take appropriate steps to notify the public concerning such closure and to provide appropriate warnings of risks to public safety.

**(6)** For purposes of this subsection, the term "conservation system unit" has the same meaning as specified in section 3102 of Title 16.

**43 C.F.R. §1610.5-3**

**§1610.5–3 Conformity and implementation.**

**(a)** All future resource management authorizations and actions, as well as budget or other action proposals to higher levels in the Bureau of Land Management and Department, and subsequent more detailed or specific planning, shall conform to the approved plan.

**(b)** After a plan is approved or amended, and if otherwise authorized by law, regulation, contract, permit, cooperative agreement or other instrument of occupancy and use, the Field Manager shall take appropriate measures, subject to valid existing rights, to make operations and activities under existing permits, contracts, cooperative agreements or other instruments for occupancy and use, conform to the approved plan or amendment within a reasonable period of time. Any person adversely affected by a specific action being proposed to implement some portion of a resource management plan or amendment may appeal such action pursuant to 43 CFR 4.400 at the time the action is proposed for implementation.

**(c)** If a proposed action is not in conformance, and warrants further consideration before a plan revision is scheduled, such consideration shall be through a plan amendment in accordance with the provisions of §1610.5–5 of this title.

**(d)** More detailed and site specific plans for coal, oil shale and tar sand resources shall be prepared in accordance with specific regulations for those resources: Group 3400 of this title for coal; Group 3900 of this title for oil shale; and part 3140 of this title for tar sand. These activity plans shall be in conformance with land use plans prepared and approved under the provisions of this part.

43 C.F.R. §3809.5

## §3809.5 How does BLM define certain terms used in this subpart?

As used in this subpart, the term:

Casual use means activities ordinarily resulting in no or negligible disturbance of the public lands or resources. For example—

**(1)** Casual use generally includes the collection of geochemical, rock, soil, or mineral specimens using hand tools; hand panning; or non-motorized sluicing. It may include use of small portable suction dredges. It also generally includes use of metal detectors, gold spears and other battery-operated devices for sensing the presence of minerals, and hand and battery-operated drywashers. Operators may use motorized vehicles for casual use activities provided the use is consistent with the regulations governing such use (part 8340 of this title), off-road vehicle use designations contained in BLM land-use plans, and the terms of temporary closures ordered by BLM.

**(2)** Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, motorized vehicles in areas when designated as closed to "off-road vehicles" as defined in §8340.0–5 of this title, chemicals, or explosives. It also does not include "occupancy"

as defined in §3715.0–5 of this title or operations in areas where the cumulative effects of the activities result in more than negligible disturbance.

Exploration means creating surface disturbance greater than casual use that includes sampling, drilling, or developing surface or underground workings to evaluate the type, extent, quantity, or quality of mineral values present. Exploration does not include activities where material is extracted for commercial use or sale.

Minimize means to reduce the adverse impact of an operation to the lowest practical level. During review of operations, BLM may determine that it is practical to avoid or eliminate particular impacts.

Mining claim means any unpatented mining claim, millsite, or tunnel site located under the mining laws. The term also applies to those mining claims and millsites located in the California Desert Conservation Area that were patented after the enactment of the Federal Land Policy and Management Act of October 21, 1976. Mining "claimant" is defined in §3833.0–5 of this title.

Mining laws means the Lode Law of July 26, 1866, as amended (14 Stat. 251); the Placer Law of July 9, 1870, as amended (16 Stat. 217); and the Mining Law of May 10, 1872, as amended (17 Stat. 91); as well as all laws supplementing and amending those laws, including the Building Stone Act of August 4, 1892, as amended (27 Stat. 348); the Saline Placer

Act of January 31, 1901 (31 Stat. 745); the Surface Resources Act of 1955 (30 U.S.C. 611–614); and the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.).

Mitigation, as defined in 40 CFR 1508.20, may include one or more of the following:

**(1)** Avoiding the impact altogether by not taking a certain action or parts of an action;

**(2)** Minimizing impacts by limiting the degree or magnitude of the action and its implementation;

**(3)** Rectifying the impact by repairing, rehabilitating, or restoring the affected environment;

**(4)** Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and

**(5)** Compensating for the impact by replacing, or providing substitute, resources or environments.

Operations means all functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses, whether on a mining claim or not, including the construction of roads, transmission lines, pipelines, and other means of access across public lands for support facilities.

Operator means a person conducting or proposing to conduct operations.

Person means any individual, firm, corporation, association, partnership, trust, consortium, joint venture, or any other entity conducting operations on public lands.

Project area means the area of land upon which the operator conducts operations, including the area required for construction or maintenance of roads, transmission lines, pipelines, or other means of access by the operator.

Public lands, as defined in 43 U.S.C. 1702, means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the BLM, without regard to how the United States acquired ownership, except—

**(1)** Lands located on the Outer Continental Shelf; and

**(2)** Lands held for the benefit of Indians, Aleuts, and Eskimos.

Reclamation means taking measures required by this subpart following disturbance of public lands caused by operations to meet applicable performance standards and achieve conditions required by BLM at the conclusion of operations. For a definition of "reclamation" applicable to operations conducted under the mining laws on Stock Raising Homestead Act lands, see part 3810, subpart 3814 of this title. Components of reclamation include, where applicable:

**(1)** Isolation, control, or removal of acid-forming, toxic, or deleterious substances;

**(2)** Regrading and reshaping to conform with adjacent landforms, facilitate revegetation, control drainage, and minimize erosion;

**(3)** Rehabilitation of fisheries or wildlife habitat;

**(4)** Placement of growth medium and establishment of self-sustaining revegetation;

**(5)** Removal or stabilization of buildings, structures, or other support facilities;

**(6)** Plugging of drill holes and closure of underground workings; and

**(7)** Providing for post-mining monitoring, maintenance, or treatment.

Riparian area is a form of wetland transition between permanently saturated wetlands and upland areas. These areas exhibit vegetation or physical characteristics reflective of permanent surface or subsurface water influence. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are areas such as ephemeral streams or washes that do not exhibit the presence of vegetation dependent upon free water in the soil.

Tribe means, and Tribal refers to, a Federally recognized Indian tribe.

Unnecessary or undue degradation means conditions, activities, or practices that:

**(1)** Fail to comply with one or more of the following: the performance standards in §3809.420, the terms and conditions of an approved plan of operations, operations described in a complete notice, and other Federal and state laws related to environmental protection and protection of cultural resources;

**(2)** Are not "reasonably incident" to prospecting, mining, or processing operations as defined in §3715.0–5 of this chapter; or

**(3)** Fail to attain a stated level of protection or reclamation required by specific laws in areas such as the California Desert Conservation Area, Wild and Scenic Rivers, BLM-administered portions of the National Wilderness System, and BLM-administered National Monuments and National Conservation Areas.

**Executive Order 13007**

**Indian Sacred Sites**

May 24, 1996

By the authority vested in me as President by the Constitution and the laws of the United States, in furtherance of Federal treaties, and in order to protect and preserve Indian religious practices, it is hereby ordered:

**Section 1.** *Accommodation of Sacred Sites.* (a) In managing Federal lands, each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall, to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites. Where appropriate, agencies shall maintain the confidentiality of sacred sites.

**(b)** For purposes of this order:

**(i)** "Federal lands" means any land or interests in land owned by the United States, including leasehold interests held by the United States, except Indian trust lands;

**(ii)** "Indian tribe" means an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to Public Law No. 103-

454, 108 Stat. 4791, and "Indian" refers to a member of such an Indian tribe; and

**(iii)** "Sacred site" means any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.

**Sec. 2.** *Procedures.* **(a)** Each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall, as appropriate, promptly implement procedures for the purposes of carrying out the provisions of section 1 of this order, including, where practicable and appropriate, procedures to ensure reasonable notice is provided of proposed actions or land management policies that may restrict future access to or ceremonial use of, or adversely affect the physical integrity of, sacred sites. In all actions pursuant to this section, agencies shall comply with the Executive memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments."

**(b)** Within 1 year of the effective date of this order, the head of each executive branch agency with statutory or administrative responsibility

for the management of Federal lands shall report to the President, through the Assistant to the President for Domestic Policy, on the implementation of this order. Such reports shall address, among other things, (i) any changes necessary to accommodate access to and ceremonial use of Indian sacred sites; (ii) any changes necessary to avoid adversely affecting the physical integrity of Indian sacred sites; and (iii) procedures implemented or proposed to facilitate consultation with appropriate Indian tribes and religious leaders and the expeditious resolution of disputes relating to agency action on Federal lands that may adversely affect access to, ceremonial use of, or the physical integrity of sacred sites.

**Sec. 3.** Nothing in this order shall be construed to require a taking of vested property interests. Nor shall this order be construed to impair enforceable rights to use of Federal lands that have been granted to third parties through final agency action. For purposes of this order, "agency action" has the same meaning as in the Administrative Procedure Act (5 U.S.C. 551(13)).

**Sec. 4.** This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it, create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by any party against the United States, its agencies, officers, or any person.

WILLIAM J. CLINTON

**Oregon Resources Conservation Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-536 (1996)**

\*　　\*　　\*

**SEC. 401. LAND EXCHANGE.**

\*　　\*　　\*

**(g)** WITHDRAWAL OF LANDS.—All lands managed by the Department of the Interior, Bureau of Land Management, located in Townships 2 and 3 South, Ranges 6 and 7 East, Willamette Meridian, which can be seen from the right-of-way of U.S. Highway 26 (in this section, such lands are referred to as the "Mt. Hood Corridor Lands"), shall be managed primarily for the protection or enhancement of scenic qualities. Management prescriptions for other resource values associated with these lands shall be planned and conducted for purposes other than timber harvest, so as not to impair the scenic qualities of the area.

**(h)** TIMBER CUTTING.—Timber cutting may be conducted on Mt. Hood Corridor Lands following a resource-damaging catastrophic event. Such cutting may only be conducted to achieve the following resource management objectives, in compliance with the current land use plans—

**(1)** to maintain safe conditions for the visiting public;

**(2)** to control the continued spread of forest fire;

**(3)** for activities related to administration of the Mt. Hood Corridor Lands; or

126

**(4)** for removal of hazard trees along trails and roadways.

**49 U.S.C. §303**

**§303. Policy on lands, wildlife and waterfowl refuges, and historic sites**

**(a)** It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

**(b)** The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States, in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of lands crossed by transportation activities or facilities.

**(c) Approval of programs and projects.**--Subject to subsections (d) and (h), the Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if--

**(1)** there is no prudent and feasible alternative to using that land; and

**(2)** the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

**(d) De minimis impacts.**--

**(1) Requirements.**--

**(A) Requirements for historic sites.**--The requirements of this section shall be considered to be satisfied with respect to an area described in paragraph (2) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area.

**(B) Requirements for parks, recreation areas, and wildlife or waterfowl refuges.**--The requirements of subsection (c)(1) shall be considered to be satisfied with respect to an area described in paragraph (3) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area. The requirements of subsection (c)(2) with respect to an area described in paragraph (3) shall not include an alternatives analysis.

**(C) Criteria.**--In making any determination under this subsection, the Secretary shall consider to be part of a transportation program or project any avoidance, minimization, mitigation, or enhancement measures that are required to be implemented as a condition of approval of the transportation program or project.

**(2) Historic sites.**--With respect to historic sites, the Secretary may make a finding of de minimis impact only if--

**(A)** the Secretary has determined, in accordance with the consultation process required under section 306108 of title 54, United States Code, that--

**(i)** the transportation program or project will have no adverse effect on the historic site; or

**(ii)** there will be no historic properties affected by the transportation program or project;

**(B)** the finding of the Secretary has received written concurrence from the applicable State historic preservation officer or tribal historic preservation officer (and from the Advisory Council on Historic Preservation if the Council is participating in the consultation process); and

**(C)** the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A).

**(3) Parks, recreation areas, and wildlife or waterfowl refuges.**--With respect to parks, recreation areas, or wildlife or waterfowl refuges, the Secretary may make a finding of de minimis impact only if--

**(A)** the Secretary has determined, after public notice and opportunity for public review and comment, that the transportation program or project will not adversely affect the activities, features, and attributes of the

park, recreation area, or wildlife or waterfowl refuge eligible for protection under this section; and

**(B)** the finding of the Secretary has received concurrence from the officials with jurisdiction over the park, recreation area, or wildlife or waterfowl refuge.

\*   \*   \*

**(h) Rail and transit.**--

**(1) In general.**--Improvements to, or the maintenance, rehabilitation, or operation of, railroad or rail transit lines or elements thereof that are in use or were historically used for the transportation of goods or passengers shall not be considered a use of a historic site under subsection (c), regardless of whether the railroad or rail transit line or element thereof is listed on, or eligible for listing on, the National Register of Historic Places.

**(2) Exceptions.**--

**(A) In general.**--Paragraph (1) shall not apply to--

**(i)** stations; or

**(ii)** bridges or tunnels located on--

**(I)** railroad lines that have been abandoned; or

**(II)** transit lines that are not in use.

131

**(B) Clarification with respect to certain bridges and tunnels.**-- The bridges and tunnels referred to in subparagraph (A)(ii) do not include bridges or tunnels located on railroad or transit lines--

**(i)** over which service has been discontinued; or

**(ii)** that have been railbanked or otherwise reserved for the transportation of goods or passengers.

**23 C.F.R. §774.3**

**§774.3 Section 4(f) approvals.**

The Administration may not approve the use, as defined in §774.17, of Section 4(f) property unless a determination is made under paragraph (a) or (b) of this section.

**(a)** The Administration determines that:

**(1)** There is no feasible and prudent avoidance alternative, as defined in §774.17, to the use of land from the property; and

**(2)** The action includes all possible planning, as defined in §774.17, to minimize harm to the property resulting from such use; or

**(b)** The Administration determines that the use of the property, including any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures) committed to by the applicant, will have a de minimis impact, as defined in §774.17, on the property.

**(c)** If the analysis in paragraph (a)(1) of this section concludes that there is no feasible and prudent avoidance alternative, then the Administration may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that:

**(1)** Causes the least overall harm in light of the statute's preservation purpose. The least overall harm is determined by balancing the following factors:

133

**(i)** The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

**(ii)** The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

**(iii)** The relative significance of each Section 4(f) property;

**(iv)** The views of the official(s) with jurisdiction over each Section 4(f) property;

**(v)** The degree to which each alternative meets the purpose and need for the project;

**(vi)** After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

**(vii)** Substantial differences in costs among the alternatives.

**(2)** The alternative selected must include all possible planning, as defined in §774.17, to minimize harm to Section 4(f) property.

**(d)** Programmatic Section 4(f) evaluations are a time-saving procedural alternative to preparing individual Section 4(f) evaluations under paragraph (a) of this section for certain minor uses of Section 4(f) property. Programmatic Section 4(f) evaluations are developed by the Administration based on experience with a specific set of conditions that includes project type, degree of use and impact, and evaluation of avoidance alternatives. An approved programmatic Section 4(f) evaluation may be

relied upon to cover a particular project only if the specific conditions in the programmatic evaluation are met

**(1)** The determination whether a programmatic Section 4(f) evaluation applies to the use of a specific Section 4(f) property shall be documented as specified in the applicable programmatic Section 4(f) evaluation.

**(2)** The Administration may develop additional programmatic Section 4(f) evaluations. Proposed new or revised programmatic Section 4(f) evaluations will be coordinated with the Department of Interior, Department of Agriculture, and Department of Housing and Urban Development, and published in the Federal Register for comment prior to being finalized. New or revised programmatic Section 4(f) evaluations shall be reviewed for legal sufficiency and approved by the Headquarters Office of the Administration.

**(e)** The coordination requirements in §774.5 must be completed before the Administration may make Section 4(f) approvals under this section. Requirements for the documentation and timing of Section 4(f) approvals are located in §§774.7 and 774.9, respectively.

**23 C.F.R. §774.7**

**§774.7 Documentation.**

**(a)** A Section 4(f) evaluation prepared under §774.3(a) shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property.

**(b)** A de minimis impact determination under §774.3(b) shall include sufficient supporting documentation to demonstrate that the impacts, after avoidance, minimization, mitigation, or enhancement measures are taken into account, are de minimis as defined in §774.17; and that the coordination required in §774.5(b) has been completed.

**(c)** If there is no feasible and prudent avoidance alternative the Administration may approve only the alternative that causes the least overall harm in accordance with §774.3(c). This analysis must be documented in the Section 4(f) evaluation.

**(d)** The Administration shall review all Section 4(f) approvals under §§774.3(a) and 774.3(c) for legal sufficiency.

**(e)** A Section 4(f) approval may involve different levels of detail where the Section 4(f) involvement is addressed in a tiered EIS under §771.111(g) of this chapter.

**(1)** When the first-tier, broad-scale EIS is prepared, the detailed information necessary to complete the Section 4(f) approval may not be available at that stage in the development of the action. In such cases, the documentation should address the potential impacts that a proposed action will have on Section 4(f) property and whether those impacts could have a bearing on the decision to be made. A preliminary Section 4(f) approval may be made at this time as to whether the impacts resulting from the use of a Section 4(f) property are de minimis or whether there are feasible and prudent avoidance alternatives. This preliminary approval shall include all possible planning to minimize harm to the extent that the level of detail available at the first-tier EIS stage allows. It is recognized that such planning at this stage may be limited to ensuring that opportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the first-tier stage. This preliminary Section 4(f) approval is then incorporated into the first-tier EIS.

**(2)** The Section 4(f) approval will be finalized in the second-tier study. If no new Section 4(f) use, other than a de minimis impact, is identified in the second-tier study and if all possible planning to minimize harm has occurred, then the second-tier Section 4(f) approval may finalize the preliminary approval by reference to the first-tier documentation. Re-evaluation of the preliminary Section 4(f) approval is only needed to the

extent that new or more detailed information available at the second-tier stage raises new Section 4(f) concerns not already considered.

**(3)** The final Section 4(f) approval may be made in the second-tier CE, EA, final EIS, ROD or FONSI.

**(f)** In accordance with §§771.105(a) and 771.133 of this chapter, the documentation supporting a Section 4(f) approval should be included in the EIS, EA, or for a project classified as a CE, in a separate document. If the Section 4(f) documentation cannot be included in the NEPA document, then it shall be presented in a separate document. The Section 4(f) documentation shall be developed by the applicant in cooperation with the Administration.

**Federal Rule of Civil Procedure 8**

*   *   *

**(c) Affirmative Defenses.**

**(1)** ***In General.*** In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:

- accord and satisfaction;

*   *   *

- laches;

- license;

- payment;

- release;

- res judicata;

- statute of frauds;

- statute of limitations; and

- waiver.

*   *   *