No. 21-35220

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WILBUR SLOCKISH, Hereditary Chief of the Klickitat/Cascade Tribe, et al.,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Defendants-Appellees.*

Appeal from the United States District Court for the District of Oregon
No. 3:08-cv-1169 (Hon. Marco A. Hernandez)

**ANSWERING BRIEF FOR FEDERAL APPELLEES**

JEAN E. WILLIAMS
*Acting Assistant Attorney General*
ANDREW C. MERGEN
REUBEN S. SCHIFMAN
ALLEN BRABENDER
JOAN M. PEPIN
KATELIN SHUGART-SCHMIDT
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-1834
katelin.shugart-schmidt@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iv

GLOSSARY ................................................................................ x

INTRODUCTION ....................................................................... 1

STATEMENT OF JURISDICTION ............................................. 3

STATEMENT OF THE ISSUES ................................................. 3

STATEMENT OF THE CASE ..................................................... 5

      A.    Statement of the Facts ................................................. 5

            1.    Background: ODOT's widening of Highway 26
                 in the 1980s and 90s............................................. 5

            2.    The agencies conducted a robust environmental
                 review and public participation process. ............. 7

            3.    A year after the public review process ended,
                 Plaintiffs voiced wide-ranging objections to the
                 project. .................................................................. 12

            4.    Project construction began in February 2008
                 and was completed in 2009. ................................ 14

      B.    Procedural History..................................................... 14

SUMMARY OF ARGUMENT ................................................... 17

STANDARD OF REVIEW ........................................................ 18

ARGUMENT .............................................................................. 19

I.    This appeal is moot. ............................................................ 19

II.   Plaintiffs' RFRA claims are foreclosed by Supreme Court
     and en banc Circuit precedent. .......................................... 26

A. Under RFRA, a "substantial burden" requires a showing of coercion, not just a collateral impact on religious exercise...................................................... 26

B. *Navajo Nation* established that government use of federal land does not substantially burden religious exercise.............................................................. 30

C. *Lyng* and *Navajo Nation* are not distinguishable. ........................ 36

D. The other cases on which Plaintiffs rely are distinguishable........................................................... 39

E. Plaintiffs' theory has far-reaching and unworkable consequences. .................................................... 41

III. The Free Exercise Clause does not prohibit government land use that affects religious exercise.......................................... 43

IV. Plaintiffs' NEPA, NHPA, FLMPA, and Section 4(f) claims were waived and lack merit. .............................................. 46

A. Plaintiffs waived these claims. ................................... 46

1. Plaintiffs failed to raise these claims during the administrative process...................................... 46

2. Defendants did not forfeit their waiver defense. ................ 51

B. Plaintiffs' claims lack merit. ...................................... 52

1. Defendants complied with NEPA. .................................. 52

a. No EIS was required. ............................. 53

b. The EAs rationally focused on reasonable alternatives based on information available at the time................................. 54

c. BLM need not duplicate FHWA's environmental review. ........................... 55

2. Defendants complied with NHPA...................................... 55

    a. BLM need not duplicate the Section 106 process. ............................................................. 56

    b. Defendants consulted with all affected Tribes............................................................... 57

3. BLM complied with FLPMA........................................... 59

    a. BLM complied with Executive Order 13007. ................................................................ 59

    b. Tree removal was consistent with the RMP and ORCA.................................................... 61

4. Section 4(f) does not apply to Dwyer............................... 63

CONCLUSION ................................................................... 64

STATEMENT OF RELATED CASES ...................................... 65

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Apache Survival Coalition v. United States,*
    21 F.3d 895 (9th Cir. 1994)............................................................21, 22

*Black Warrior Riverkeeper v. U.S. Army Corps of Engineers,*
    781 F.3d 1271 (11th Cir. 2015) .......................................... 25

*Bowen v. Roy,*
    476 U.S. 693 (1986)............................................................ 31

*Buckingham v USDA,*
    603 F.3d 1073 (9th Cir. 2010) ........................................46, 47

*California Parents v. Torlakson,*
    973 F.3d 1010 (9th Cir. 2020) ........................................... 43

*California v. Block,*
    690 F.2d 753 (9th Cir. 1982)............................................. 54

*California v. Texas,*
    -- S. Ct. --, 2021 WL 2459255 (June 17, 2021) .................... 21

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993)........................................................... 44

*City of Boerne v. Flores,*
    521 U.S. 519 (1997)........................................................... 27

*Communities Against Runway Expansion, Inc. v. F.A.A.,*
    355 F.3d 678 (D.C. Cir. 2004) .......................................... 60

*Comanche Nation v. United States,*
    2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) ................... 41

*Cutter v. Wilkinson,*
    544 U.S. 709 (2005)........................................................40, 42

*DeMarco v. Davis*,
    914 F.3d 383 (5th Cir. 2019) ............................................................... 34

*Department of Transportation v. Public Citizen*,
    541 U.S. 752 (2004) ............................................................................ 47

*Employment Division v. Smith*,
    494 U.S. 872 (1990) .......................................................................26, 44

*Fulton v. City of Philadelphia*,
    -- S. Ct. --, 2021 WL 2459253 (June 17, 2021) ....................39, 43, 44, 45

*Garcia v. Salvation Army*,
    918 F.3d 997 (9th Cir. 2019) ..........................................................25, 52

*Glanton v. AdvancePCS Inc.*,
    465 F.3d 1123 (9th Cir. 2006) ............................................................. 20

*Great Basin Mine Watch v. Hankins*,
    456 F.3d 955 (9th Cir. 2006) ............................................................... 47

*Greene v. Solano County Jail*,
    513 F.3d 982 (9th Cir. 2008) ............................................................... 40

*Haight v. Thompson*,
    763 F.3d 554 (6th Cir. 2014) ............................................................... 40

*Havasupai Tribe v. Robertson*,
    943 F.2d 32 (9th Cir. 1991) ................................................................. 49

*Herrera v. Wyoming*,
    139 S. Ct. 1686 (2019) ........................................................................ 57

*Idaho Community Action Network v. U.S. Department of Transportation*,
    545 F.3d 1147 (9th Cir. 2008) ............................................................. 49

*International Church of the Foursquare Gospel v. City of San Leandro*,
    673 F.3d 1059 (9th Cir. 2011) ............................................................. 34

*Jicarilla Apache Tribe v. Andrus*,
  687 F.2d 1324 (10th Cir. 1982) ........................................................ 21

*La Cuna De Aztlan Sacred Sites Prot. Circle v. Department of Interior*,
  2014 WL 12597035 (C.D. Cal. June 20, 2014) .................................. 39

*La Cuna De Aztlan Sacred Sites Prot. Circle v. U.S. Department of
  Interior*, 642 F. App'x 690 (9th Cir. 2016) ...................................... 57

*LaFlamme v. FERC*,
  945 F.2d 1124 (9th Cir. 1991) .......................................................... 55

*Lands Council v. McNair*,
  629 F.3d 1070 (9th Cir. 2010) .......................................................... 46

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) ...................................................................... 29

*Lyng v. Northwest Indian Cemetery Protective Association*,
  485 U.S. 439 (1988).................................................................passim

*McGirt v. Oklahoma*,
  140 S. Ct. 2452 (2020) ...................................................................... 57

*McMaster v. United States*,
  731 F.3d 881 (9th Cir. 2013) ............................................................ 58

*Mockaitis v. Harcleroad*,
  104 F.3d 1522 (9th Cri. 1977) .......................................................... 40

*Nance v. Miser*,
  700 F. App'x. 629 (9th Cir. 2017) .................................................... 40

*Native Ecosystems Council v. U.S. Forest Service*,
  428 F.3d 1233 (9th Cir. 2005) .......................................................... 54

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) .......................................................... 53

*National Parks & Conservation Association v. Bureau of Land Management*, 606 F.3d 1058 (9th Cir. 2010) ......................................... 48

*Navajo Nation v. U.S. Forest Service*,
535 F.3d 1058 (9th Cir. 2008) ........................................................passim

*Nome Eskimo Community v. Babbitt*,
67 F.3d 813 (9th Cir. 1995) .................................................................. 21

*Northwest Indian Cemetery Protection Association v. Peterson*,
795 F.2d 688 (9th Cir. 1986) ................................................................ 45

*Omnipoint Communications, Inc. v. White Plains*,
202 F.R.D. 402 (S.D.N.Y. 2001) ......................................................... 34

*Oregon Natural Desert Association v. Jewell*,
840 F.3d 562 (9th Cir. 2016) ................................................................ 47

*Petrella v. Metro-Goldwyn-Mayer*,
572 U.S. 663 (2014) .............................................................................. 24

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
894 F.3d 1015 (9th Cir. 2018) ............................................................. 25

*Presidio Golf Club v. National Park Service*,
155 F.3d 1153 (9th Cir. 1998) ............................................................. 53

*Presidio Historical Association v. Presidio Trust*,
811 F.3d 1154 (9th Cir. 2016) ............................................................. 55

*San Luis & Delta-Mendota Water Authority v. Jewell*,
747 F.3d 581 (9th Cir. 2014) .........................................................19, 54

*SCA Hygiene Products v. First Quality Baby Products*,
137 S. Ct. 954 (2017) ........................................................................... 24

*Sherbert v. Verner*,
374 U.S. 398 (1963)........................................................................26, 27

*Snoqualmie Indian Tribe v. FERC*,
    545 F.3d 1207 (9th Cir. 2008) ............................................................. 37

*South Fork Band v. Dep't of the Interior*,
    2010 WL 3419181 (D. Nev. 2010) ...................................................60, 61

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
    239 F. Supp. 3d 77 (D.D.C. 2017) ...................................................24, 40

*Tanzin v. Tanvir*,
    141 S. Ct. 486 (2020) ........................................................................... 34

*Te-Moak Tribe v. Department of the Interior*,
    565 F. App'x 665 (9th Cir. 2014) ........................................................ 60

*Te-Moak Tribe v. Department of the Interior*,
    608 F.3d 592 (9th Cir. 2010) ............................................................... 56

*Trinity Lutheran Church v. Comer*,
    137 S. Ct. 2012 (2017) ...................................................................36, 45

*United States v. Hoffman*,
    436 F. Supp. 3d 1272 (D. Ariz. 2020) ...........................................35, 39

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) ............................................................................... 46

*United States v. Washington*,
    157 F.3d 630 (9th Cir. 1998) ............................................................... 12

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ............................................................................. 46

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ............................................................... 40

*West v. Secretary of Transportation*,
    206 F.3d 920 (9th Cir. 2000) ............................................................... 20

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)........................................................................26, 27

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014)..........................................................38, 40


## Other Authorities

Executive Order 13007,
    61 Fed. Reg. 26,771 (May 24, 1996) ..............................................59, 60

16 U.S.C. § 470aa *et seq.* ................................................................. 12, 16, 56

23 U.S.C. §139(a)(3)........................................................................ 49

23 U.S.C. § 101 ............................................................................... 20

25 U.S.C. § 3001 *et seq.* ................................................................. 16

42 U.S.C. § 1997 ............................................................................. 42

42 U.S.C. § 2000 ........................................................................ 26, 27, 34

43 U.S.C. § 1701 *et seq.* ................................................................. 16

43 U.S.C. § 1732 ............................................................................. 59

49 U.S.C. § 303 *et seq.* ................................................................16, 63

5 U.S.C. §§ 701-706........................................................................ 18

# GLOSSARY

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| BLM | Bureau of Land Management |
| CGS | Cascade Geographic Society |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| ODOT | Oregon Department of Transportation |
| RFRA | Religious Freedom Restoration Act of 1993 |
| RMP | Resource Management Plan |
| SHPO | [Oregon] State Historic Preservation Officer |

# INTRODUCTION

In 2008 and 2009, the Oregon Department of Transportation (ODOT) widened a 1.26-mile stretch of highway by 14 feet to add a center turn lane to reduce collisions. Plaintiffs allege that the Project destroyed a sacred site, violating the Free Exercise Clause, the Religious Freedom Restoration Act, and other laws.

On one issue, Plaintiffs and the government agree: "the destruction of Plaintiffs' sacred site never had to happen." Brief at 4. If Plaintiffs had only placed before the agencies the claims they now place before this Court, the agencies could have avoided any impact on Plaintiffs' sacred site. As the record demonstrates, the agencies were thorough and conscientious in their efforts to avoid adverse impacts to Native American cultural or religious sites. They conducted detailed cultural and archaeological surveys. They shared the results and consulted with every federally recognized Tribe in the area, all of whom approved the Project. And they conducted a well-publicized public review process to seek input from the community about issues, develop and review alternatives, and ultimately select an alternative.

But throughout that two-year process, Plaintiffs never informed the agencies that some alternatives under consideration would impact an area they held sacred, nor did they even comment more generally in opposition to those

alternatives or in favor of others. Plaintiffs submitted only one, unrelated comment about a pair of stone pillars marking a housing subdivision. To accommodate Plaintiffs, the agencies relocated the pillars. But Plaintiffs did not give the agencies the opportunity to accommodate their religious exercise, because they did not inform the agencies of their objections until a year *after* the decision was made. And even when Plaintiffs belatedly spoke up, their claims were very different from the ones they press now.

Because Plaintiffs failed to raise their concerns during the administrative process, Plaintiffs' environmental, historic-preservation, and procedural claims are waived. They are also meritless.

Plaintiffs' Free Exercise and Religious Freedom Restoration Act (RFRA) claims are foreclosed by precedent. Although the agencies undoubtedly *would have* protected the site if they had been timely informed of its religious importance to Plaintiffs, this Court and the Supreme Court have both made clear that neither the Free Exercise Clause nor RFRA *require* the government to manage federal land in conformity with the religious beliefs or practices of its citizens. As this Court acknowledged, "no government—let alone a government that presides over a nation with as many religions as the United States of America—could function were it required to do so." *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1064 (9th Cir. 2008) (en banc).

In any event, this case is moot. This Project has been complete since 2009. The stones forming what Plaintiffs now call an altar have long since disappeared, and the trees were cut down in 2008. The site is within a right-of-way controlled by ODOT, which has been dismissed from this suit, and the remaining defendants lack the authority to excavate it. The relief Plaintiffs seek is also barred by laches. Because no meaningful relief can be granted, this case is moot and should be dismissed. In the alternative, the judgment of the district court should be affirmed.

## STATEMENT OF JURISDICTION

The district court initially had subject matter jurisdiction under 28 U.S.C. § 1331, but the case became moot because meaningful relief can no longer be granted.

Defendants concur in Plaintiffs' statement of appellate jurisdiction.

## STATEMENT OF THE ISSUES

1. Plaintiffs make clear that any relief short of restoration of their sacred site would be "insulting." The site is located on a right-of-way controlled by ODOT, which is not a party to this case. The federal defendants lack authority to restore the site, and even if they could, that equitable relief is barred by laches.

Should this appeal be dismissed as moot because no meaningful relief can be granted?

3

2. RFRA applies strict scrutiny to laws and actions that impose a "substantial burden"—defined by this Court as *punishment* or *denial of a benefit*—on a person's religious exercise. Under binding precedent, federal land-management actions do not impose a substantial burden on individuals, even when the collateral impact on their religious practices is severe.

Did the district court correctly hold that Defendants' construction of the Project did not violate RFRA?

3. The Free Exercise Clause applies strict scrutiny to laws that substantially burden the exercise of religion if they lack neutrality and general applicability. The Supreme Court has held that government land-use actions that "do not penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens" do not violate the Free Exercise Clause.

Did the district court correctly hold that Defendants' construction of the Project did not violate the Free Exercise Clause?

4. Throughout a two-year public process, Plaintiffs raised none of the environmental, historic-preservation, or procedural concerns now raised.

a. Did the district court properly hold that those claims were waived?

b. If those claims are properly presented for judicial review, did Defendants comply with the law?

## STATEMENT OF THE CASE

**A.    Statement of the Facts**

###    1.    Background: ODOT's widening of Highway 26 in the 1980s and 90s.

U.S. Highway 26 is a "heavily traveled tourist route" and "a designated freight route" in Oregon. 6-ER-1208. In the 1980s, ODOT proposed to widen Highway 26 between Wildwood and Rhododendron. The original plan was to widen the two-lane road to five lanes: two travel lanes in each direction and a center turn lane.

The project faced opposition led by Michael Jones, a passionate historical preservationist who, with Plaintiff Carol Logan, co-founded Plaintiff Cascade Geographic Society (CGS). In the 1980s, as leader of Citizens for a Suitable Highway (C-FASH), Jones raised countless objections to the widening. 9-ER-1933-96; 1-ER-16. Jones' chief concern was historic preservation, especially of a pair of stone pillars erected in 1937 to mark the entrance to the Mountain Air Park housing subdivision, 9-ER-1923; 6-ER-1354-57; photo at 1-ER-17, but he also opposed the cutting of mature trees in the A.J. Dwyer Memorial Roadside Preservation Area (Dwyer), a small federally-owned parcel in Wildwood abutting Highway 26 to the north. 7-ER-1417. While "conducting a tree survey" at Dwyer, Jones claimed to have discovered a possible unmarked pioneer grave. 9-ER-1963.

5

ODOT sent a team of archaeologists to investigate. 1-ER-17.[1] To avoid disrupting a possible gravesite, the team dug down next to the "rock feature in question" and tunneled laterally beneath it. They found "no subsurface disturbance" and "[n]o skeletal material or other cultural objects." *Id.* The archaeologists were "in complete agreement" that the "possibility of a burial" was "extremely remote." *Id.* Jones continued to call the rock feature a "Native American or pioneer gravesite," 8-ER-1791, but never identified any evidence refuting the archaeologists' findings.

Though the rock feature was found to have no archaeological significance, 1-ER-18, concerns expressed by Jones and others about the old-growth trees in Dwyer carried the day. Most of the roadway was widened to five lanes as planned, but one 1.26-mile stretch—including the quarter-mile abutting Dwyer—was built without the center turn lane "to reduce, by approximately 37, the number of large trees to be removed." 9-ER-1823.

By the end of the 1990s, however, it became apparent that the preservation of those 37 trees came at the cost of human life. Between 1997 and 2002 alone, there were fourteen crashes, two fatal, on that 1.26-mile stretch. 1-SER-29. In 1998, 674 residents petitioned ODOT to add a turn lane, expressing their "fear

---

[1] The full archaeological report is reproduced, under seal, at 11-ER-2294-2304.

for their personal safety due to the lack of left turn provisions." 6-ER-1299-1329.

Their concern was shared by state legislators. 7-ER-1474. ODOT responded by

developing the "Wildwood to Wemme Project," the action now before this

Court.

### 2. The agencies conducted a robust environmental review and public participation process.

ODOT's public outreach campaign began in 2005 with a newsletter, sent

to 3,750 local residents and other interested parties, including Jones and CGS.

5-ER-1045-52. The newsletter introduced the project, reviewed the history,

advertised upcoming meetings, and solicited public input. 6-ER-4974. ODOT

also advertised all meetings in local newspapers, providing email and U.S. Mail

addresses to which interested persons could send comments, and created a

website providing information about the Project and soliciting feedback. *Id.*

The first public meeting took place in March 2005 to gather issues and

concerns to inform development of a range of alternatives. 6-ER-1285. At a

second meeting in September 2005, ODOT presented and solicited public

comment on potential design alternatives, including widening to the north,

widening to the south, widening to both north and south, widening and

realigning to the north, and a no-action alternative. 6-ER-1286. Based on

feedback and other factors, ODOT decided to move forward with "Widen to the

North" as the preferred alternative. *Id.,* 6-ER-1213-24*.* At the third meeting, in

early 2006, ODOT presented large maps and visual simulations depicting the Widen to the North alternative, and preliminary findings from environmental studies. A second newsletter followed, describing alternatives considered, preliminary environmental findings, and a project schedule. *Id.*

In August 2006, ODOT and the Federal Highway Administration (FHWA) jointly released an Environmental Assessment (EA) detailing the project's purpose and need; alternatives considered; the preferred alternative's predicted effects on 17 environmental resources (including historical and archaeological resources); measures to mitigate adverse effects; and a recounting of the public coordination and consultations undertaken. 6-ER-1202-1363. ODOT also published a third newsletter describing the EA, inviting the public to comment, and publicizing another meeting, which was held on September 21, 2006.

To ensure that no cultural resources would be impacted, ODOT hired an archaeological team from the University of Oregon to survey the project area in April 2005 and again in March 2006. 6-ER-1248. The surveys found no prehistoric cultural materials. *Id.*[2] ODOT also commissioned three surveys of

---

[2] The term "prehistoric" "refers to the study of the cultures and events that occurred in any given region prior to the time written records are available." Because "native North Americans did not use alphabetic writing in pre-contact times, prehistory here ends with European contact." 6-ER-1248.

historical resources, which identified 30 potential historical properties in and near the project area but found that none of them would be affected by the Project. The Oregon State Historic Preservation Officer (SHPO) concurred. 6-ER-1358-59.

Throughout the process, ODOT repeatedly consulted with and provided information to the Tribal governments of the Confederated Tribes of the Warm Springs, Confederated Tribes of Grand Ronde, and Confederated Tribes of Siletz Indians to ensure that the project would not adversely affect cultural resources or other matters of importance to the area Tribes. 1-ER-28, 31-32, 34; 1-SER-188-90. ODOT also later consulted the Confederated Tribes of the Yakama Nation. *None* of the Tribes opposed the project.

Based on Jones' long history of opposing development in the Mount Hood area, ODOT specifically reached out to Jones and CGS, sending them every mailing by certified mail. 5-ER-1045-52. But neither Jones nor any other Plaintiff attended any of the meetings, nor did they submit comments by mail or email. Jones requested a copy of the Draft EA, and submitted only one comment, by telephone, expressing concern for the stone pillars. 6-ER-1185. ODOT studied the pillars and concluded they were not eligible for listing on National Register of Historic Places, but agreed to relocate them so they would not be affected by the construction. 1-ER-37, 44; 6-ER-1355-56.

Aside from that single comment, no Plaintiff participated in the public review process. At no point during that process did any Plaintiff communicate that any part of the Project area had religious significance or that certain alternatives would impact a site sacred to them. Plaintiffs' brief obscures that fact, presenting illustrations of the alternatives that include depictions of a "Stone Altar" and "Sacred Campground," Brief at 19-20, and lamenting that "[d]espite these options, the Government chose the 'Widen to the North' alternative . . . the option most destructive of the sacred site." But those illustrations were never before Defendants; they were created by Plaintiffs for litigation purposes. The actual illustration from the EA, 6-ER-1170, looks like this:



Figure 2-1: Widen to the North Alternative

By adding a "Stone Altar" and "Sacred Campground" to their look-alike illustrations, Plaintiffs create the false impression that Defendants were aware of their sacred site but callously chose an alternative that would destroy it.[3] But in truth, Defendants knew only that Jones had claimed, decades earlier, that a "pile of moss-covered rocks" in Dwyer was a pioneer or Native American gravesite, 9-ER-1978, and that an archaeological investigation had determined that it was not. 1-ER-17-18. The record contains no references to Plaintiffs' "Sacred Campground" or "Stone Altar," because Plaintiffs declined to participate in the process and provide that information.

On January 25, 2007, ODOT and FHWA jointly released a Revised EA, 6-ER-1159, and FHWA issued a Finding of No Significant Impact (FONSI), selecting the Widen to the North alternative. 6-ER-1162.

---

[3] Plaintiffs also allege that agency officials "admitt[ed] in internal correspondence that they didn't think they need to 'blindly follow[] the rule book' given the low 'likelihood of someone figuring out.'" Brief at 4. The quotation is regrettable, but Plaintiffs' insinuation that it had anything to do with their concerns is false; it was about whether felled trees could be used in a fish habitat restoration project in nearby Sandy, Oregon. 7-ER-1379-80. The record does not reveal how that issue was resolved, but it does not affect any issue in this appeal.

### 3. A year after the public review process ended, Plaintiffs voiced wide-ranging objections to the project.

A year later, on January 25, 2008, Jones called FHWA to discuss "at length" the stone pillars, Jones' criticisms of the Section 106 process,[4] and a range of "other concerns" about other projects and resources in the greater Mount Hood area. 1-SER-184-85. Plaintiff Carol Logan called several days later to express her concerns about impacts on her "usual and accustomed places"— a term evoking Native American treaty rights to take fish. 1-ER-37; *United States v. Washington*, 157 F.3d 630, 646 (9th Cir. 1998).

Jones and Logan followed up with a February 14, 2008, letter "jointly requesting" a new Section 106 analysis. 6-ER-1147-56. The letter mentioned unspecified "heritage resources of concern in the 'Dwyer Memorial Forest,'" but devoted more attention to the "Wildwood Stone Pillars." 6-ER-1152-54. Plaintiffs also demanded that the new analysis include some 33 other sites, many of them outside the Project area. 6-ER-1150-52.

---

[4] As discussed *infra* IV. B. 2., Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470aa *et seq.*, requires federal agencies to consider project's effects on historical properties, giving the Advisory Council on Historic Preservation (ACHP), interested parties—including federally recognized Tribes—and the public the chance to weigh in before a final decision is made.

One day later, Jones and Logan wrote again, noting that tree-cutting for the Project was imminent. Having declined to participate in the two-year public review process that ended over a year earlier, Jones and Logan demanded "How can your office delay this while ourselves and others undertake the time and efforts to work through the established system?" 6 ER-1069. FHWA responded to Jones and Logan on February 26, 2008, that the comprehensive Section 106 review prepared with the EA was satisfactory. 5-ER-1041-43. ACHP concurred. 1-SER-193-94.

In her communications with Defendants, Logan identified herself as a representative of the Clackamas people, who are part of the Confederated Tribes of Grand Ronde. Concerned that Logan's views might signify an objection by the Grand Ronde Tribe, ODOT archaeologist Tobin Bottman reached out to the Tribe's Cultural Protection Coordinator Eirik Thorsgard. 1-SER-186. Thorsgard replied on February 15, 2008, that "Carol is not representing the Tribe, . . . she is working as a private individual in concert with Michael Jones. The Tribe's official position is that ODOT has done and followed the 106 and NEPA process. We have no fault with what they have done." 1-SER-191.

The Tribe confirmed that understanding with a letter identifying three people (including Thorsgard, but not Logan) who could speak for the Tribe on this matter, and asking Defendants to "please be aware" that other tribal

members "can only represent their *personal perspectives*" and do not speak for the Tribe. 1-SER-195-96.

### 4. Project construction began in February 2008 and was completed in 2009.

Removal of the large trees in Dwyer took place in February and March 2008. As FHWA explained, tree-cutting had to be completed by March 15 to comply with the Migratory Bird Treaty Act. 4-ER-788. The record is unclear on exactly what happened to the rock feature. Plaintiff Johnny Jackson testified that he saw individuals he assumed to be "the highway department" throwing the stones into a truck, 4-ER-614, but all of Plaintiffs' complaints allege that it was destroyed by vandalism. 2-SER-217, 242, 277, 316, 357. Whatever happened, it happened by March 2008. 3-ER-468.

The Project was substantially completed by April 2009. 1-SER-198-201. Once the turn lane was added, "the accident rate went down, and the severity of the accidents went down." 4-ER-784.

### B. Procedural History

Plaintiffs filed a complaint against both state and federal defendants on October 6, 2008, but did not serve it until they filed their First Amended Complaint on February 3, 2009. 10-ER-2253. Plaintiffs did not move for a preliminary injunction. *Id.*

In neither the original nor First Amended Complaint did any Plaintiff assert that their religious exercise was impacted by Defendants' actions, nor did they plead claims under RFRA or the Free Exercise Clause. Rather, they asserted broad interests in the protection of "Native American sacred and cultural sites, and historical and archaeological resources in the area of Mount Hood, in Oregon," and alleged that "these sites and resources" were damaged by the Project. 2-SER-206, 229. Specifically, they alleged that Defendants violated duties by failing adequately to protect a "rock cluster later identified as a burial cairn," a separate alleged "historic stone toll booth," and a "Third Priority Barlow Road segment." 2-SER-221, 247-49

In June 2010, Plaintiffs filed a Second Amended Complaint, stating for the first time a claim under the Free Exercise Clause. Plaintiffs Slockish, Jackson, and Logan all claimed that they had been "harmed by the damage to the sacred sites," 2-SER-261-63, which for the first time included a "historic campground" as well as the "rock cluster later identified as a burial cairn." 2-SER-273, 312. A similar Third Amended Complaint followed in 2012, 2-SER-296, and then the litigation was stayed until mid-2015 as the parties explored settlement. 1-ER-58.

In 2016, Plaintiffs filed a Fourth, and final, Amended Complaint. 2-SER-336. Plaintiffs asserted twelve claims, arising under the National Environmental

Policy Act (NEPA), the National Historic Preservation Act (NHPA), the National Forest Management Act (NFMA), the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*; the Department of Transportation Act, 49 U.S.C. § 303 *et seq* ("section 4(f)"); the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.*; the Archaeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*; the Free Exercise and the Due Process Clauses of the Constitution, and—for the first time in eight years of litigation—RFRA. 1-ER-7, 44-45; 2-SER-328.

The proceedings were split, with briefing first on the RFRA claim. On March 2, 2018, Magistrate Judge Youlee You found that, under binding precedent, the government's use of its own property did not impose a substantial burden on Plaintiffs' religious exercise, and their RFRA claim therefore fails. 1-ER-97-103. The district court adopted the Magistrate's report in relevant part on June 11, 2018. 1-ER-92.

The parties then briefed the remaining eleven claims. On April 1, 2020, Magistrate Judge You issued Findings and Recommendations laying out, in clear and meticulously record-backed detail, the complicated factual background of this case. 1-ER-13-44.

Turning to the law, Magistrate Judge You concluded that all of Plaintiffs' remaining claims failed as a matter of law, were waived by Plaintiffs' failure to

16

raise the issues before the agencies, or were barred by laches. 1-ER-67-87. On February 21, 2021, the district court erroneously held that laches does not apply to any claim brought within the statute of limitations, but otherwise adopted the Magistrate's report in its entirety, holding that all of Plaintiffs' claims either failed as a matter of law or were waived. 1-ER-3-5. The district court entered final judgment on March 19, 2021. 1-ER-2.

## SUMMARY OF ARGUMENT

1. This case is moot because no effective relief can be granted. Plaintiffs have made clear that their injuries would not be meaningfully redressed by any relief short of restoration of the site. The site lies entirely within a right-of-way controlled by ODOT, which was dismissed from this suit on Eleventh Amendment grounds. The remaining defendants lack authority to restore the site, and even if they could, that equitable relief is barred by laches. Plaintiffs bypassed the administrative process they now criticize; did not sue until after the trees and rock feature were irretrievably gone; and did not raise religious-exercise claims until 2010—five years after the administrative process began, and more than a year after the Project was complete.

2. Plaintiffs' RFRA claim is foreclosed by binding precedent holding that the government's use of federal land does not impose a substantial burden on individuals, even if it severely impacts their religious exercise, because it neither

punishes nor conditions availability of a benefit on their religiously-motivated conduct. Those cases are not distinguishable; indeed, the Supreme Court specifically rejected Plaintiffs' proffered distinction between physical and spiritual or "subjective" impacts because it would impermissibly require the Court to evaluate the truth of religious beliefs.

3. Plaintiffs' Free Exercise claim is similarly foreclosed by precedent. Plaintiffs assert that any government land-use action that includes environmental mitigation measures thereby discriminates against religion and is subject to strict scrutiny, but that theory has never been accepted by any court and is inconsistent with binding Supreme Court precedent.

4. Plaintiffs' environmental, historic-preservation, and procedural claims are waived by their failure to raise those issues in the administrative process. They are also meritless.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant a motion for summary judgment de novo, using the same standard as applied by the district court. *Navajo Nation*, 535 F.3d at 1067.

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, governs judicial review of Plaintiffs' NEPA, NHPA, FLPMA, and 4(f) claims. Under that "highly deferential" standard, a reviewing court "may not substitute [its]

judgment for that of the agency," but must uphold the agency's decision as long as the agency has considered the relevant data, articulated a satisfactory explanation for its action, and made no clear error of judgment. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

## ARGUMENT

### I.    This appeal is moot.

As Plaintiffs themselves argue, the Project "destroyed everything that made the site sacred—the old-growth trees have been cut, Plaintiffs' stone altar has been scattered and removed, and the campsite and burial ground have been destroyed." Appellate ECF 7 at 2. These acts occurred before Plaintiffs brought suit, and they cannot be undone. Because no effective relief can be granted, this case is moot.

The district court held otherwise, reasoning that "it is likely that the Court could craft some relief that would mitigate Plaintiff's injury and improve their access to the site and ability to exercise their religion." 1-ER-92. But Plaintiffs have proven the court wrong, stating that access to the site (which they already have) is so far from effective relief that they consider it "frankly, insulting." Brief at 40. Only restoration of the site would redress Plaintiffs' asserted injuries, and that is beyond the power of the federal defendants. Only ODOT—which was dismissed from this case on Eleventh Amendment grounds—has authority to

modify the highway, which by statutory definition includes not only the roadway but the entire right-of-way. D.Ct. ECF 131; 23 U.S.C. §§ 101(a)(11) & (13); 114(a), 116, 145.

Plaintiffs' sacred site lies within ODOT's right-of-way. 5-ER-962. Within that right-of-way, the federal government retains only limited rights. It may not "use or authorize the use of any portion of the right-of-way for non-highway purposes" when such use conflicts with applicable statutes and regulations, or if it would "impair the full use and safety of the highway," and even allowable uses require consultation with ODOT. 5-ER-57. Defendants lack authority to remove the embankment or guardrail.

ODOT's authority over the highway is an insurmountable barrier to redress here. "There is no redressability, and thus no [Article III jurisdiction], where . . . any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Glanton v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006). This case is therefore unlike *West v. Secretary of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000), which held that a NEPA challenge to a completed highway

interchange was not moot because the Court could order the interchange removed. Without ODOT as a party, the Court cannot order such relief here.[5]

Even if it were possible to restore the site, that equitable relief is barred by laches. Even in environmental cases where the defense is applied "sparingly," laches bars equitable relief when there is a clear lack of diligence by the plaintiff and prejudice to the defendant. *Apache Survival Coal. v. United States*, 21 F.3d 895 (9th Cir. 1994); *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337-39 (10th Cir. 1982).

In *Apache Survival Coalition*, this Court applied laches where the plaintiffs sat out the administrative process for the Mount Graham Observatory and then sued after construction began, alleging that it interfered with their religious practices. 21 F.3d 895 (9th Cir. 1994). Because the Coalition "ignored the *very process* that its members now contend was inadequate," the Court held that laches ran "not from the date of the relevant agency action, . . . but from the onset of the NHPA review process, beginning with the Forest Service's first attempts to elicit the Tribe's input in 1985." *Id.* at 907 (emphasis in original).

---

[5] Plaintiffs' request for declaratory relief cannot revive their moot claims. When "there is no 'case' in the Constitutional sense of the word," then the Court also "lacks the power to issue a declaratory judgment." *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 816 (9th Cir. 1995); *see also California v. Texas*, -- S. Ct. --, 2021 WL 2459255 (June 17, 2021) at *5-6. Plaintiffs have not pled a claim for nominal damages.

This Court applied laches because the plaintiffs, with "full knowledge of the impending construction of the observatory on Mount Graham, were content to stand on the sidelines while the federal agencies undertook their administrative duties. Only after substantial work on the observatory complex had been completed did they raise objections, and even then without a reasonable amount of diligence. Therefore, we conclude that [their] NHPA claim is barred by laches." *Id.* at 914.

This case could hardly be more similar. Defendants made special efforts to include Plaintiffs from the beginning of the review process in March 2005, 5-ER-1045-52, but Plaintiffs "ignored the *very process* that [they] now contend was inadequate" until a year after it ended, at which point they raised scattershot objections on the eve of construction. 21 F.3d at 907; 6-ER-1067-71, 1147-56.[6] They then waited until *after* the trees and stones had been removed before filing a complaint in October 2008 (which they failed to serve until February 2009);

---

[6] This Court held that Apache Survival Coalition and the San Carlos Apache Tribe were "a single entity" for purposes of laches analysis. Magistrate Judge You correctly made the same finding about Plaintiffs here. 1-ER-68-69. All individual Plaintiffs are members of Plaintiff CGS, which was co-founded by Jones and Logan; and all the individual Plaintiffs, plus Jones, founded Plaintiff Mount Hood Sacred Lands Preservation Alliance in the 1990s. The individual members' standing declarations also attest to their privity with Jones. 5-ER-921, 930, 946.

never moved for a preliminary injunction; and did not plead a religious-exercise claim until 2010, after the Project was complete.

Plaintiffs argue that Defendants already knew about the site, but their brief obscures or outright misrepresents *what* Defendants knew about it. Certainly, Defendants knew that Jones, who was neither Native American nor a practitioner of Native American religion, 1-ER-16, believed that the rock feature was a "Native American or pioneer grave," but they also knew that "every professional archaeologist who visited the site" disagreed, 1-ER-51, as did all four of the Tribes consulted. 1-ER-62. The Grand Ronde's Cultural Protection Coordinator stated that it "is most likely a pile of rocks from ploughing." 1-SER-182. And Jones did not, as Plaintiffs allege, "inform[] the Government of the site's historic and religious significance, including the graves and stone altar." Brief at 1. In fact, no Plaintiff (or anyone else) informed Defendants that they personally used this site for religious purposes until 2010, 2-SER-261-63 (Second Amended Complaint), and no Plaintiff (or anyone else) called this rock feature an "altar" until approximately 2016. Compare 2-SER-213 ("rock cluster", 2008); 5-ER-934 ("stone monument"; 2012); 5-ER-875 ("altar", 2016).

Plaintiffs also allege that Yakama Elder Wilferd Yallup "participated in a meeting with government officials, at which Yallup 'identified the [Dwyer site as] having burials.'" Brief at 17 (brackets supplied by Plaintiffs). That is false.

The transcript of that 1991 meeting is in the record, 6-ER-1073, and the "word Dwyer does not appear anywhere in" it. 1-ER-64.[7] Yallup identified two burial sites near Highway 26, but neither is in Dwyer or even in the Wildwood-Wemme project area. 1-ER-21, 64 (redacted); 11-ER-2320, 2363 (unredacted).

The district court rejected the Magistrate's laches recommendation, holding that "the doctrine of laches does not bar a suit filed within an applicable federal statute of limitations," 1-ER-4, citing *SCA Hygiene Prods. v. First Quality Baby Prods.*, 137 S. Ct. 954, 960 (2017). That was legal error; *SCA Hygiene* and its predecessor, *Petrella v. Metro-Goldwyn-Mayer*, 572 U.S. 663 (2014), held only that laches will not bar a claim for *legal* relief—i.e., damages—brought within the statute of limitations. Neither displaced the longstanding rule, applied in *Apache Survival Coalition*, that laches can bar *equitable* relief in cases brought within the statute of limitations. *Petrella*, 572 U.S. at 685-86 (laches may warrant "curtailment of the relief equitably awardable"); *Standing Rock Sioux Tribe v. U.S.*

---

[7] Jones and Logan sent the transcript to FHWA in February 2008, not representing it as incomplete. 6-ER-1070. But in 2016, Jones submitted an extra-record declaration claiming that the tape recorder malfunctioned and failed to record Yallup's identification of Dwyer as a burial site. 5-ER-832. There are numerous inconsistencies between Jones' 2016 story and the 1991 transcript. No party mentions the purported malfunction. The transcript also shows Jones trying to prevent Yallup from disclosing information that, according to Jones' 2016 story, Yallup had already disclosed. 6-ER-1075-76, 1101-02. The district court rejected Jones's attempts to "recharacterize the transcript." 1-ER-65.

*Army Corps of Engineers*, 239 F. Supp. 3d 77, 84-88 (D.D.C. 2017) (explaining *Petrella;* applying laches on similar facts); *see also Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*, 894 F.3d 1015, 1024 (9th Cir. 2018); *Black Warrior Riverkeeper v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1286 n.10 (11th Cir. 2015).

Plaintiffs argued below that Defendants' laches defense was waived because it was not asserted in the Answer, but that is wrong. "In the absence of a showing of prejudice, an affirmative defense may be raised for the first time at summary judgment. There is no prejudice to a plaintiff where an affirmative defense would have been dispositive if asserted when the action was filed. Rather, a party must point to a tangible way in which it was prejudiced by the delay." *Garcia v. Salvation Army*, 918 F.3d 997, 1008-09 (9th Cir. 2019) (cleaned up). Plaintiffs were not prejudiced, as the Magistrate correctly concluded, so the defense is not waived.

Defendants do not contend that laches bars Plaintiffs' claims in their entirety, but laches *does* bar the equitable relief of ordering Defendants to restore the site, which Plaintiffs have made clear is the only relief that would redress their injuries. Because effective relief cannot be awarded, this case is moot.

**II.    Plaintiffs' RFRA claims are foreclosed by Supreme Court and en banc Circuit precedent.**

In *Navajo Nation v. U.S. Forest Service*, this Court, sitting en banc, squarely held that the government's use of federal land in a manner that conflicts with a plaintiff's religious exercise does not impose a substantial burden within the meaning of RFRA. 535 F.3d at 1072. In so holding, this Court followed the Supreme Court's decision in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), which reached the same conclusion under the Free Exercise Clause. Those decisions are controlling here, and Plaintiffs' attempts to distinguish them are unavailing.

**A.    Under RFRA, a "substantial burden" requires a showing of coercion, not just a collateral impact on religious exercise.**

In 1990, the Supreme Court held that the Free Exercise Clause does not require religious exemptions from a "valid and neutral law of general applicability." *Employment Div. v. Smith*, 494 U.S. 872 (1990). Unless "prohibiting the exercise of religion" is "the object of" the law, the Court held, "the First Amendment has not been offended." *Id.* at 878-79.

Congress responded by enacting RFRA, which restored, as a matter of statutory right, the broader protection of religious exercise exemplified in the Supreme Court's earlier decisions in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). 42 U.S.C. § 2000bb(b)(1). In *Sherbert*,

26

the Court held that South Carolina's denial of unemployment benefits to a Seventh-Day Adventist fired for refusing to work on Saturdays placed "the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship," 374 U.S. at 404. *Id*. at 406-07. And in *Yoder*, the Court held Wisconsin's compulsory schooling law "unduly burden[ed]" the religious exercise of Amish parents and children by "compel[ling] them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218, 220.

RFRA provides that the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless it demonstrates that the "application of the burden to the person" serves a "compelling governmental interest" and is the "least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1 (emphasis added).[8]

Congress did not, however, disturb "pre-*Smith* case law" establishing that "strict scrutiny does not apply to government actions involving only

---

[8] RFRA originally applied to the States, but that was held unconstitutional in *City of Boerne v. Flores*, 521 U.S. 519, 532-36 (1997). Congress then enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, which requires States and local governments to satisfy strict scrutiny for laws imposing substantial burdens on religious exercise with respect to zoning, *id.* § 2000cc, and institutionalized persons, *id.* § 2000cc-1.

management of internal Government affairs or the use of the Government's own property or resources." S. Rep. 103-111 (1993). Senator Hatch, RFRA's principal Senate sponsor, explained that "RFRA does not affect *Lyng*, . . . a case concerning the use and management of Government resources, because the incidental impact on a religious practice does not constitute a cognizable burden on anyone's free exercise of religion." 139 Cong. Rec. 26,193 (1993). Representative Brooks, RFRA's floor manager in the House, confirmed that the "substantial burden" requirement was "consistent with the intent of the bill, and prior caselaw, which does not protect persons against State actions which have only an incidental burden on their religious exercise." 139 Cong. Rec. 27,240 (1993).

To establish a *prima facie* RFRA case, a plaintiff must establish two elements: "First, the activities the plaintiff claim are burdened by the government action must be an 'exercise of religion.' Second, the government action must 'substantially burden' the plaintiff's exercise of religion." *Navajo Nation*, 535 F.3d at 1068 (citation omitted). The elements are "distinct," and the "first question, that the Plaintiffs' activities are an 'exercise of religion,' . . . has no bearing on the second, 'substantial burden,' question." *Id.* at 1076-77. If the plaintiff makes those two showings, the burden shifts to the government to show

it has acted in the least restrictive means to further a compelling interest. *Id*. at 1068.

The first prong is easily satisfied because courts "must accept the sincerely held . . . objections of religious" claimants. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020). Plaintiffs have carried their first-prong burden.

The second prong examines whether the government exercises the coercive power of the state against the plaintiff to compel compliance, or punish noncompliance, with the law that impacts the plaintiff's exercise of religion. Absent such compulsion or punishment, a law or government action does not impose a substantial burden, no matter how serious its impact on an individual's religious exercise. *Navajo Nation*, 535 F.3d at 1072.

Plaintiffs contend that a substantial burden exists whenever the conflict between the government's action and the plaintiff's religious beliefs is "significantly great," Brief at 33, but this Court rejected that formulation in *Navajo Nation*. 535 F.3d at 1078.[9] Guided by "the express language of RFRA and decades of Supreme Court precedent," *Navajo Nation* held that "a

---

[9] Because *Navajo Nation* "express[ed] no opinion as to the standard to be applied in RLUIPA actions," 535 F.3d at 1077 n.23, "significantly great" or other "ordinary meaning" definitions are still sometimes used in RLUIPA land-use cases.

'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*). Any burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA, and does not require the application of the compelling interest test set forth in those two cases." *Id.* at 1068, 1069-70.

**B.** ***Navajo Nation* established that government use of federal land does not substantially burden religious exercise.**

*Navajo Nation* was a challenge to a Forest Service decision allowing a ski resort to use recycled wastewater for snowmaking. The plaintiffs claimed that the wastewater would desecrate "the most sacred mountain of southwestern Indian tribes" and prevent them from performing religious ceremonies. *Id.* at 1080, 1098-1106 (Fletcher, J., dissenting).

This Court concluded that the Forest Service decision did not impose a "substantial burden" on the plaintiffs because it "does not force the Plaintiffs to choose between following the tenets of their religion and receiving a governmental benefit, as in *Sherbert*." It "also does not coerce the Plaintiffs to act contrary to their religion under the threat of civil or criminal sanctions, as in *Yoder*." Because the plaintiffs were "not fined or penalized in any way" by the

government's approval of a third party's request to use recycled water for snowmaking, the collateral impact of that decision on the plaintiffs' religious beliefs and practices, "serious though it may be—is not a 'substantial burden' on the free exercise of religion." *Id.* at 1070.

That holding was guided by two other pre-*Smith* Free Exercise decisions: *Lyng,* 485 U.S. 439, and *Bowen v. Roy*, 476 U.S. 693 (1986). In *Roy*, the plaintiff objected to the government's use of a Social Security number for his daughter, believing it would rob her of spiritual power. 476 U.S. at 697. The Supreme Court held that the government's use of a Social Security number to identify the daughter did not impose a cognizable burden: it required nothing of the plaintiff or his child, nor did it impose any penalty on them. "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens," the Court explained. "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* at 699-700.

The Supreme Court applied that principle in *Lyng*, which—like *Navajo Nation*—was a challenge to a use of federal land with profound collateral effects on the plaintiffs' religious practices. 485 U.S. at 451. The Supreme Court held

31

that the government's use of "publicly owned land cannot meaningfully be distinguished from the use of a Social Security number in *Roy*. In both cases, the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs. In neither case, however, would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng*, 485 U.S. at 449. "However much we might wish that it were otherwise," the *Lyng* Court explained, "government simply could not operate if it were required to satisfy every citizen's religious needs and desires." *Id.* at 452.

As the district court recognized, *Lyng* and *Navajo Nation* compel the conclusion that Project did not impose a substantial burden on Plaintiffs. "As in *Lyng* and *Navajo Nation*, plaintiffs contend that the sacred site at issue, which is located on federal land, has been desecrated and destroyed. Yet, as in those cases, plaintiffs have not established that they are being coerced to act contrary to their religious beliefs under the threat of sanctions or that a governmental benefit is being conditioned upon conduct that would violate their religious beliefs. Without these critical elements, plaintiffs cannot establish a substantial burden under the RFRA." 1-ER-102, 90.

Seizing on *Navajo Nation*'s statement that "[a]ny burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA," 535 F.3d at 1070, Plaintiffs argue that the destruction of their sacred site makes religious exercise there impossible, and thus is "worse" than, not "short of" coercion or punishment. Brief at 40. That argument, however, is irreconcilable with both *Navajo Nation* and *Lyng*. *Navajo Nation* involved a government land-use decision that, according to the plaintiffs' sincere religious beliefs, rendered their holiest site unfit for their religious exercise. But this Court held that "even were we to assume, as did the Supreme Court in *Lyng*, that the government action in this case will 'virtually destroy the Indians' ability to practice their religion,'" there would still be no substantial burden because the government was not punishing or coercing the Plaintiffs. *Id.* at 1072. And in *Lyng*, the Court found no substantial burden despite the plaintiffs' belief that the project would "render any meaningful continuation of traditional practices *impossible*." 485 U.S. at 451 (emphasis added). Plaintiffs' claim that their religious exercise at this site has become "impossible" does not distinguish this case from *Lyng* or *Navajo Nation*.

Taking language out of context, Plaintiffs argue that the Supreme Court "recognized last year [that] government prevention of religious exercise through physical acts—such as '*destruction of religious property*'—can constitute a 'RFRA

33

violation.'" Brief at 34, quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020) (emphasis supplied by Plaintiffs). But *Tanzin* had nothing to do with religious sites on public land; its lone reference to "destruction of religious property" was in a parenthetical describing *DeMarco v. Davis*, 914 F.3d 383, 390 (5th Cir. 2019), a § 1983 suit against a prison guard who confiscated and destroyed a prisoner's Bible. *Tanzin*, 141 S. Ct. at 492.

Similarly inapposite is Plaintiffs' citation to *International Church of the Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1066-70 (9th Cir. 2011), and other RLUIPA cases for the proposition that the right to "a place of worship" is "at the very core of the free exercise of religion." Brief at 34. RLUIPA "applies only to government land-use regulations of private land— such as zoning laws—not to the government's management of its own land." *Navajo Nation*, 535 F.3d at 1077 & n.22. Its reach is limited to land in which "the claimant has an ownership, leasehold, easement, servitude, or other property interest" or a "contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5). Thus, RLUIPA applies when a plaintiff's religious exercise is impacted by regulation of *its own* property, but is completely inapplicable when a plaintiff's religious exercise is impacted by regulation of *someone else's* property. *See Omnipoint Commc'ns, Inc. v. White Plains*, 202 F.R.D.

402, 403 (S.D.N.Y. 2001) (RLUIPA does not provide grounds for synagogue to challenge permit for construction of utility tower on neighboring property).

Plaintiffs ridicule the notion that no substantial burden exists because they have not been punished or denied a benefit, yet "had the Government merely fenced off Plaintiff's site and threatened 'sanctions' for trespassing, Plaintiffs would face a 'substantial burden.'" Brief at 39. But, as shown above, pp. 28-30, the substantial-burden inquiry examines what the government is doing *to the plaintiff*, not what it is doing to federal land. If the government coerces a person by punishing them for their religiously-motivated use of federal land, that punishment may be a substantial burden. *See United States v. Hoffman*, 436 F. Supp. 3d 1272, 1286 (D. Ariz. 2020) (vacating criminal convictions for religiously-motivated conduct on federal land; distinguishing *Navajo Nation* because "[h]ere, in contrast, Defendants face criminal sanctions for exercising their religious beliefs.") But where, as here, the government neither punished nor conditioned a benefit on Plaintiffs' religiously-motivated conduct, it has not imposed a substantial burden.

Plaintiffs and amici argue that, under *Navajo Nation*'s definition of "substantial burden," government could forcibly round up Amish children and send them to a public boarding school, drag worshippers from their church, and even bomb a gurdwara without running afoul of RFRA. Brief at 40; ECF 28 at

35

4, 7. But each of these examples involves the use of force against an individual's or religious organization's person or property. Such an exercise of coercive governmental power easily qualifies as a substantial burden. Plaintiffs identify no case in which *Navajo Nation*'s definition of "substantial burden" led to such absurd results.

Plaintiffs argue that they *have* been deprived of a benefit—the use of the site for religious exercise. Brief at 42. But RFRA does not compel the government to provide whatever might be beneficial or even necessary to an individual's religious exercise. A "broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs," but government is not compelled to supply those needs. *Lyng*, 485 U.S. at 452. RFRA simply prohibits the government from *conditioning* an "otherwise available benefit" on the claimant's religious status or conduct. *Trinity Lutheran Church v. Comer*, 137 S. Ct. 2012, 2021-22 (2017).

## C.    *Lyng* and *Navajo Nation* are not distinguishable.

Plaintiffs argue that *Lyng* and *Navajo Nation* are distinguishable because the government actions in those cases "would have no physical impact" on the sacred sites, whereas this case "isn't just about 'subjective spiritual experience,'

it's about the physical destruction of Plaintiffs' sacred site." Brief at 37. But *Lyng* expressly *rejected* the supposed distinction between "subjective" and "physical" impacts. *Lyng*, 485 U.S. at 449-50. Plaintiffs contend that *Lyng* and *Navajo Nation* "acknowledged the outcome would have been different" if they had "involved physical destruction of a sacred site," *id.* at 36, but the opposite is true; both cases acknowledged that the result would have been the *same* even if the project would "virtually destroy the Indians' ability to practice their religion." *Lyng*, 485 U.S. at 451-52; *Navajo Nation*. 535 F.3d at 1072. And in *Snoqualmie Indian Tribe v. FERC*, this Court found that the absence of coercion meant no substantial burden resulted from FERC's order relicensing a hydroelectric facility that physically altered a sacred waterfall and "eliminate[d] the mist necessary for the Tribe's religious experiences." 545 F.3d 1207, 1213-14 (9th Cir. 2008).

In *Lyng*, the plaintiffs argued that *Roy* was distinguishable because "the Social Security number in *Roy* could be characterized as interfering with Roy's religious tenets from a subjective point of view, where the government's conduct of its own internal affairs was known to him only secondhand and did not interfere with his ability to practice his religion," but "in this case, . . . the proposed road will physically destroy the environmental conditions and the privacy without which the religious practices cannot be conducted." 485 U.S. at 449 (cleaned up).

"These efforts to distinguish *Roy* are unavailing," the Supreme Court held, because "this Court cannot determine the truth of the underlying beliefs that led to the religious objections here or in *Roy*, and accordingly cannot weigh the adverse effects on the appellees in *Roy* and compare them with the adverse effects" on the *Lyng* plaintiffs. *Id.* at 449-50 (cleaned up). "Without the ability to make such comparisons, we cannot say that the one form of incidental interference with an individual's spiritual activities should be subjected to a different constitutional analysis than the other." *Id.* at 450.

Plaintiffs' argument also fails because it wrongly presumes that a "substantial burden" exists whenever a government action nontrivially impacts a plaintiff's religious exercise. As shown above, pp. 28-30, such interference establishes only the first prong of a *prima facie* RFRA case. On the second prong, the "inquiry here isn't into the merit of the plaintiff's religious beliefs or the relative importance of the religious exercise: we can't interpret his religion for him. Instead, the inquiry focuses *only* on the coercive impact of the government's actions." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (Gorsuch, J.) (emphasis added). Thus, even if Project's physical impact on Plaintiffs' sacred site was greater than the physical impacts of the snowmaking in *Navajo Nation*, that factual distinction is irrelevant to the substantial-burden inquiry, which examines what the government is doing *to the plaintiff*, not to federal land.

38

Plaintiffs suggest that *Lyng* held that denial of access would impose a substantial burden (and that government counsel conceded as much at oral argument in *Navajo Nation*). Brief at 38, 41,[10] *but see La Cuna De Aztlan Sacred Sites Prot. Circle v. Dep't of Interior*, 2014 WL 12597035, at *7 (C.D. Cal. June 20, 2014) Context makes clear, however, that the *Lyng* Court stated only that a *discriminatory* denial of access might violate the Free Exercise Clause. *Lyng*, 485 U.S. at 453. It is undisputed that government may not "discriminate against religion," even "when acting in its managerial role." *Fulton v. City of Philadelphia*, -- S. Ct. --, 2021 WL 2459253 (June 17, 2021) at *6. But Plaintiffs have not been discriminated against—nor have they been denied access to the site. 1-ER-105. That the site's sacredness has, in their eyes, been diminished or destroyed does not distinguish this case from *Lyng* or *Navajo Nation*.

### D. The other cases on which Plaintiffs rely are distinguishable.

Plaintiffs cite a string of RLUIPA prisoner cases allegedly holding that any government action that "prevents" the plaintiff from participating in a religious exercise imposes a substantial burden. *See* Brief at 32, 33 n.16. The district court rightly distinguished those cases, explaining that "[n]ot only have

---

[10] Plaintiffs overlook that the hypothetical scenario being discussed included criminal penalties for violating the closure order. *See Hoffman*, 436 F. Supp. 3d at 1286.

inmates suffered a total loss of liberty, whereas [Plaintiffs] have not, but the cases cited involved either a specific prohibition on a particular form of religious exercise or the imposition of a sanction or other collateral, non-religious harm in response to religious exercise." 1-ER-108, quoting *Standing Rock*, 239 F. Supp. 3d at 95-96. In *Yellowbear*, 741 F.3d at 55-56; *Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir. 2008); *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014), prison officials prohibited the incarcerated plaintiffs from participating in group religious ceremonies. In *Nance v. Miser*, 700 F. App'x. 629 (9th Cir. 2017), prison officials prohibited the incarcerated plaintiff from growing a beard or using scented oils in his religious exercises. In each case, the "prevention" of religious exercise resulted from the state exercising coercive control over the plaintiff to an extent "unparalleled in civilian society." *Cutter v. Wilkinson*, 544 U.S. 709, 720-21 (2005). Such coercion easily establishes a substantial burden under *Navajo Nation*. And in *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005), the incarcerated plaintiff was punished for refusing to cut his hair in violation of his religious beliefs—another exercise of coercion. Neither form of coercion is present here.[11]

---

[11] Plaintiffs also cite *Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cri. 1977), a pre-*Boerne* RFRA case involving the surreptitious taping of a prisoner's confession to a priest. But *Navajo Nation* stated that "*Mockaitis* cannot serve as precedent here" because of its subsequent overruling and because "*Mockaitis* did not define

The only case that supports Plaintiffs' argument is an unpublished district court case from another Circuit that never acknowledged *Lyng* and declined to follow *Navajo Nation*. *Comanche Nation v. United States*, 2008 WL 4426621 at *3 n.5 (W.D. Okla. Sept. 23, 2008). *Lyng* and *Navajo Nation* control here.

### E. Plaintiffs' theory has far-reaching and unworkable consequences.

As the Supreme Court explained, if individuals could subject to strict scrutiny any government action that conflicted with their religious beliefs—whether or not the government was coercing them or depriving them of a benefit—then public lands would be subjected to an unlimited "religious servitude." 485 U.S. at 452. Plaintiffs' testimony confirms the sweeping consequences that would follow from the principles for which they contend. Plaintiffs now describe this site as uniquely important and holy, *see, e.g.*, Brief at 12, but that is at odds with their earlier testimony.

When asked if there are "particular spots" where he performs religious ceremonies, Plaintiff Johnny Jackson replied, "No. Anywhere. Anywhere there. . . . It's all the same. . . . Like I told you, that whole valley is sacred to us." 4-ER-635-36. Plaintiff Wilbur Slockish testified that all areas where his ancestors lived and died were sacred to him, and that his religious practices were

---

substantial burden, let alone analyze the substantial burden standard under the *Sherbert/Yoder* framework restored in RFRA." 535 F.3d at 1074 n.15.

not tied to particular locations within that vast area: "So this whole area where our people were is sacred for those activities. . . . Wherever I decide I feel I need to talk to my creator, I can stop and do that. . . . So, yeah, the entire area is very sacred." 4-ER-715-16. When asked what he meant by "the entire area," he replied, "The entire state of Washington and Oregon where we utilize and trade." 4-ER-716.

Plaintiffs' beliefs cannot grant them the right to block government action on public land throughout the vast areas they hold sacred. *Navajo Nation*, 535 F.3d at 1063. If RFRA claimants like Plaintiffs need not show that the government is applying coercion *to them* by punishing them or depriving them of a right or benefit, then "any action the federal government were to take, including action on its own land, would be subject to the personalized oversight of millions of citizens. Each citizen would hold an individual veto to prohibit the government action solely because it offends his religious beliefs." *Navajo Nation*, 535 F.3d at 1063.[12]

---

[12] This Court's and the Supreme Court's warnings, *Lyng*, 485 U.S. at 452, cannot credibly be dismissed as unrealistic because prisoner cases under RFRA have not proved as burdensome as some predicted. Prisoner cases are held in check, not only by the required showing of a substantial burden, but also by the Prison Litigation Reform Act, 42 U.S.C. § 1997e. *See Cutter v. Wilkinson*, 544 U.S. at 723 & n.12.

As Plaintiffs' other claims in this appeal illustrate, many statutes permit judicial review of government land-use actions. If Plaintiffs had raised their concerns during the administrative process, and Defendants had nevertheless failed to protect the site, Plaintiffs could have challenged that decision under NEPA and other statutes. It is only because Plaintiffs did not participate in the administrative process that those claims are now waived. And if they had participated, the destruction of their sacred site could have been avoided in the first place.

### III. The Free Exercise Clause does not prohibit government land use that affects religious exercise.

Plaintiffs' Free Exercise argument fails for the same reason as their RFRA claim: there is no substantial burden. Plaintiffs argue that no such requirement exists in Free Exercise jurisprudence, but this Court rejected that argument in *California Parents v. Torlakson*, 973 F.3d 1010, 1019-20 (9th Cir. 2020), and the Supreme Court's most recent Free Exercise decision begins by noting, "[a]s an initial matter, it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs." *Fulton*, 2021 WL 2459253 at *4. And, of course, the Supreme Court has directly held that the "building of a road or the harvesting of timber on publicly owned land" does not violate the Free Exercise Clause because no-one is "coerced by the Government's action into

violating their religious beliefs; nor would [the] governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng*, 485 U.S. at 449.

Plaintiffs' Free Exercise argument also fails because Defendants' actions were neutral and generally applicable. Plaintiffs argue otherwise, asserting the novel claim that, because the Project mitigated impacts on wetlands, but did not protect their sacred site, it is not a "neutral law of general applicability." Plaintiffs' theory draws on but misapplies the principle, recognized in *Smith*, 494 U.S. at 884, *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537 (1993), and most recently and authoritatively expounded in *Fulton*, 2021 WL 2459253, that a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 2021 WL 2459253 at *5.

The Project easily satisfies those standards: it does not prohibit religious conduct, nor does it invite the government to consider the particular reasons for a person's conduct. Indeed, it does not "implicate the conduct of the individual" at all, which is the crux of why land-use actions and other internal government actions do not violate the Free Exercise Clause. *Fulton*, 2021 WL 2459253 at *16

(Alito, J., concurring) (distinguishing *Sherbert* from *Lyng* and *Roy*).

No court has ever held that environmental mitigation is an "exception" or "exemption" that renders a government land-use action discriminatory if it affects religious exercise, and there are several reasons this Court should not be the first. First, since virtually all government land-management actions include environmental mitigation measures, Plaintiffs' theory amounts to a wholesale reversal of *Lyng*'s central holding that such actions do not violate the First Amendment. *Lyng*, 485 U.S. at 452.

Second, under Plaintiffs' theory, the action in *Lyng* would not be neutral and generally applicable. *See Nw. Indian Cemetery Prot. Ass'n v. Peterson*, 795 F.2d 688, 697 (9th Cir. 1986) (describing environmental mitigation measures). But in *Trinity Lutheran*, the Supreme Court held up *Lyng* as an *example* of "neutral and generally applicable" government actions, which it distinguished from "those that single out the religious for disfavored treatment." 137 S. Ct. at 2020. And in *Fulton*, the majority cited *Lyng* as a *source* from which the "neutral and generally applicable standard" was drawn. 2021 WL 2459253 at *6.

Finally, Plaintiffs' argument ignores the reason this Project didn't include measures to protect the site: *Plaintiffs didn't tell the agencies about it*. It would be perverse to characterize that situation, which is of Plaintiffs' own making, as anti-religious discrimination.

IV.  **Plaintiffs' NEPA, NHPA, FLMPA, and Section 4(f) claims were waived and lack merit.**

A.  **Plaintiffs waived these claims.**

The exhaustion doctrine is a matter of "[s]imple fairness to those who are engaged in the tasks of administration." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). It "permit[s] administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) (citing *Buckingham v USDA*, 603 F.3d 1073, 1080 (9th Cir. 2010)). To allow agencies the opportunity to do so, litigants must raise their concerns "with sufficient clarity to allow the decision maker to understand and rule on the issue raised." *Buckingham*, 603 F.3d at 1080. Contrary to Plaintiffs' assertions, Brief at 62, the district court did not err in imposing an issue-exhaustion requirement.

1.  **Plaintiffs failed to raise these claims during the administrative process.**

Both the Supreme Court and this Court impose this requirement in administrative record cases when litigants had opportunity to comment on agency action during the administrative process. *See, e.g.*, *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978) ("[I]t is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and

contentions[.]"); *Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it alerts the agency to the parties' position and contentions,' in order to allow the agency to give the issue meaningful consideration."); *Buckingham*, 603 F.3d at 1073; *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 574 (9th Cir. 2016).[13]

Plaintiffs *only* comment during well-publicized two-year administrative process concerned the white stone pillars. 6-ER-1185. Plaintiffs did not "afford [Defendants] the opportunity to rectify" the very different concerns now alleged. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006).

Plaintiffs seek to excuse this failure by asserting that: (1) similar concerns were raised for a separate project in the 1980s; (2) some concerns were raised *after* the administrative process had closed; (3) federal defendants knew of some

---

[13] None of the concerns articulated in the Indian Law Scholars' amicus brief are present here. First, Plaintiffs made *no* attempt to notify Defendants of their concerns during the administrative process. Second, Defendants fully engaged with federally recognized Tribes during the process and repeatedly sought their input. Third, the record shows that when Plaintiffs *did* provide Defendants with information—on the stone pillars—Defendants acted in response. 6-ER-1185. Had Plaintiffs suggested that the Widen to the North alternative would impact cultural resources, Defendants would have responded accordingly. But Plaintiffs said nothing.

concerns; and (4) concerns about site vandalism. Brief at 65-69. None of these preserve their claims.

*First*, raising concerns about a *different* agency action decades earlier cannot preserve concerns about *this* Project. "As a general rule, we will not consider issues not presented before an administrative proceeding *at the appropriate time*." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010) (emphasis added).

Moreover, Jones' comments in the 1980s and '90s were inadequate to alert Defendants to Plaintiffs' current claims. From prior comments, Defendants knew that removal of large trees from Dwyer could be controversial, and they addressed it in the Revised EA. 6-ER-1238-48, 1255-66. But that general knowledge provided no notice of Plaintiffs' claims that the safety-related removal of 65 trees from Dwyer required an Environmental Impact Statement (EIS), or that it constituted a prohibited "timber harvest." Brief at 47-48, 57-59; 6-ER-1260. Similarly, Jones' decades-old comments that the rock feature was a "Native American or pioneer gravesite," 8-ER-1791, which was diligently investigated and determined to be untrue, did not alert Defendants to Plaintiffs' later claims about a sacred campsite and altar. The district court correctly found those arguments waived. 1-ER-78-79.

*Second*, Plaintiffs' comments made a year or more after the administrative process closed did not preserve their claims. *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1156 n.2 (9th Cir. 2008). Plaintiffs argue that Jones' and Logan's January and February 2008 comments were timely because they preceded BLM's issuance of a tree-cutting permit. They misread 23 U.S.C. §139(a)(3), which defines the "environmental review process" as the process for preparing a NEPA document, including "the process for and completion of any environmental permit, approval, review, or study required for a project" under other laws such as NHPA and FLPMA.

FHWA completed its NHPA, FLPMA, and Section 4(f) analyses at the same time as its NEPA document, so the "appropriate time" for objections to those analyses was during that public review process. At any rate, "[e]ven when Jones and Logan began calling and faxing documents to defendants in early 2008, . . . they sought to recognize 'all heritage resources' along the highway, including outside the project area." 1-ER-80 n.17. Even if timely (which they were not), Plaintiffs' comments were too broad and vague to preserve their claims.

*Third*, during the administrative process, no one, including the Tribes themselves, suggested it was improper for ODOT to conduct Tribal

49

consultation. No one suggested that BLM had to conduct its own, separate NEPA review rather than relying on ODOT's and FHWA's analysis of the Project, or that a Section 4(f) analysis was required. Because Defendants had no chance to address those concerns, they are waived.

*Fourth*, Plaintiffs' fear of vandalism cannot excuse their failure to timely raise their separate claims that the impact on trees required an EIS; that the Section 106 and tribal consultation processes were inadequate; that the tree removal was a prohibited "timber harvest"; or that a section 4(f) analysis was required.

Plaintiffs' unwillingness to publicly disclose the precise location of their sacred site is understandable, but the record establishes ODOT's earnest desire to avoid impacting sacred sites or burials, even based on generalized information. In 1991, Yakama Elder Wilferd Yallup described to ODOT the location of some burials outside this project area, but was twice interrupted by Jones, who opposed disclosing that information. 6-ER-1076, 1101. ODOT's Cultural Specialist explained that inadvertently disturbing burial sites "is really, really upsetting for all of us, believe me. And we don't want this to happen. Now if there's anyway that's better, like if we show you exactly where we are going to put something and you say that's o.k. and you don't say anything more, we don't have to know but do tell – do look at what we are doing and tell us is there

50

a danger here. . . . We don't have to know whether its cultural materials, burials, sacred grounds, what kind of significance it has. But just tell us no here." 6-ER-1101-02.

Plaintiffs could have commented privately about their sacred site.[14] At the very least they could have commented that widening to the north would impact cultural resources that widening to the south would not. But they said nothing, except about unrelated stone pillars, and thus gave Defendants no chance to address their concerns.

### 2. Defendants did not forfeit their waiver defense.

The district court correctly rejected Plaintiffs' argument that the waiver defense was forfeited. "In the absence of a showing of prejudice, an affirmative defense may be raised for the first time at summary judgment. There is no

---

[14] Plaintiffs imply that Defendants couldn't be trusted with the information, citing Jones' 2016 claim that, at a meeting in the 1990s, an ODOT official pointed to the rock feature on a map and said, "this is the reason why we can't widen the highway, is because of this pile of stones here," and that days later the site was vandalized. Brief at 16, 68; 3-ER-375. The district court rejected Jones' declaration recounting that tale as an impermissible attempt to recharacterize the record. 1-ER-65-66. It is not likely that anyone at ODOT would have said the "pile of stones" was the reason the highway couldn't be widened, because ODOT determined in 1986 that it was not a grave and not "worthy of either protection nor mitigation." 1-ER-18. The *trees* were why Highway 26 was built without a refuge lane in this area. 1-ER-20. Further, Plaintiffs' suggestion that they feared disclosing their sacred site to Defendants is inconsistent with their claim that Defendants already knew about it.

prejudice to a plaintiff where an affirmative defense would have been dispositive if asserted when the action was filed. Rather, a party must point to a tangible way in which it was prejudiced by the delay." *Garcia v. Salvation Army*, 918 F.3d at 1008-09 (cleaned up).

The district court found that Plaintiffs were not prejudiced. 1-ER-4, 68. Plaintiffs do not even attempt to show otherwise, Brief at 61-62, and so their waiver-of-waiver argument fails. 1-ER-5, 74-81.

### B. Plaintiffs' claims lack merit.

#### 1. Defendants complied with NEPA.

An interdisciplinary team from ODOT, FHWA, and BLM spent years scoping the Project, soliciting and reviewing multiple rounds of public comment and analyzing impacts to the human environment. 6-ER-1288-89. Through years of work this team produced a draft and Revised EA describing the Project's purpose and need, analyzing numerous alternatives, disclosing environmental consequences and describing mitigation measures to reduce environmental impacts. The EA included twenty-three technical reports on topics including archaeology, historical resources, and the potential effects on Dwyer. 6-ER-1189.

Public input was considered at each stage. Following years of review, Defendants concluded that the Project would not have a significant impact on

the environment and signed a FONSI. 6-ER-1162. This thorough analysis satisfied NEPA.

### a. No EIS was required.

Despite this robust process, Plaintiffs argue that an EIS was required because the trees removed were "unique." Brief at 47-49. But an EIS is not automatically required even if an area contains unique characteristics. *See, e.g.*, *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162 (9th Cir. 1998). The agency need only consider those characteristics, which the EA did. 6-ER-1238-48, 1255-66.

Moreover, agency staff is better equipped to determine what makes the Project area biologically "unique," and this Court should defer to their expertise. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (noting deference when a Court reviews scientific judgments and technical analyses within the agency's expertise under NEPA). Expert staff determined lichens and vascular plants present at the site made it "unique," 6-ER-1256, 1331, and analyzed impacts on them, 6-ER-1241, 1247, 1264, ultimately concluding no significant impact. 6-ER-1162, 1176. This Court should defer to the agency's view that no EIS was required.

**b.    The EAs rationally focused on reasonable alternatives based on information available at the time.**

"Judicial review" of alternatives considered "is governed by a 'rule of reason'" that is highly deferential. *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (citations omitted); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). Here the EA considered two alternatives in depth: "no action" and "widen to the north." 6-ER-1213. Four others, including widening to the south or in both directions, were considered but not developed further, as explained in the EA. 6-ER-1169, 1218-24. The EA also considered steeper slopes and a retaining wall as part of various mitigation alternatives, 6-ER-1265-66, but explains why they were not selected. 6-ER-1180, 1218-24.

Agency action must be judged on the record before the agency at the time of its decision; "post-decision information . . . may not be advanced as a new rationalization either for sustaining or attacking an agency's decision." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 603. If that record had included information about Plaintiffs' sacred site, then it would have been arbitrary and capricious for Defendants not to take it into account in choosing the Widen to the North alternative, or whether to use a retaining wall or steeper embankments. But that information was not before Defendants, and they made

a rational choice based on the information they had, after a thorough and inclusive public process. NEPA requires nothing more.

### c. BLM need not duplicate FHWA's environmental review.

Plaintiffs assert BLM had to prepare a separate EA, Brief at 46-47, but "when a lead agency prepares environmental statements, there is no need for other cooperating agencies involved in the action or project to duplicate that work." *LaFlamme v. FERC*, 945 F.2d 1124, 1130 (9th Cir. 1991); *accord* 40 C.F.R. §-1501.5. FHWA, as the lead federal agency, worked jointly with "an interdisciplinary team" of experts from ODOT and BLM. 6-ER-1212. The resulting EA satisfies the NEPA duties of all Defendants.

### 2. Defendants complied with NHPA.

"NHPA, like NEPA, is a procedural statute requiring government agencies to 'stop, look, and listen' before proceeding when their action will affect national historical assets." *Presidio Historical Ass'n v. Presidio Trust*, 811 F.3d 1154, 1169 (9th Cir. 2016) (cleaned up). Section 106 of NHPA[15] and its implementing regulations require agencies to make reasonable, good faith efforts to identify historic properties within the area of potential effects of an undertaking; to consult with SHPOs and federally recognized Tribes; and to

---

[15] NHPA was recodified in 2014. *See* 54 U.S.C. § 306108.

provide interested members of the public reasonable opportunity to comment. *Te-Moak Tribe v. Dep't of the Interior*, 608 F.3d 592, 607-08 (9th Cir. 2010); 1-ER-9-10.

ODOT, FHWA, and BLM worked together to coordinate environmental and historical review under Section 106 and NEPA, as regulations encourage. 36 C.F.R. § 800.8; 6-ER-1212. Under a programmatic agreement with FHWA, 7-ER-1461-71, ODOT consulted with the SHPO and federally recognized Tribal governments on behalf of Defendants. *See* 36 C.F.R. §§ 800.14(b), (b)(2)(i). The SHPO and Tribal governments expressed no concerns about the Project or the consultation, and concurred that no historical properties were affected. 6-ER-1358-59, FHWA 3346-61; FHWA-5641-43, FHWA-6569-70.

### a. BLM need not duplicate the Section 106 process.

Plaintiffs argue that BLM had to conduct a separate Section 106 analysis before issuing the tree-cutting permit, but that argument fails for the same reason as their parallel NEPA argument. An undertaking is defined, as relevant here, as "a project . . . requiring a Federal permit." 16 U.S.C. § 470w(7) (2013). Section 106 analysis is required for the *undertaking*, *i.e.*, the Project, not for each associated permit. Here, Defendants satisfied NHPA by cooperatively producing a thorough Section 106 process for the Project.

**b.    Defendants consulted with all affected Tribes.**

Pursuant to a programmatic agreement between FHWA, ODOT, the Oregon SHPO and ACHP, ODOT led the Project's Section 106 compliance, including consultation with Indian Tribes. No Tribe objected to either the form or substance of consultations, but Plaintiffs do, arguing that FHWA's consultation duties cannot be delegated to ODOT. But NHPA's "regulations extend the right to government-to-government consultation to the Tribe, not its individual members," so individual tribal members like Plaintiffs lack "standing to bring a claim for inadequate tribal consultation on behalf of the Tribe." *La Cuna De Aztlan Sacred Sites Prot. Circle v. U.S. Dep't of Interior,* 642 F. App'x 690, 692-93 (9th Cir. 2016).

Plaintiffs dispute that holding, but the cases they cite are inapposite. *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), involved whether the defendant's crimes were committed in "Indian country." *Id.* at 2459. *Herrera v. Wyoming*, 139 S. Ct. 1686 (2019), involved whether a member of a Tribe with treaty rights to hunt off-reservation could be prosecuted for violating state wildlife laws. *Id.* at 1693. In both, the defendants asserted *individual* interests to be free from criminal prosecution.

The Tribes were satisfied with the consultation process. The Grand Ronde stated the "Tribe's official position is that ODOT has done and followed the 106

and NEPA process. We have no fault with what they have done." 1-SER-191; 1-ER-50. It would "debase a tribe's sovereignty for a tribal member . . . to override a tribe's government-to-government consultation authority in what would amount to a veto of the tribe's official position." 1-ER-50.

Even if justiciable, Plaintiffs' argument is meritless. NHPA's implementing regulations expressly authorize such programmatic agreements. 36 C.F.R. § 800.14(b); 7-ER-1461-70. Plaintiffs' claim that BLM's Manual forbids delegation of tribal consultation is doubly irrelevant, because *FHWA* was the responsible federal agency and because "BLM manuals are not legally binding." *McMaster v. United States*, 731 F.3d 881, 888 (9th Cir. 2013).

Plaintiffs also argue ODOT's consultation with the Yakama Nation was untimely. But the Yakama Nation does not object, and Plaintiffs lack standing to object on their behalf. At any rate, any putative error is harmless. The Oregon Intertribal Commission initially advised ODOT to consult with the Grand Ronde, Siletz, and Warm Spring Tribes. 1-SER-3. When it was later suggested that the Yakama should also be consulted, ODOT did so. 1-ER-39-40, 43. The Yakama's Cultural Resource Coordinator responded that he didn't "see a reason for further consultation based on the scope, especially in light of the negative results of the extensive archaeological investigations conducted." 1-SER-197. Thus, even assuming that consultation was late, any such error was harmless.

### 3. BLM complied with FLPMA.

FLPMA requires BLM to "manage the public lands under principles of multiple use and sustained yield, in accordance with" Resource Management Plans (RMPs) developed by BLM, and to "prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(a), (b).

### a. BLM complied with Executive Order 13007.

Executive Order (E.O.) 13007 provides that agencies shall, "to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites." 61 Fed. Reg. 26,771 (May 24, 1996). It defines "sacred site" as

> any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; *provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.*

61 Fed. Reg. 26,771, § 1(b)(iii) (emphasis added).

Although E.O. 13007 does not "create any right . . . enforceable at law or equity . . . against the United States," *id.* § 4, this Court has held that "its requirements are incorporated into FLPMA by virtue of FLPMA's prohibition

on unnecessary or undue degradation of the lands." *Te-Moak Tribe v. Dep't of the Interior*, 565 F. App'x 665, 667 (9th Cir. 2014).[16]

Plaintiffs argue that Defendants violated FLPMA by violating E.O. 13007, but that argument fails for two independent reasons:

*First*, Plaintiffs are neither Tribes nor "appropriately authoritative representative[s] of an Indian religion." Jones was not Native American, nor a member of any Tribe, and never claimed to practice Native American religion. 1-ER-16; 1-SER-192. The Grand Ronde Tribe specifically informed Defendants that Logan spoke only for herself, 1-SER-195-96, and "there has been no showing that" Slockish and Jackson—whose federally recognized Tribes had no objection to the Project—"are 'appropriately authoritative representative[s]' of their religions" within the meaning of E.O. 13007. *South Fork Band v. Dep't of the Interior*, 2010 WL 3419181 at *9 n.7 (D. Nev. 2010).

*Second*, even assuming arguendo that Logan, Slockish, and Jackson were "appropriately authoritative representatives," they never "informed the agency of the existence" of a "specific, discrete, narrowly delineated location" with "established religious significance." 61 Fed. Reg. 26,771, § 1(b)(iii).

---

[16] Courts may also examine agencies' compliance with Executive Orders in examining whether they complied with NEPA, but Plaintiffs have raised no such NEPA claim here. *See Cmtys. Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004).

Plaintiffs argue that the site meets the definition because it "measured 100 by 30 meters" and "comprised specific, discrete features: a historic campground, altar, burial ground, old-growth trees, and medicinal plants." Brief at 56. But they can point to *nothing* in the record showing that they "specifically identified" that area to Defendants. *S. Fork Band*, 2010 WL 3419181, at *9 (rejecting "statements that refer generally to the Mt. Tenabo area."). When Plaintiffs belatedly objected, they sought protection of the *entire* "Dwyer Memorial Forest," the Oregon Trail, unspecified "Usual and Accustomed Places," and a long list of other places. 1-ER-80 n.17; 6-ER-1147-56; 5-ER-982-85. Plaintiffs cite Jones' comments about the alleged gravesite in the 1980s and '90s, Brief at 57, but Jones was not an "authoritative representative" of any Native religion, nor did his comments show the area had "established religious significance."

### b. Tree removal was consistent with the RMP and ORCA.

Plaintiffs argue that that BLM violated FLMPA in issuing the tree-cutting permit because ODOT's removal of approximately 65 trees in the Dwyer area right-of-way was an impermissible "timber harvest" that violated the RMP and the Oregon Resources Conservation Act of 1996 (ORCA).[17] Brief at 67-68; 6-

---

[17] Plaintiffs also cite an inapplicable regulation pertaining to mining operations, Brief at 56 (citing 43 C.F.R. § 3809.5).

ER-1260. "Timber harvest" is not permitted in Dwyer, but Plaintiffs err in equating that prohibition with a complete ban on tree removal. 8-ER-1595. If that were the case, BLM would not even be able to remove hazard trees that threaten life or property.

The RMP does not define "timber harvest," but context—and the ordinary meaning of "harvest"—make clear that it refers to cutting trees to obtain "forest products." 8-ER-1562. When the RMP mentions the removal of "trees along rights-of-way if they are a hazard to public safety," it does not refer to that as a "timber harvest." 8-ER-1578.[18] It refers to it simply as "Fall[ing] trees." *Id.*

Here, trees were cut only as necessary to facilitate the highway expansion and safe operation. 1-SER-202. The felled trees did not become "forest products," but remained federal property. *Id.* The permit, under these terms and with these purposes, did not violate the RMP's or ORCA's restrictions against "timber harvest" in Dwyer.

---

[18] This section of the RMP is about late-successional reserves, a category that does not include Dwyer. The point is simply that the RMP does not categorize felling trees for safety in a right-of-way as "timber harvest."

### 4. Section 4(f) does not apply to Dwyer.

If a transportation project will require use of a "public park or recreation area" of "national, State, or local significance," FHWA must ensure that 1) there is no prudent and feasible alternative to using that land; and 2) the project includes all possible planning to minimize harm to the park or recreation area. 49 U.S.C. § 303(c) ("Section 4(f)").

The Dwyer Area is a five-acre triangular parcel on the north side of Highway 26. Immediately opposite, on the south side, is the 550-acre Wildwood Recreation Site. 6-ER-1331; 7-ER-1417 (map); https://www.blm.gov/visit/wildwood-recreation-site. Both are managed by BLM. The Wildwood Recreation Site, as its name implies, *is* a recreation area, and that is part of why the Widen to the South alternative was dismissed. 6-ER-1220. Dwyer, however, is "not used for any recreation purposes due to its isolation from the majority of the recreation area on the south side of the highway." 1-SER-2; 6-ER-1331.

As BLM explained in 1986, both Dwyer and Wildwood are covered by the same Public Land Order withdrawing them from mineral location and other claims, but "[t]he public land north of the existing highway right-of-way is not used as a recreation site and there are no plans for its future use as a recreation site." 7-ER-1426. The RMP designates Dwyer as a "Special Area" managed for

63

"scenic and botanical values." Because Dwyer is not a recreation area, Plaintiffs' 4(f) claim, in addition to being waived, is meritless.

## CONCLUSION

For the foregoing reasons, this case should be dismissed as moot. In the alternative, the district court's judgment should be affirmed.

Respectfully submitted,

s/Katelin Shugart-Schmidt
JEAN E. WILLIAMS
*Acting Assistant Attorney General*
ANDREW C. MERGEN
REUBEN S. SCHIFMAN
ALLEN BRABENDER
JOAN M. PEPIN
KATELIN SHUGART-SCHMIDT
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice

June 25, 2021
90-2-4-12757

## STATEMENT OF RELATED CASES

*Apache Stronghold v. United States*, 9th Cir. No. 21-15295, is related within the meaning of Circuit Rule 28-2.6 because it has an issue in common with this case, specifically, whether a federal land-use decision imposed a substantial burden on religious practitioners in violation of RFRA and the Free Exercise Clause.

## Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**        21-35220

I am the attorney or self-represented party.

**This brief contains 13,912 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ Katelin Shugart-Schmidt

**Date**        June 25, 2021